**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| TOM MILLIKEN, derivatively on behalf of HOSPITALITY INVESTORS TRUST, INC., | ) ) ) ) | **No.** |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| AMERICAN REALTY CAPITAL HOSPITALITY ADVISORS, LLC, AMERICAN REALTY CAPITAL HOSPITALITY PROPERTIES, LLC, AMERICAN REALTY CAPITAL HOSPITALITY GRACE PORTFOLIO, LLC, AR CAPITAL, LLC, AR GLOBAL INVESTMENTS, LLC, NICHOLAS A. SCHORSCH, WILLIAM M. KAHANE, PETER M. BUDKO, EDWARD M. WEIL, BRIAN S. BLOCK, JONATHAN P. MEHLMAN, EDWARD T. HOGANSON, STANLEY R. PERLA, ABBY M. WENZEL, AND ROBERT H. BURNS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants, | ) ) | |
| -and- | ) ) | |
| HOSPITALITY INVESTORS TRUST, INC., | ) ) | |
| Nominal Defendant. | | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

Plaintiff Tom Milliken ("Plaintiff"), derivatively on behalf of Hospitality Investors Trust, Inc. ("HIT" or the "Company"), by and through his undersigned counsel, upon knowledge as to himself, and as to all other matters upon information and belief and investigation of counsel, alleges as follows:

1

## OVERVIEW OF CLAIMS AND PROCEDURAL HISTORY

1.      The Company's primary business purpose is to invest in lodging properties within the real estate hospitality sector; as of September 30, 2017 the Company had acquired or had an interest in 148 hotel properties.  The Company operates as a public, non-traded real estate investment trust ("REIT"), meaning that it is: "public" because it is registered with the Securities and Exchange Commission ("SEC"), sold its stock to the investing public rather than only to qualified investors, and is required to file reports with the SEC; and "non-traded" because its common stock is not listed on any national securities exchange and there is no public market for it.  Until March 2017, the Company had no employees; rather, its day-to-day affairs were managed by its external advisor, American Realty Capital Hospitality Advisors, LLC (the "Advisor").

2.      HIT was formed in July 2013 as "American Realty Capital Hospitality Trust, Inc." by its sponsor American Realty Capital IX, LLC (the "Sponsor").  The Sponsor is owned by Defendant AR Capital, LLC and/or its successor, Defendant AR Global, Investments LLC. (AR Capital, LLC and AR Global Investments, LLC are referred to collectively as "AR Capital.")  AR Capital was formed in 2007 by Defendants Nicholas A. Schorsch ("Schorsch") and William H. Kahane ("Kahane") and is majority-owned by Defendant Schorsch and his wife Shelley Schorsch.  Its remaining ownership interests are held by Defendants Kahane, Peter M. Budko ("Budko"), Edward M. Weil ("Weil"), and Brian S. Block ("Block"). Certain of these individuals also acted as the Company's executive officers, as well as directors of the Company ("Directors") at various relevant times.  AR Capital also ultimately owns the Advisor and the Company's former property managers, Defendants American Realty Capital Hospitality Properties, LLC and American Realty Capital Hospitality Grace Portfolio, LLC (collectively the

2

"Property Managers").

3.      The Company's management structure resulted in inherent conflicts of interest between the Company (on the one hand) and the Advisor, the Property Managers, AR Capital, and AR Capital's owners (on the other hand).   For example, as set forth in detail *infra*, the Advisor received acquisition fees on the Company's acquisition of properties; Defendants caused the Company to pursue a reckless property acquisition campaign in order to maximize these acquisition fees.   Further, Defendants caused the Company to enter into long term property management agreement with the Property Managers requiring the Company to pay management fees at rates that were grossly uncompetitive and unfair for the Company.

4.      Between 2007 and 2014, AR Capital and its affiliates were prolific players in the non-traded REIT industry: they sponsored and provided management services to numerous other non-traded REITs and direct investment programs.   Through a securities broker-dealer firm that AR Capital owned, Realty Capital Securities, LLC ("RCS"), which contracted with other securities broker-dealer firms to distribute the securities, AR Capital raised from investors over $20 billion for AR Capital-sponsored REITs and direct investment programs.   RCS was the broker-dealer for HIT.

5.      Since October 2014, AR Capital and its affiliates have been plagued by various scandals that have prevented AR Capital-sponsored entities from continuing to raise investor capital:

(a) In October 2014, American Realty Capital Properties, Inc. ("ARCP"), an AR Capital-sponsored REIT which at that time was listed on the NASDAQ Capital Market ("NASDAQ"), disclosed in an SEC filing that its prior-filed financial statements "should no longer be relied upon" based upon findings by Ernst & Yong which had been hired in

3

September 2014 to conduct an internal investigation.   An ARCP internal investigation revealed that ARCP executives had engaged in fraud in the calculation of adjusted funds from operations ("AFFO"), a critical measure of REIT operating performance, and had caused ARCP to misrepresent AFFO in SEC filings. Subsequently, Defendant Block, who was also an ARCP executive, was found guilty of securities fraud in June 2017 and sentenced to 18 months in prison. Another ARCP executive pled guilty to securities fraud and made a sworn statement that Defendant Schorsch had directed the ARCP fraud.

(b) In November 2014, numerous securities broker-dealer firms announced their suspension of sales of all AR Capital-sponsored products; by November 24, 2014, 68 broker-dealer firms had suspending selling agreements with RCS.

(c) On December 18, 2014, a former ARCP employee filed a complaint in New York State court against ARCP, Schorsch and others, detailing the above misconduct.

(d) In December 2014, Schorsch resigned from the boards of directors of RCS, ARCP and other AR Capital-sponsored investment programs, including HIT.

(e) On December 15, 2014 ARCP publicly announced through an 8-K filing its "unwinding [of all] of its relationships with entities in which Mr. Schorsch maintains an executive or director-level role or is a significant stockholder" in an effort to "demonstrate the conviction of the [ARCP] independent board members to reset its senior leadership and governance, [and] increase transparency."

6.      Schorsch resigned from the Company's Board on December 29, 2014.  Despite Schorsch's resignation, entities and individuals affiliated with AR Capital, including the Advisor, have continued to control the Company. Defendant Kahane, one of AR Capital's owners, was in fact appointed as chairman of HIT's Board on December 29, 2014 to take

Schorsch's place.

7.     More negative information concerning ARCP and AR Capital affiliates came to light in 2015:

(a) On March 2, 2015, ARCP announced the completion of its audit committee's investigation which included addressing issues relating to payments to, and transactions with, affiliates of the parent of its sponsor and certain equity awards to certain officers and directors, and disclosed that the audit committee investigation had found material weaknesses in ARCP's internal control over financial reporting and its disclosure controls and procedures.

(b) On March 31, 2015, a HIT's 2014 Form 10-K revealed that: (1) "*Disclosures made by [ARCP] an entity previously sponsored by the parent of our Sponsor may adversely affect our ability to raise substantial funds"*; and (2) "*Since the initial announcement in October*, a number of participating broker-dealers *temporarily suspended their participation in the distribution of our Offering*. Although certain of these broker-dealers have reinstated their participation, we cannot predict the length of time *the remaining temporary suspensions will continue* or whether all participating broker-dealers will reinstate their participation in the distribution of our Offering. As a result, our ability to raise substantial funds may be adversely impacted." (Emphasis added.)

(c) In November 2015 it came to light that AR Capital and RCS had engaged in proxy fraud in an attempt to sell off a 60% stake in AR Capital to a private investment fund for almost $900 million earlier in 2015.  The deal was contingent upon the amendment of the advisory agreements that existed between AR Capital-sponsored

5

investment programs and their AR Capital owned external advisors; the advisory agreements could not be amended without charter amendments which required shareholder approval.  Following an investigation that commenced in June 2015, the Massachusetts Secretary of State Securities Division ("Mass SOS") filed an administrative complaint against RCS in November 2015 seeking to suspend RCS's broker-dealer license on the basis of RCS having engaged in proxy fraud in order to try to secure the vote.   An internal investigation revealed that AR Capital had directed RCS to engage in the misconduct constituting proxy fraud.

(d) On November 8, 2015, AR Capital's attempt to sell a 60% stake in itself to a private investment fund was abandoned.

8.     These scandals made it impossible for AR Capital-sponsored entities to continue raising investor capital.  In November 2015, the Company was forced to discontinue its initial public offering ("IPO").

9.     Immediately before the Company discontinued its IPO, Defendants materially altered the Advisory Agreement (defined below) between HIT and the Advisor to require HIT to pay unconditional asset management fees to the Advisor.     The Advisory Agreement had previously required the Company to pay asset management fees in the form of Class B Units in the Company's Operating Partnership (defined below); these Class B units were subordinated, resulting in value to the Advisor only if the Company exceeded a set performance hurdle.   The Company's Charter in fact prohibits payment of unconditional asset management fees.   The independent Directors approved the unjustified change to the Advisory Agreement, failing to ensure that the fees were within the limits prescribed by the Charter in dereliction of their fiduciary duty to the Company.   HIT subsequently paid over $26 million in cash asset

6

management fees.  (The claims relating to the Company's payment of unconditional cash asset management fees are referred to as the "Cash Asset Management Fee Claims.")

10.     The Company faced a severe liquidity crisis following the suspension of its IPO. The IPO had been the Company's primary source of operating capital.  Further, the Company had significant financial obligations as a result of a reckless property acquisition campaign that Defendants had caused the Company to undertake; the Company relied upon the IPO to meet these obligations.  The Company had in fact agreed to close on the sale of numerous properties between December 2015 and February 2016.  As a result of the liquidity crisis resulting from the forced suspension of the IPO, the Company was forced to forfeit a $41.1 million earnest money deposit and to seek a recapitalization.  The Company's payment of cash asset management fees to the Advisor, which commenced current with the suspension of its IPO, contributed significantly to its financial problems.

11.     In January 2017 the Company announced that a private investment fund (the "Brookfield Investor"), managed by affiliates of Brookfield Asset Management ("Brookfield"), would make a $300 million preferred equity investment in the Company's Operating Partnership (defined below).  As discussed in detail *infra,* the Brookfield Investor is entitled to distributions at the rate of 12.5% per annum and has been afforded substantial control over the Company; these terms are detrimental to the Company and its stockholders. The Company has suspended payments of stockholder distributions indefinitely and currently reports that the estimated value of the Company's stock is $13.20 per share, a dramatic decline from the $25.00 per share price for which the stock was sold through the IPO.  HIT recently concluded a self-tender offer to purchase its shares at a price of $6.75 per share.

12.     The capital infusion from the Brookfield Investor created an opportunity for

7

Schorsch and his affiliates to implement a lucrative exit strategy for the Advisor and Property Managers at HIT's expense.  Concurrent with the acceptance of the Brookfield Investor, the Company's property management arrangements – through which the Company paid management fees to the Property Managers at a grossly uncompetitive rate – were restructured; the restructuring of these arrangements had the effect of bringing them in line with the competitive market.  As consideration for the restructuring of the property management arrangements, the Company is obligated to pay compensation to the Advisor and Property Managers totaling approximately $37 million.  These payments have been financed in part through capital received from the Brookfield Investor. (The Company's claims arising from its entry into property management agreements with the Property Managers through which it paid property management fees at grossly uncompetitive rates, and its payment of compensation to the Advisor and Property Managers to restructure these uncompetitive are referred to as the "Property Management Arrangement Claims.")

13.     Defendants also caused the Company to enter into the Mutual Waiver and Release dated March 31, 2017, through which HIT purportedly released the Advisor, Property Managers, AR Capital, AR Capital's members, Company officers and certain Company Directors from all claims, losses, and proceedings. The Mutual Waiver and Release is void and unenforceable for lack of consideration.  Defendants acted in bad faith and breached fiduciary duties when they caused the Company to enter into it.  (This claims arising from this challenged conduct are referred to as the "Release Claims.")

14.     On July 14, 2017, Plaintiff sent a demand letter (the "July 2017 Demand Letter") (Ex. A.) to the chair of the Company's Board demanding that the Board investigate and take action with respect to certain claims belonging to the Company, including the Cash Asset

Management Fee Claims. Plaintiff's counsel subsequently had an in-person meeting with the Company's counsel on August 8, 2017. Following the meeting, Plaintiff made a request to the Board for confidential documents relating to the claims identified in the July 2017 Demand Letter; the Company subsequently produced certain confidential documents subject to a confidentiality agreement. Plaintiff's counsel then had a second in-person meeting with the Company's counsel on December 9, 2017. On December 12, 2017, Plaintiff sent a second demand letter (the "December 2017 Demand")[1] demanding that the Board investigate and take action with respect to the Property Management Arrangement Claims.

15.     The Board has failed to take any formal action whatsoever responsive to either the July 2017 Demand or the December 2017 Demand. As there has been more than a reasonable amount of time to investigate and make a decision with respect to the demands, including with respect to the Cash Asset Management Fee Claims and the Property Management Arrangement Claims, and as the Board has failed to take any formal responsive action, Plaintiff has standing to pursue the claims identified in the July 2017 Demand and December 2017 derivatively. Moreover, as the Board has failed to take any action responsive to the July 2017 Demand or December 2017 Demand, demand is excused as futile with respect to the Release Claims that Plaintiff may otherwise have been required to make.

16.     Accordingly, Plaintiff asserts derivative claims on behalf of HIT for Breach of Fiduciary Duty (Count I); Waste (Count II); Aiding and Abetting (Count III); Breach of Contract – Charter (Count IV); Unjust Enrichment (Count V); and Declaratory Judgment (Count VI).

---

[1] Plaintiff does not include a copy of the December 2017 Demand herewith because it contains information that may be deemed non-public.

## PARTIES

### I.    The Plaintiff

17.    Plaintiff Tom Milliken is an individual who is a resident of the State of Florida. Plaintiff is a current stockholder of HIT and has continuously held HIT stock since August 19, 2014.  Plaintiff Milliken was a stockholder at the time of the transactions complained of herein. Milliken had no knowledge of the claims asserted herein prior to June 2017.

### II.    The Nominal Defendant

18.    Nominal Defendant HIT is a Maryland corporation that was formed on or about July 25, 2013.  HIT was known as American Realty Capital Hospitality Trust, Inc. from its formation until on or about March 31, 2017, when HIT filed an Articles of Amendment to its Charter through which it changed its name to Hospitality Investors Trust, Inc.  Since its inception, HIT's principal executive offices have been located in New York, New York, and are currently located at 450 Park Avenue, Suite 1400, New York, New York, 10022.

### III.    The Fiduciary Defendants

19.    Defendants American Realty Capital Hospitality Advisors, LLC (the "Advisor"), Schorsch, Kahane, Jonathan P. Mehlman ("Mehlman"), Edward T. Hoganson ("Hoganson"), Abby M. Wenzel ("Wenzel"), Stanley R. Perla ("Perla"), and Robert H. Burns ("Burns") are referred to collectively as the "Fiduciary Defendants."

20.     The Advisor is a Delaware limited liability company that was formed on or about July 23, 2013.  The Advisor was the Company's external Advisor from the Company's inception until the Advisory Agreement was terminated in March 2017.

21.    Defendant Schorsch is an individual who upon information and belief is a resident of the State of New York.  Schorsch served as a Director of the Company and as chairman of the

Company's Board from its inception until December 29, 2014.  Upon information and belief, Schorsch owns a 56.2% membership interest in AR Capital and his wife, Shelly Schorsch, owns an additional 7.54% membership interest in AR Capital.

22.     Defendant Kahane is an individual who upon information and belief is a resident of the State of New York.  Kahane served as a Director of the Company from its inception until March 31, 2017 and as the chief executive officer and president of the Company from November 20, 2014 until March 31, 2017.  Upon information and belief, Kahane owns a 13.5% membership interest in AR Capital.

23.     Defendant Mehlman is an individual who has served as chief executive officer and president of the Company since November 20, 2014.  From the Company's inception until March 31, 2017, Mehlman served as executive vice president and chief investment officer of the Company.

24.     Defendant Hoganson is an individual who upon information and belief is a resident of the State of New York.  Hoganson has served as the Company's chief financial officer, treasurer, and secretary since December 15, 2014.

25.     Defendant Wenzel is an individual who upon information and belief is a resident of the State of New York.  Wenzel has served as an Independent Director (defined below) of the Company since September 2013.

26.     Defendant Perla is an individual who upon information and belief is a resident of the State of New York.  Perla has served as an Independent Director of the Company since January 15, 2014.

27.     Defendant Burns is an individual who upon information and belief is a United States citizen who currently resides in the United Arab Emirates.  Burns served as an

11

Independent Director of the Company from September 12, 2014 until March 31, 2017.

28.     By reason of their positions as officers, Directors, and/or fiduciaries of HIT, and because of their ability to control the business and corporate affairs of HIT, the Fiduciary Defendants owed HIT fiduciary obligations, and were required to use their utmost ability to control and manage HIT in a fair, just, honest, and equitable manner.

29.     Further, the Fiduciary Defendants were required to act in furtherance of the best interests of HIT and in compliance with HIT's Charter, and not in furtherance of their personal interest or benefit. Each Director and officer of the Company owed to HIT the fiduciary duty to exercise good faith and due diligence in the administration of the Company's affairs, and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

30.     Through their control and authority as Directors, advisors,  and/or officers of HIT, the Fiduciary Defendants exercised control, directly and/or indirectly exercise, over the wrongful acts complained of herein. The Fiduciary Defendants failed to discharge their duties, and failed to exercise reasonable and prudent supervision over the management, policies, practices and controls of HIT.

**IV.     The AR Capital Defendants**

31.      Defendants AR Capital, LLC and AR Global, LLC (collectively "AR Capital") and Defendants Budko, Weil, and Block are referred to collectively as the "AR Capital Defendants."

32.     Defendant AR Capital, LLC is a Delaware limited liability company that was formed on or about December 27, 2012.

33.     Defendant AR Global Investments, LLC is a Delaware limited liability company that was formed on or about August 5, 2015.  AR Global Investments, LLC is the successor to

AR Capital, LLC.

34.     Defendant Budko is an individual who upon information is a resident of the State of New York, and owns a 16.4% membership interest in AR Capital.

35.     Defendant Weil is an individual who upon information and belief is a resident of the State of New York, and owns a 3.51% membership interest in AR Capital.

36.     Defendant Brian S. Block ("Block") is and individual who upon information and belief is a resident of the State of New York, and owns a 3.03% membership interest in AR Capital.

**V.      The Property Manager Defendants**

37.     Defendants American Realty Capital Hospitality Properties, LLC and American Realty Capital Hospitality Grace Portfolio, LLC may be referred to collectively as either the "Property Managers" or "Property Manager Defendants."

38.     Defendant American Realty Capital Hospitality Properties, LLC is a Delaware limited liability company that was formed on or about August 13, 2013.

39.     Defendant American Realty Capital Hospitality Grace Portfolio, LLC is a Delaware limited liability company that was formed on or about September 11, 2014.

**JURISDICTION AND VENUE**

40.     The Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a) because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

41.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

42.     The Court has jurisdiction over each Defendant named herein because each

Defendant is either an entity that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

43.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because a substantial portion of the transactions and wrongs complained of herein, including Defendants' participations in the wrongful acts detailed herein, occurred in this District and HIT maintains its principal executive offices in this District.  Further, Defendants either reside in or maintain executive offices in this District, and/or have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## SUBSTANTIVE ALLEGATIONS

## I.     Overview of the Company's History

### A.     The Company's Formation and Securities Offering

44.     HIT was formed by the Sponsor on July 25, 2013.  The Sponsor is a wholly-owned subsidiary of AR Capital.

45.     The Company's original stated business objective was to "to acquire lodging properties in the midscale limited service, extended stay, select service, upscale select service, and upper upscale full-service segments within the hospitality sector."

46.     However, the Company reports that following the suspension of its IPO in 2015, its "primary business objective has been a focus on meeting [its] capital requirements and on maximizing the value of [its] existing portfolio by continuing to invest in [its] hotels primarily through brand-mandated property improvement plans ('PIPs'), and through intensive asset

management."

47.     The Company sold shares of common stock primarily to retail investors through independent securities broker-dealer firms that had entered into distribution agreements with RCS.  The Company reports that there were approximately 38.5 million shares of the Company's common stock outstanding as of December 31, 2016 and that the Company had received gross proceeds of approximately $913 million through its IPO and through its distribution reinvestment program ("DRIP") net of the Company's repurchases of shares. The IPO was abruptly suspended on November 15, 2015 and was terminated on January 7, 2017.  The DRIP was suspended on January 7, 2017.

**B.      Pertinent Statements in the Company's Offering Documents**

48.     The Company utilized prospectuses in connection with the IPO which were filed with the SEC on Form 424B3 on January 10, 2014 and on April 29, 2015.

49.     The prospectuses set forth all of the types of compensation that the Company may pay to the Advisor or its affiliates in accordance with the Advisory Agreement (defined below), the Operating Partnership Agreement (defined below), and the Charter.  The prospectuses describe that the Company would pay performance-based asset management fees to the Advisor in the form of Class B Units in the Company's Operating Partnership (defined below).

50.     The prospectuses make clear that unconditional asset management fees payable in cash are not among the types of compensation that the Company may pay to the Advisor.  The prospectuses in fact explicitly state that the Advisor may not elect to have asset management fees paid in cash: "[i]n the sole discretion of our advisor, the advisor may elect to have certain fees and commissions (<u>not including any asset management fees</u>) paid, in whole or in part, in cash or shares of our common stock." (Emphasis added.)

15

51.    The Company therefore sold stock through the IPO on the basis of the representation that the Advisor would receive only performance-based asset management fees. This was a primary selling point and allowed the Company to raise significant capital within a short period of time.

### C.    The Company's Operating Partnership and Management Structure

52.    HIT is structured as an umbrella limited partnership meaning that its business is conducted through an operating partnership, Hospitality Investors Trust Operating Partnership, L.P., (the "Operating Partnership")[2], of which the Company is the general partner.   The Operating Partnership was formed on July 24, 2013.   HIT contributed the net proceeds of the capital raised from its stockholders to the Operating Partnership through which it made investments in real estate beginning on March 21, 2014.

53.    From its inception until March 31, 2017, the Company had no employees. Instead, the Advisor managed the Company's business affairs and controlled its day-to-day operations pursuant to the Advisory Agreement by and among the Company, the Operating Partnership, and the Advisor ("Advisory Agreement").

54.    Through an internalization agreement that became effective as of March 31, 2017, the Advisory Agreement was terminated, the Company directly hired many of the Advisor's employees, and the Company became self-managed.

---

[2] The Operating Partnership was known as American Realty Capital Hospitality Operating Partnership, L.P. from its inception until March 31, 2017.

**D.      The Company's Operative Agreements: Charter, Advisory Agreement, Operating Partnership Agreement, and Property Management Agreements**

55.      The Company's Charter specifies that the Directors serve, and the Advisor served, in fiduciary capacities to the Company with fiduciary duties owing to the Company's stockholders.  The Charter further specifies that the Directors had a fiduciary duty to supervise the relationship between the Advisor and the Company.  In addition, the Advisory Agreement specifies that the Advisor stood in a fiduciary relationship with the Company and with the Company's stockholders.

56.      The Charter sets forth the categories of fees that the Company may pay to the Advisor and its affiliates.  These are limited to acquisition fees on the purchase of properties, disposition fees on the sale of properties, incentive fees, and annual subordinated performance fees, the Company's payment of which is conditional upon: (i) receipt by the Company's stockholders of a 6% cumulative, pre-tax, non-compounded annual return on their contributions; and (ii) the return of the stockholders' capital contributions back to them.  The Charter, however, does not permit the Company to pay any asset management fees to the Advisor or its affiliates beyond the annual subordinated performance fee.

57.      The Charter defines an "Independent Director" as one who has not had an ownership interest in the Sponsor, Advisor, or their affiliates within the past two years.  The Charter requires that the majority of the Board be comprised of Independent Directors from and after the commencement of the Company's IPO.  The Charter further requires the Independent Directors to ensure that the fees that the Company pays to the Advisor and its affiliates are within the limits prescribed by the Charter.

58.      The Charter specifies that the Company shall neither indemnify nor hold harmless

17

an Independent Director for loss or liability suffered by the Company resulting from the Independent Director's bad faith conduct or gross negligence.  Further, the Charter specifies that the Company shall neither indemnify nor hold harmless a Company officer or Director (who does not qualify as an Independent Director) for loss or liability suffered by the Company resulting from the officer or Director's bad faith conduct or negligence.

59.    The Advisory Agreement required the Company to pay the Advisor acquisition fees at the rate of 1.5% of the contract purchase price of the asset.  Prior to its amendment in November 2015 (*see* **Section II** *infra*), the Advisory Agreement also required the Company to pay the Advisor asset management fees in the form of subordinated profits interests in the Company's Operating Partnership pursuant to the terms of the Agreement of Limited Partnership of the Operating Partnership ("Operating Partnership Agreement").

60.    Prior to its amendment in November 2015[3], the Operating Partnership Agreement specified that: (i) the Operating Partnership shall issue the Advisor Class B Units in the Operating Partnership on a  quarterly basis; (ii) the Class B Units shall remain restricted until the Company's stockholders have received a 6% cumulative, pre-tax, non-compounded annual return on their contribution, until the stockholders' capital contributions have been returned back to them (the "Economic Hurdle") and until either a liquidity event occurs or until the Advisory Agreement is terminated concurrent with or subsequent to the Economic Hurdle having been met; and (iii) that the Class B Units shall be forfeited upon the occurrence of a liquidity event or upon the termination of the Advisory Agreement if the Economic Hurdles has not been met.  The

---

[3] The November 15, 2015 amendment to the Operating Partnership Agreement states that the Advisor would only receive Class B Units until the end of the quarter ending September 30, 2015.

18

Company's payment of performance-based asset management fees to the Advisor in the form of Class B Units in the Operating Partnership, through which the Advisor will realize value only when the Economic hurdle has been met, appears to be consistent with and permissible under the Charter.

61.     The Defendants caused HIT to enter into primary property management arrangements requiring HIT to pay base property management fees at the rate of 4.0% of gross revenue to one of the Property Managers.  The Property Managers then paid a sub-manager a base management fee between 2.0% and 3.25% of gross revenue to a sub-manager pursuant to sub management agreement.  The sub-property manager was either Crestline Hotels & Resorts, LLC ("Crestline") an affiliate of the Advisor and Property Managers owned by AR Capital, or an unaffiliated, third-party manager.  Crestline received a base management fee of 3.25% of gross revenue.  The unaffiliated managers typically received a base management fee of 2.0% of gross revenue.  As set forth in detail in **Section III** *infra,* the property management arrangements were grossly unfair to the Company.

### E.     The Fiduciary Defendants Led the Company on a Reckless Property Acquisition Campaign

62.     In May 2014, the Company entered into an agreement to acquire a portfolio of 116 hotel properties (the "Grace Portfolio") from W2007 Grace Acquisition I, Inc. and completed the acquisition on February 27, 2015.  The properties comprising the Grace Portfolio were limited service hotels.

63.     The total purchase price of the Grace Portfolio was approximately $1.8 billion exclusive of closing costs.  Through December 31, 2015, the Company had raised only approximately $375.1 million in the IPO.  The purchase was funded with approximately $230

million of cash, raised through the IPO, and approximately $1.131 billion of debt, including a $102.8 million mezzanine loan with an outside maturity date of May 1, 2019. The balance was funded through the issuance of $447.1 million of preferred equity interests to the sellers which the Company must redeem in full by February 27, 2019. Pursuant to the agreement with the preferred equity investor, the Company was required to use 35% of future proceeds from the IPO to redeem the preferred equity investor. The Grace Portfolio acquisition therefore saddled the Company with extremely onerous financial obligations and put tremendous pressure on the Company to raise capital through the IPO in order to satisfy its debt obligations and obligations to the preferred equity investor.

64.     In order to acquire the Grace Portfolio, the Independent Directors waived a Charter provision requiring that the Company's real estate asset portfolio leverage shall not exceed 300%. When HIT completed the Grace Portfolio acquisition on February 27, 2015, it reported that HIT's total portfolio leverage was 538%, meaning that the debt-to-equity ratio for the assets in its total real estate portfolio exceeded 5-1. The 538% calculation did not account for the fact that $447.1 of the purchase price of the Grace Portfolio was financed through the Company's issuance of preferred equity securities which the Company was required to fully redeem within four years. HIT's financing of the acquisition through these preferred equity securities imposed financial obligation upon HIT indistinguishable from unsecured debt financing as a practical matter. Taking into account the $447.1 million of financing through the issuance of preferred equity securities, the portfolio leverage was substantially greater than 538%.

65.     In June 2015, HIT entered into agreements to acquire a total of 44 additional hotels from three separate sellers for a total purchase price of $739.8 million. These acquisitions

are referred to in HIT's SEC filings as the "SWN Acquisitions."   On October 10, 2015, HIT completed the acquisition of 10 of the hotels for a total price of $150.1 million and on November 2, 2015, completed the acquisition of two hotels for a total price of $46.8 million.   HIT was unable to complete the acquisition of all of the remaining hotels, and was thereby forced to forfeit a $41.1 million earnest money deposit.

66.   HIT's acquisition campaign, which caused it to exceed the Charter's real estate asset portfolio leverage cap, was driven by the Advisor and AR Capital's desire to maximize acquisition fees.   Through December 31, 2015, HIT reported that the amount of acquisition fees and financing coordinating fees paid to the Advisor, and the amount of acquisition costs reimbursed to the Advisor, totaled approximately $52.5 million.   Through the IPO, HIT raised a total of approximately $797.9 million net of selling commissions; HIT's payment of acquisition fees through December 31, 2015 represented approximately 6.6% of the net proceeds from the IPO.

> **F.    The Company Was Forced to Suspend Its IPO As a Result Of the ARCP Accounting Fraud Scandal and the RCS Proxy Fraud Scandal**

67.   On October 29, 2014, ARCP filed a Form 8-K Current Report revealing that its audit committee had hired the accounting firm of Ernst & Young to conduct an internal investigation. ARCP further reported that based upon the investigation's preliminary findings, ARCP's previously issued audited consolidated financial statements and other information contained in its December 31, 2013, March 31, 2014, and June 30, 2014 SEC Filings and other communications for those periods "should no longer be relied upon."

68.   Certain of ARCP's officers had caused the Company to purposefully misstate its AFFO, a metric commonly calculated and reported by REITs as a measure of operating

performance and the amount of distributions available to distribute to stockholders from funds generated through operations.   AFFO is perhaps the most important indicator of a REIT's performance.   Beginning in the fourth quarter of 2013, ARCP changed the methodology that it used to calculate AFFO which was reported in the company's SEC filings.   Most significantly, in the case of real estate assets of which ARCP did not own entirely, ARCP began to factor in the entirety of certain costs that are excluded from AFFO rather than only its pro-rata share.   This improper methodology had the effect of improperly inflating ARCP's AFFO calculations; when ARCP reported these inflated AFFO figures in its SEC filings, it overstated its operating performance and concealed its financial performance which was in fact faltering.

69.     By purposefully overstating AFFO, ARCP was able to continue raising capital through the sale of its stock to finance its further acquisition of properties.   ARCP's advisor – which was owned by AR Capital – received fees on ARCP's acquisitions of properties and RCS received commissions on the sale of ARCP's stock.   ARCP's misstatement of AFFO was calculated to enrich AR Capital by allowing it to garner massive commissions through RCS's sale of ARCP's stock and through ARCP's continued acquisitions of properties.

70.     Ernst & Young's investigation revealed that Defendant Block, ARCP's chief financial officer, and Lisa P. McAlister ("McAlister"), the chief accounting officer, played key roles in the purposeful miscalculation of AFFO and the Company's reporting of false financial information.   The investigation further revealed that if ARCP had calculated AFFO properly, then ARCP's AFFO figures would have fallen short of analyst projections.

71.     Block and McAlister were forced to resign from ARCP and were both ultimately indicted.   In June 30, 2017, Block was found guilty of securities fraud and was subsequently sentenced to 18 months in prison.   McAlister pled guilty to securities fraud.   In a defamation case

that McAlister filed shortly after she was forced to resign, she asserted under oath that beginning in February 2014 she repeatedly informed Schorsch about ARCP's accounting irregularities, that Schorsch nonetheless directed ARCP to continue using improper methods, and that Schorsch took further steps to cover up the fraud in ARCP's SEC filings.

72.     Following the revelation of overstated AFFO at ARCP, numerous securities broker-dealer firms suspended all sales of AR Capital-sponsored products including HIT stock. By November 24, 2014, 68 securities broker-dealer firms had suspended selling agreements with RCS.

73.     In December 2014, Schorsch resigned from the boards of directors of RCS's parent company, ARCP, New York REIT, Inc. and 11 non-traded REITs and direct investment programs sponsored by AR Capital affiliates.  On December 29, 2014, Schorsch resigned from the Company's Board and Defendant Kahane was appointed as executive chairman of the Board.

74.     On March 2, 2015, ARCP filed amendments to its Form 10-K for the year ended December 31, 2013, and to its Form 10-Q for the quarters ended March 31, 2014 and June 30, 2014 which corrected errors relating to its calculation of AFFO and addressed issues relating to payments to, and transactions with affiliates of the parent of its sponsor and certain equity awards to certain officer and directors.   ARCP also disclosed that its audit committee investigation had uncovered weaknesses in ARCP's internal control over financial reporting and its disclosure of controls and procedures and that the SEC had commenced a formal investigation of ARCP.

75.     In its 2014 10-K, filed March 31, 2015, HIT reported that ARCP's disclosures concerning its internal investigation "may adversely affect [the Company's] ability to raise substantial funds"; and that "a number of participating broker-dealers had temporarily suspended

their participation in [the Company's IPO]"; that "although certain broker-dealers have reinstated their participation…we cannot predict whether…all participating broker dealers will reinstate their participation…"; and that "[a]s a result, [the Company's] ability to raise substantial funds may be adversely affected."

76.     Despite the fact that it appeared very uncertain by March 2015 whether HIT would have ability to raise additional funds through the IPO, and despite the fact that HIT already faced onerous financial obligations relating to its acquisition of the Grace Portfolio in February 2015, the Fiduciary Directors nevertheless forged ahead with the HIT's reckless acquisition campaign, committing the Company to purchase an additional 44 hotels through the SWN Acquisitions in June 2015.

77.     RCS was itself experiencing substantial difficulties as a result of suspensions of broker-dealer distribution agreements for AR Capital investment products.  A special committee of RCS directors was formed in April 2015 to explore restructuring options and to begin soliciting third-party proposals for capital investments in RCS.

78.     A private investment company, Apollo Global Management ("Apollo") was interested in buying a portion of AR Capital as a way to gain entry into the REIT business and to raise funds for its own sponsored investment products.  On June 25, 2015, Apollo made an offer to purchase a portion of AR Capital for $100 million; a tentative agreement was subsequently reached in August 2015.

79.     Beginning in June 2015, AR Capital endeavored to amend the charters of certain of the AR-Capital sponsored investment programs to facilitate the Apollo transaction. These charter amendments would increase the power of the investment fund boards, decrease the ability of shareholders to remove directors, and permit advisory agreement amendments.

24

80.   These charter amendments required shareholder approval.   To facilitate the changes, AR Capital directed RCS to aggressively obtain shareholder consents, placing extraordinary pressure on RCS's representatives to deliver the required proxies.   These employees subsequently disclosed to regulators that they were given no proxy solicitation training; rather, their superiors simply demanded that they deliver the required proxies.

81.   On June 11, 2015, the Mass SOS issued a subpoena requesting documents related to proxy solicitation efforts that had been conducted out of RCS's Boston office.  The subpoena was based upon allegations made by a whistleblower employee who had told his supervisors of concerns about unethical behavior involving proxy solicitations by coworkers.  Rather than making any appropriate response, the supervisor told the whistleblower to "suck it up" and "be a team player."

82.   In October 2015, RCS hired an outside law firm to conduct an internal investigation of proxy solicitation misconduct.   The investigation revealed an astonishingly pervasive pattern of misconduct.

83.   On November 8, 2015, RCS and Apollo terminated the agreement whereby Apollo would have purchased a 60% stake in AR Capital's assets which included HIT's Advisor and Sponsor and RCS.  AR Capital and Apollo instead agreed to a deal whereby Apollo would purchase RCS for only $6 million.

84.   On November 12, 2016, the Mass SOS filed an administrative complaint to suspend RCS's business license on the basis of blatant proxy fraud by its employees in obtaining shareholder votes to allow an AR-Capital sponsored investment program to alter its advisory agreement.   The complaint alleged that its representatives, "facing intense pressure from management," "thinly-veiled threats regarding continued employment," and even threats to

"their own personal well-being," acted to "steamroll" shareholders into voting in favor of management, including at least two instances when representatives impersonated shareholders to vote their shares.

85.     By November 8, 2015, with the Mass SOS on the verge of filing an administrative action against RCS, with AR Capital's sale of RCS pending, and with AR Capital reeling from the ARCP accounting scandal, it was evident that the Company no longer had the ability to raise capital through the IPO.

86.     On November 18, 2015, Defendants would cause the Company to suspend the IPO; it would never be recommenced.

### G.     Immediately Before Defendants Suspended the Company's IPO, Defendants Caused the Company to Enter into an Amendment to the Advisory Agreement Purportedly Requiring the Company to Pay Unconditional Asset Management Fees

87.     By November 8, 2015, with AR Capital and RCS engulfed in scandal, AR Capital's owners recognized that AR Capital's capital-raising ability had been destroyed.  At this juncture, they decided to take as much from the Company as they could.

88.     AR Capital's owners also knew that the Company faced massive financial difficulties.  The IPO had been the Company's primary source of capital.   The Company had enormous financial obligations resulting from the Grace Portfolio acquisition and from the SWN Acquisitions through which it would be required to complete the purchase of 34 hotels by early 2016.   AR Capital's owners further recognized that there was virtually no chance that the Company would meet the Economic Hurdle and that the Advisor's Class B Units would never have any value.

89.     Nevertheless, the Advisory Agreement and the Operating Partnership Agreement

were amended on November 11, 2015 to materially alter the terms in order to cause HIT to pay

the Advisor unconditional, cash asset management fees. As set forth in detail in **Section II** *infra,*

the Independent Directors were grossly negligent and violated the Charter when they approved

the Advisory Agreement amendment.

      **H.**      **With its IPO Suspended and Its Assets Highly Leveraged, HIT Faced Massive Financial Problems and Was Forced to Seek a Recapitalization**

      90.     In December 2015 and January 2016, HIT had insufficient capital to complete the

SWN Acquisitions.  It was forced to terminate its agreement to purchase 24 hotel properties and

forfeited a $41.1 million earnest money deposit.

      91.     The Company's 2015 10-K describes the massive financial problems that the

Company faced:

> •    We suspended our initial public offering of common stock (our "IPO" or our "Offering") on November 15, 2015, effective as of December 31, 2015. Prior to the suspension of our IPO, we depended, and expected to continue to depend, in substantial part on proceeds from our IPO to meet our major capital requirements. Because we do not expect we will resume our IPO, <u>we will require funds in addition to operating cash flow and cash on hand to meet our capital requirements, including payments due on our outstanding indebtedness.</u> (emphasis added)

> •    Because our IPO has raised substantially less proceeds than expected, we will not be able to make additional investments unless we are able to identify additional debt or equity capital on favorable terms and our ability to achieve our original investment objectives has been adversely affected.

The 2015 10-K likewise describes that HIT faced the risk of defaulting on its debt obligations

and obligations pursuant to the preferred equity securities issued in connection with HIT's

purchase of the Grace Portfolio as the result of the suspension of the IPO.

      92.     HIT's 2015 10-K also announced that the Company was actively seeking

liquidity: "[w]e are evaluating a variety of alternatives for obtaining additional liquidity, but

there can be no assurance that we will be successful in obtaining sufficient proceeds from any of these pursuits to meet our capital requirements."

## I.     The Brookfield Investor's Preferred Equity Investment

93.     On January 13, 2017, HIT announced that it had reached an agreement, the Securities Purchase, Voting and Standstill Agreement ("SPA"), with Brookfield Strategic Real Estate Partners II Hospitality REIT II LLC and Brookfield Strategic Real Estate Partners II, LLC (collectively the "Brookfield Investor"), a private investment fund managed by affiliates of Brookfield.   Pursuant to the SPA, the Brookfield Investor would make a preferred equity investment in HIT's Operating Partnership.

94.     On March 31, 2017, the initial closing pursuant to the SPA occurred.   HIT sold to the Brookfield Investor: (i) the Redeemable Preferred Share in HIT for a nominal purchase price; and (ii) 9,152,542.37 Class C Units in HIT's Operating Partnership for a purchase price of $14.75 per unit ($135 million in the aggregate).   In addition, subject to the terms and conditions of the SPA, HIT committed to selling the Brookfield Investor additional Class C Units in an aggregate amount of up to $265.0 million at subsequent closings to occur through February 2019.

95.     As the holder of the Redeemable Preferred Share, the Brookfield Investor has been afforded significant control over all aspects of HIT's business and operations.   The Brookfield Investor has the right to elect two Directors (each, a "Redeemable Preferred Director").   In addition, the Brookfield Investor must approve the nomination of two additional Independent Directors (each an "Approved Independent Director") for election by HIT's stockholders at the Company's annual meeting. Also, each committee of the Board must include a Redeemable Approved Director selected by the holder of the Redeemable Preferred Share.

Further, the majority of the then outstanding Class C Units, and at least one of the Redeemable Preferred Directors, must provide consent before HIT may: (i) pay dividends or other distributions to HIT's stockholders; (ii) redeem or repurchase securities; (iii) acquire property; (iv) sell or dispose of any property; (v) issue equity); or (vi) incur debt.

96.     The Redeemable Preferred Directors must also approve: (i) HIT's annual business plan (*including the annual operating and capital budget*); (ii) HIT's hiring and compensation decisions related to certain key personnel (including the Company's executive officers); (iii) any increase or decrease of the authorized number of Directors on the Board; (iv) nomination or appointment of any Director (other than Redeemable Preferred Director) who is not an Independent Director (as defined in the Charter); (v) certain elections under the Maryland General Corporation Law; and (vi) the nomination and appointment of the Board's chairperson.

97.     The SPA provides that the Class C Units rank senior to HIT's units of limited partnership interest in the Operating Partnership ("OP Units") in priority to both ordinary distributions and to distributions of assets in the event of liquidation, dissolution or the winding-up of the Operating Partnership.  In addition, the SPA outlines the redemption rights of the Brookfield Investor which are detrimental to the interests of HIT and its stockholders for a multitude of reasons including that floors have been established for the Brookfield Investor's recovery of investment principal upon redemption regardless of HIT's performance and that the Brookfield Investor has the right to redeem at any time after March 2022.  In addition, BSREP II Hospitality Special GP, OP LLC (the "Special General Partner") has been appointed as a special general partner of HIT's Operating Partnership, with certain non-economic rights benefitting the Brookfield Investor which apply in the event that HIT is unable to redeem the Class C Units when it is required to do so.

98.     With respect to ordinary distributions, the Brookfield Investor is entitled to receive, with respect to each Class C Unit, fixed, quarterly cumulative cash distributions at a rate of 7.5% per annum.  HIT's failure to pay these cash distributions when due will cause the per annum rate to increase to 10% until all accrued and unpaid distributions required to be paid in cash are reduced to zero. The Brookfield Investor is also entitled to receive, with respect to each Class C Unit, a fixed, quarterly, cumulative distribution payable in Class C Units at a rate of 5% per annum ("PIK Distribution"). In addition, if HIT fails to redeem the Brookfield Investor when required, the 5% per annum PIK Distribution rate will increase to the per annum rate of 7.5%, and will further increase by 1.25% per annum for the next four quarterly periods thereafter, up to a maximum per annum rate of 12.5%. Further, following the Initial Closing, the holders of Class C Units became entitled to tax distributions under certain circumstances

99.     HIT has not paid distributions to stockholders since January 2017.  In addition, provisions of the SPA transferred substantial control over the Company to the Brookfield Investor, including the right to reject Independent Directors elected by the stockholders, and permitting it to appoint two Redeemable Preferred Directors.  This provision is in violation of Section 11.1 of the Charter governing the election of directors by Company stockholders and Section 7.1 of the Charter permitting the Board to "take any action, that in its sole judgment and discretion, is necessary or desirable to conduct the business of the Company."

**J.      The Company's Internalization of the Advisor and Restructuring of Property Management Arrangements**

100.    In connection with the Framework Agreement, on January 13, 2017, HIT also announced that significant changes to HIT's management structure would take place simultaneously with HIT's sale of the preferred equity investment to the Brookfield Investor.

101.     These changes included the termination of the Advisory Agreement, the internalization of the Advisor, the Company's hiring of the Advisor's officers and employees, and a restructuring of HIT's property management arrangements, which brought the property management fees that the Company paid in line with the competitive market.

102.     Rather than terminating for cause or renegotiating the agreements without penalty to HIT, Defendants instead caused HIT to pay compensation of approximately $37 million to the Property Managers and Advisor to restructure the property management arrangements.   (*See* **Section III** *infra.*)

### K.     The Value of the Company's Common Stock Has Plummeted

103.     HIT reports a net asset value ("NAV") of $13.20 per share as of March 31, 2017. This estimate is misleading as to the value of HIT's stock as it fails to account for: (1) the distributions to the Brookfield Investor at the annual rate of 7.5% in cash and at the annual rate of 5% in the form of HIT common stock, which distributions result in continual dilution; (2) HIT has ceased paying distributions to common stockholders; (3) that the Fiduciary Defendants have handed over substantial control over the Company to the Brookfield Investor; (4) that the Board may not declare distributions to common stockholders in excess of $0.525 per year without prior approval of the Brookfield Investor; and (5) that the Brookfield Investor will invest another $265 million in the Company which will accelerate the dilution process and will obligate the Company to pay substantially more in cash distributions to the Brookfield Investor.

104.     HIT recently completed a self-tender offer to purchase shares of its common stock for only $6.75 per share, i.e., a discount from NAV and a discount of approximately 73% from the IPO price.

105.     HIT's poor performance is solely attributable to the Fiduciary Defendants'

reckless and willful misconduct and/or gross negligence.  Most other REITs have performed well in recent years.  From January 7, 2014, the date on which HIT's IPO commenced, to the present, the FTSE NAREIT Equity REITs Index – an index that includes all tax-qualified REITs with more than 50% of total assets in qualifying real estate assets other than mortgages – has increased by more than 20%.

**L.      The Independent Directors Lacked Independence to Make Decisions with Only the Company's Best Interest in Mind**

106.      Defendants Wenzel, Burns, and Perla served as "independent directors" of multiple AR Capital-sponsored non-traded REITs.  Each has received substantial compensation from these entities.

107.      Between 2012 and 2016, Wenzel received compensation in excess of $1.8 million as a director of HIT, Global Net Lease, Inc. (f/k/a American Realty Capital Daily Net Asset Value Trust, Inc. and American Realty Capital Global Trust, Inc.) ("Global Net Lease"), American Realty Capital Trust IV, Inc., and American Realty Capital New York City REIT, Inc. In 2015 alone, Wenzel received compensation in excess of $800,000 from AR Capital-sponsored non-traded REITs.

108.      Between 2012 and 2016, Perla received compensation in excess of $1.3 million as a director of HIT, Global Net Lease, American Finance Trust, Inc. (f/k/a American Realty Capital Trust V, Inc.) ("AFIN"), and American Realty Capital Global Trust II, Inc.  ("ARC Global II").  In 2016 alone, Perla received compensation in excess of $500,000 from AR-Capital sponsored non-traded REITs.

109.      Between 2008 and 2016, Burns received compensation in excess of $2.5 million as a director of HIT, AFIN, ARC Global II, American Realty Capital Trust, Inc., New York

REIT, Inc. (f/k/a/ American Realty Capital New York Recovery REIT, Inc.) ("New York REIT"), American Realty Capital Healthcare Trust, Inc. ("ARC Healthcare Trust"), and American Realty Capital Trust III, Inc. ("ARC Healthcare Trust III").   In 2014 alone, Burns received compensation in excess of $756,000 from AR-Capital sponsored non-traded REITs.

110.   As a result of the Independent Directors' affiliations with numerous AR-Capital sponsored non-traded REITs in addition to HIT and their receipt of massive amounts of compensation from these entities, the Independent Directors were never capable of making decisions with only HIT's best interest in mind.   The Independent Directors' continued nomination for director positions at AR-Capital sponsored entities, which garnered them massive compensation, rewarded their willingness to give their approval to self-interested proposals made by HIT's management that were not in HIT's best interest.

111.   The compensation paid to the Independent Directors exceeded that of almost every other non-traded REIT not affiliated with AR Capital.

112.   In addition, the Independent Director's receipt of compensation from HIT increased significantly as HIT's problems deepened.   Defendant Wenzel received compensation from the Company of $113,625 in 2014; $95,248 in 2015; and $212,725 in 2016; Defendant Burns received compensation of $62,493 in 2014; $119,798 in 2015; and $141,177 in 2016; and Defendant Perla received compensation of $152,301 in 2014; $166,165, in 2015; and $276,125 in 2016.

## II.   Defendants Breached Fiduciary Duties Owed to the Company and Violated the Charter When They Caused the Company to Pay the Advisor Unconditional Cash Asset Management Fees

113.   On November 11, 2015, the Company and Advisor entered into the First Amendment to the Advisory Agreement which states that for all periods after September 30,

2015 the Company is required to pay, without condition, asset management fees to the Advisor at the rate of 0.75% of the lower of the costs of assets owned by the Company or the fair market value of the Company's assets.  In addition, the amendment provides that the Company may pay these asset management fees either in cash or in shares of the Company's common stock.[4] Further, it states that the Company will not issue subordinated participation interests in the Operating Partnership to the Advisor for periods after September 30, 2015.

114.    As discussed *supra,* the Company was in the midst of a highly publicized crisis, the non-public details of which were fully known to the Defendants. The Company faced had enormous financial obligations and was in fact facing financial ruin due the imminent IPO suspension.  Yet, Defendants caused HIT to materially alter the Advisory Agreement, and consented to the Company's payment of unconditional cash asset management fees, when such facts were known to Defendants, and when it was known to them that the Advisor's Class B Units, which HIT had paid as performance-based asset management fees, would never have any value.

115.    There was no rational or prudent basis on which to materially change the Advisor's compensation.  The Company's SEC filings do not state any reason for the material change to the Advisor's compensation, and provides no statement that the Independent Directors consulted with any independent advisor, or that they considered whether the amendment was within the compensation limits prescribed by the Charter.

116.    The Independent Directors lacked independence to make decisions in the best interests of the Company due to the substantial compensation they received from Advisor

---

[4]  The Company paid none of the asset management fees in the form of shares of Company common stock.

affiliated entities, alleged *supra*.

117.    Moreover, as discussed in Section I, *supra,* the Charter did not permit non-performance based asset management fees, which is confirmed by HIT's prospectuses. The Charter also required that Advisor's compensation would be "reasonable in relation to the nature and quality of services performed" and that "such compensation [would be] within the limits prescribed by the Charter."   The Charter specifically required that the Independent Directors were to consider with respect to the Advisor's compensation "the success of the Advisor in generating opportunities that meet the investment objectives of the Company," "the quality and extent of service and advice furnished by the Advisor," and "the performance of the [Company's assets], including income, conservation or appreciation of capital…"

118.    Had the Independent Directors complied with the Charter's provisions (as well as their fiduciary obligations), the only result would have been to <u>deny</u> the proposed amendment that materially changed the nature and import of the Advisor's compensation arrangement to HIT's detriment.

119.    Accordingly, in violation of their fiduciary duties and the Charter, Defendants caused HIT to pay the Advisor cash asset management fees of approximately $4.6 million, $18.0 million, and $4.1 million for years 2017, 2016, and 2015 respectively[5].

---

[5] Even if the Charter permitted the payment of unconditional cash asset management fees (which it does not), the Company's payment of cash asset management fees would still have been improper between July 1, 2016 and March 31, 2017 because these fees were calculated on the basis of an overstated fair market value of the Company's assets.  On July 1, 2016, the Company published a net asset value ("NAV") of $21.48 per share.  Less than one year later, on June 19, 2017, the Company published an NAV of $13.20 per share, a decline of approximately 39%. The massive decline in the published NAV is attributable to the fact that the July 1, 2016 NAV estimate was calculated on the basis of an overstated value of the Company's assets.  The asset management paid between July 1, 2016 and March 31, 2017 were calculated on the basis of the

III.   **Defendants Breached Their Fiduciary Duties and the Charter by Causing HIT to Enter Into Uncompetitive Property Management Agreements and Then Causing HIT to Pay Compensation to the Advisor and Property Managers to Restructure These Uncompetitive Arrangements**

   A.   **The Company's Property Management Arrangements Were Grossly Uncompetitive**

120.   The competitive base rate of management fees for limited service hotel are between 2% and 3% of gross revenue.  Property managers may also receive an incentive fee, typically in the range of 10% to 20% of operating profit above a certain performance threshold.[6] Hotel property management agreements typically have 20-year terms and cannot be terminated without significant penalty. As an example, Apple Hospitality REIT, Inc., another non-traded REIT focused on hospitality properties, pays base property management fees at the rate of 3% of gross revenue.

121.   The Company's property management arrangements, however, were as follows: for each acquired property, HIT entered into a primary property management agreement with one of the Property Managers which required HIT to pay a base management fee of 4% of gross

---

same overstated value of the Company's assets.  The Company's June 19, 2017 8-K announcing the $13.20 NAV states that the NAV decline relates to brand-mandated PIPs (i.e., property improvement plans) and the estimates and assumptions applied to them.  This statement, however, makes little sense in light of the timing of the Company's acquisitions of assets comprising its real estate portfolio and other facts disclosed in the Company's SEC filings including: (i) a majority of the assets in HIT's portfolio are part of the Grace Portfolio, which was acquired on February 25, 2017, and for which over $70 million in required PIP reserve deposits were identified and known *at the time of the acquisition,* (prior to both NAV determinations); and (ii) since the time of the Grace Portfolio acquisition, and during the interim period between the announcements of the Company's NAV estimates, the total of the required PIP reserve deposits due has declined.

[6] *See e.g.* report of HVS Global Hospitality Services, a well-respected hospitality consulting firm, available at: https://www.hvs.com/content/3173.pdf; Hotel News Now article available at: http://www.hotelnewsnow.com/Articles/152652/The-growing-expense-of-hotel-management-fees.

revenue plus an incentive fee of 15% of operating profits above 8.5% of HIT's investment.  The primary property management agreements generally had a duration of 20 years and could not be freely terminated by HIT.  The Property Manager then contracted with a sub-manager; the Property Manager paid the sub-manager a base management fee of between 2% and 3.25% of gross revenue.  These arrangements required HIT to pay a base management fee substantially above the range of competitive rates.

122.    When HIT acquired a hotel property that had an existing property management agreement with an unaffiliated property manager, that agreement would be assigned to the Property Manager, and the Property Manager would pay the unaffiliated sub-manager a portion of the base management fees that it received from HIT.  When a property management agreement with an unaffiliated sub-manager expired, the Property Manager would enter into a sub-management agreement with Crestline, an affiliate of the Property Mangers owned by AR Capital.  In some instances, the Property Manager would hire Crestline as the sub-manager immediately upon the Company's acquisition of a property.

123.    Most of the agreements with the unaffiliated sub-managers required HIT to pay a base management fee at the rate of 2.0% of gross revenue, i.e., the rate that the previous owner had paid to that property manager.  The sub-management agreement with Crestline required the Company to pay a base management fee at the rate of 3.25% of gross revenue.

124.    The day-to-day management of the hotel properties was the responsibility of the sub-managers.  In contrast, the Property Managers' responsibilities were simply the "direction and supervision of the sub-managers."  In fact, the Property Managers' responsibilities fell directly within the scope of the Advisor's responsibilities for which the Advisor received separate compensation in the form of asset management fees.  AR Capital and its members

intended that HIT's agreements with the Property Managers would provide an additional level of fees to enrich the Property Managers and thereby AR Capital and its members, which they did.

125.    AR Capital and its members also designed the property management arrangements to extract termination fees from the Company.  The Charter contemplated HIT to have a duration of less than 20 years as a non-traded REIT, and required the Directors to pursue a liquidity event or to present the Company's stockholders with a proposed plan of liquidation by the sixth anniversary of the termination of the IPO.  AR Capital and its members knew that absent material modification to or termination of HIT's affiliated property management agreements, HIT's hotel properties would be unsaleable and HIT would be an undesirable merger partner.

126.    The majority of HIT's properties were acquired as part of the acquisition of the Grace Portfolio on February 27, 2015.  With respect to those properties, the Fiduciary Defendants caused HIT to enter into the primary property management agreements with the Property Managers at that time.

127.    Due to their financial interest discussed *supra,* the Independent Directors lacked independence to make decisions in HIT's best interests.  Had the Independent Directors complied with the Charter's provisions prohibiting them from approving transactions with affiliates of the Advisor on terms and conditions less favorable to HIT than those available from unaffiliated third parties, and exercised their fiduciary obligations in good faith, they would not have approved the uncompetitive arrangements.

128.    Accordingly, Defendants caused the Company to pay property management fees to the Property Managers of approximately $50 million from inception until March 31, 2017.  If the Fiduciary Defendants had caused the Company to enter property management agreements

requiring the Company to pay base management fees at competitive rates (i.e., in the range of 2% to 3% of gross revenue), the Company would have paid far less in property management fees during this period.

> **B.   The Defendants Breached Fiduciary Duties Owed to the Company and Breached the Charter When They Caused HIT to Pay the Advisor and Property Managers Compensation Totaling Approximately $37 Million in Connection With the Framework Agreement**

129.   The Fiduciary Defendants caused the Company to enter into the "Framework Agreement" on January 13, 2017 through which the Advisor's management functions would be internalized, many of the Advisor's employees hired directly by the Company, and the Advisory Agreement terminated, and the Company's property management arrangements restructured. The Framework Agreement provided for the Company's payments of numerous categories of fees to the Advisor and to the Property Managers as consideration for the restructuring of the Company's property management arrangements.

130.   Through the restructuring of the property management arrangements, the Property Managers were entirely eliminated from the management structure.  In the case of each of 71 properties that were previously sub-managed by Crestline, the sub-management agreement was eliminated, the Property Manager assigned the primary management agreement to Crestline, and the base management fee was reduced from 4% to 3% of gross revenue.  In the case of 70 properties managed by a third-party property manager, the primary property management agreement with the Property Manager was eliminated and the sub-manager continued to manage the property pursuant to its existing agreement through which the Company paid a base management fee of 2%.  The elimination of the Property Managers from the management structure therefore had the effect of reducing the Company's base management fee from 4% to

3%, in the case of properties managed by Crestline, and from 4% to 2% in the case of properties managed by a third-party manager. These new arrangements were reasonably in line with the competitive market.

131.    As consideration for the restructuring of the property management arrangements and the elimination of the Property Managers from the management structure, the Fiduciary Defendants caused the Company to pay the compensation to the Property Managers and Advisor. The compensation included:

    (i)    a $10 million cash payment to the Property Managers;

    (ii)    12 monthly cash payments of $333,333 (i.e., approximately $4 million in total) to the Property Managers;

    (iii)    the issuance of 279,329 shares of common stock in the Company to the Property Managers worth $6 million based upon a $21.48 estimated per-share value of the stock at that time;

    (iv)    a waiver of the Advisor's obligation to repay the Company $5,821,988 in organization and offering expenses that the Company previously reimbursed to the Advisor; and

    (v)    the removal of all restrictions on the Advisor's 524,956 Class B Units in the Operating Partnership and the conversion of these Units to 524,956 shares of the Company's common stock.

The total value of the compensation, based upon a $21.48 estimated value of the Company's stock, was approximately $37 million.

132.    The Class B Units – which had been issued to the Advisor as performance-based asset management fees pursuant to the Operating Partnership Agreement and consistent with the Charter – were ineligible for conversion to shares of the common stock because the Economic Hurdle had not been met. Instead, the Advisor was required to *forfeit* its Class B Units upon the termination of the Advisory Agreement because the Economic Hurdle had not been met.

133.    The Company's payment of fees to the Property Managers and Advisor to restructure grossly uncompetitive and unfair arrangements that the Advisor had caused the Company to enter into was unconscionable.  The Fiduciary Defendants acted in bad faith when they permitted the Company to pay this compensation.

134.    As discussed *supra,* the Independent Directors lacked independence to make decisions in the best interests of the Company.  The Independent Directors' decisions to approve the Company's payment of the compensation in connection with the restructuring of the Company's property management arrangements and to permit the conversion of the Class B Units to shares of the Company's common stock were not the products of reasonable business judgment.

135.    Had the Independent Directors properly exercised their fiduciary obligations and had they complied with the Charter's provisions, the Company would not have paid the Advisor and Property Managers $37 million in compensation in connection with the Framework Agreement. The Independent Directors breached Charter provisions: (i) prohibiting them from approving transactions with affiliates of the Advisor, any Director and the Sponsor that was on terms and conditions less favorable to HIT than those available from unaffiliated third parties; (ii) prohibiting them from causing the Company and the Operating Partnership to pay any compensation or remuneration to the Advisor or its Affiliates in connection with the internalization of management services, which is what the above payments constituted; and (iii) requiring the Class B Units to be forfeited.

**IV.**     **The Mutual Waiver and Release Agreement is Void and Unenforceable**

136.     In connection with the internalization of the Advisor, the Fiduciary Defendants caused the Company and Operating Partnership to enter into a "Mutual Waiver and Release" agreement (the "Release Agreement") through which the Company purportedly released the Advisor, Property Managers, AR Capital, the Advisor's employees and officers (who included Company officers and certain Company Directors), and AR Capital's members, among other parties (the "AR Release Parties") from all claims, losses, and proceedings, and through which the AR Release Parties purportedly released the Company and Operating Partnership from all claims, losses, and proceedings.   The Independent Directors are not parties to the Release Agreement.   Carved out from the Release Agreement are all claims, losses, and proceedings arising out of the Framework Agreement, which include the Company's claims relating to its payment of compensation to the Advisor and Property Managers in connection with the restructuring of the property management arrangements discussed *supra*.

137.     When the Release Agreement was entered into, the Company had claims against the AR Release Parties for hundreds of millions of dollars of damages on account of their bad faith conduct, gross negligence, and/or unjust enrichment.   On the other hand, the AR Release Parties' release of the Company did not provide the Company with any meaningful consideration: none of the AR Release Parties had any claim against the Company with any material significance.     The Release Agreement is unenforceable for lack of adequate consideration.

138.     In addition, the Release Agreement is unenforceable because it is unconscionable: the AR Release Parties caused the Company to enter into the agreement in an attempt to evade liability for their own wrongdoing and unjust enrichment.   Further, the Release Agreement is

unenforceable as to the Company's officers and Directors on account of the Charter provisions prohibiting the Company's exculpation of bad faith conduct and negligence on the part of Company officers and Directors.

139.    In the alternative, Plaintiff pleads that the Fiduciary Defendants breached fiduciary duties owed to the Company when they caused the Company to enter into the Release Agreement.  The Fiduciary Defendants, among whom were numerous AR Release Parties, acted in bad faith when they caused the Company to enter the Release Agreement in an attempt to evade liability.  The Independent Directors were grossly negligent when they approved the Company's entry into the Release Agreement, and furthermore, lacked independence to make decisions in the best interests of the Company, as alleged *supra.*

## DERIVATIVE AND DEMAND ALLEGATIONS

140.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

141.    Plaintiff asserts claims derivatively in the right and for the benefit of HIT to redress Defendants' breaches of fiduciary duties, breaches of the Charter and other violations of law.

142.    Plaintiff is an owner of HIT common stock and was an owner of HIT common stock at all times relevant to the Defendants' wrongful course of conduct alleged herein.

143.    On July 14, 2017, Plaintiff sent the July 2017 Demand Letter to the chair of the Company's Board (Ex. A).

144.    On December 12, 2017, the Plaintiff sent the December 2017 Demand Letter to counsel acting as the Board's agent.

145.    The Board has had more than a reasonable amount of time to take action

43

responsive to the July 2017 Demand Letter and December 2017 Demand Letter. The Board has taken no formal responsive action whatsoever, and there is no justification for the Board's failure to do so. Rather than taking action to properly address Plaintiff's demands, the Board has assumed a defensive posture.

146. Further, the Company may have suffered irreparable harm if this action had not been initiated prior to February 27, 2018. Upon information and belief, certain of the property management agreements with the Property Managers were entered into when the Company acquired the Grace Portfolio on February 27, 2015. Certain of the Company's claims may have accrued at this time, and certain of these claims may be governed by a three-year statute of limitation. Defendants have not entered into a tolling agreement with respect to any claims asserted herewith.

147. As discussed *supra,* the Release Agreement is unenforceable as a matter of law. Plaintiff pleads (in the alternative) that the Fiduciary Defendants breached fiduciary duties owed to the Company when they attempted to cause the Company to release the Advisor, the Property Managers, AR Capital, AR Capital's members, the Company's officers, and certain of the Company's Directors from all claims, losses, and proceedings, except those relating to the Framework Agreement.

148. To the extent that demand on the Board may have otherwise been required with respect to the Release Claims, demand is excused as futile as the Board has demonstrated its inability and/or unwillingness to take any action responsive to Plaintiff's demands whatsoever and has otherwise demonstrated a course of bad faith conduct.

149. Accordingly, Plaintiff is entitled to commence and maintain this action derivatively on behalf of HIT.

## COUNT I

### Derivative Claim on Behalf of HIT for Breach of Fiduciary Duty against the Fiduciary Defendants

150.    Plaintiff incorporates, adopts by reference, and realleges each and every allegation set forth above as though set forth fully herein.

151.    The Fiduciary Defendants owed HIT the fiduciary duties of loyalty and good faith to, among other things, act in furtherance of the best interests of the Company.  The conduct alleged herein on the part of the Fiduciary Defendants with respect to the Cash Asset Management Fee Claims, the Property Management Arrangement Claims and the Release Claims, constitute breaches of fiduciary duty owed directly to the Company and indirectly to the Company's stockholders.

152.    As alleged herein, the Fiduciary Defendants breached their fiduciary duties to HIT by causing the Company to enter into an amendment to the Advisory Agreement that then required and caused the Company to pay cash asset management fees that were not contingent upon the Company meeting the Economic Hurdle.  The Charter prohibited the Company's payment of unconditional asset management fees and the Company's stock has been sold on the basis of the representation that the asset management fees would be performance-based.

153.    As alleged herein, Defendants Wenzel, Burns, and Perla owed the Company a fiduciary duty to ensure that the Company's payment of compensation to the Advisor was within the limits prescribed by the Charter.  They acted with gross negligence and thereby breached fiduciary duties owed to the Company when they caused the Company to enter the Advisory Agreement amendment purportedly requiring the Company pay unconditional asset management fees to the Advisor: the Charter prohibited the Company's payment of unconditional asset

management fees to the Advisor.

154.    As alleged further herein, when the Fiduciary Defendants caused the Company to enter into the November 2015 Advisory Agreement amendment, the Company had enormous contractual financial obligations and was facing a liquidity crisis due the concurrent suspension of the Company's IPO necessitated by the misconduct of certain Defendants.    Defendants Wenzel, Burns, and Perla acted with gross negligence and thereby breached fiduciary duties owed to the Company when they approved the amendment.

155.    As alleged herein, the Fiduciary Defendants breached fiduciary duties owed to the Company when they caused the Company to pay unconditional cash asset management fees to the Advisor in violation of the Charter.

156.    As alleged herein, the Fiduciary Defendants breached fiduciary duties owed to the Company when they caused the Company to enter into property management agreements with the Property Managers that had long durations, that could not be freely terminated, and that required the Company to pay a base management fee of 4% of gross revenue.  These agreements were grossly uncompetitive and were designed for the purpose of extracting termination fees from the Company.

157.    As alleged herein, the Fiduciary Defendants breached fiduciary duties owed to the Company when they caused the Company to pay compensation to the Advisor and Property Managers in connection with the termination, amendment, and assignment of property management agreements.

158.    As alleged herein, the Fiduciary Defendants breached fiduciary duties owed to the Company when they caused the Company in connection with the Framework Agreement to convert the Advisor's Class B Units in the Operating Partnership to shares of Company common

stock despite that the Economic Hurdle had not been met.

159.     As alleged herein, the Release Agreement that Defendants caused the Company to enter into purportedly providing a release to AR Capital, the Advisor, the Property Managers, and their officers and employees, is unconscionable and HIT received inadequate consideration in exchange for the Release Agreement.   Therefore, the Release Agreement is void and unenforceable as a matter of law.  In the alternative, as alleged herein, the Fiduciary Defendants breached fiduciary duties owed to the Company when they caused the Company to enter into the Release Agreement.

160.     As a direct and proximate result of the Fiduciary Defendants' breaches of fiduciary duties as herein alleged, the Company has sustained and will in the future sustain damages.

## COUNT II

### Derivative Claim on behalf of HIT for Waste of Corporate Assets against the Directors and the Advisor

161.     Plaintiff incorporates, adopts by reference, and realleges each and every allegation set forth above as though set forth fully herein.

162.     As alleged herein, the Fiduciary Defendants wasted the Company's assets with respect to the Cash Asset Management Fee Claims, the Property Management Arrangement Claims and the Release Claims.

163.     As a direct and proximate result of Fiduciary Defendants' waste of corporate assets as herein alleged, the Company has sustained damages.

## COUNT III

### Derivative Claim, on Behalf of HIT, for Aiding and Abetting
### Against the AR Capital Defendants and Schorsch

164.    Plaintiff incorporates, adopts by reference and realleges each and every allegation set forth above as though set forth fully herein.

165.    Plaintiff asserts Count III against Defendant Schorsch in the alternative to Counts I and II with respect to his actions occurring after he resigned from the Company's Board.

166.    The AR Capital Defendants and Defendant Schorsch knowingly and substantially assisted in the wrongful conduct set forth above with respect to the Cash Asset Management Fee Claims, the Property Management Arrangement Claims and the Release Claims, and which wrongful conduct could not, and would not, have occurred but for the alleged conduct of the AR Capital Defendants and Defendant Schorsch.

167.    The AR Capital Defendants and Defendant Schorsch had knowledge of the wrongful conduct alleged in Counts I and II above and colluded in, aided and abetted, and/or actively participated in such breaches for the purpose of advancing its own interests.

168.    The AR Capital Defendants and Defendant Schorsch obtained both direct and indirect benefits from colluding in or aiding and abetting the wrongful conduct alleged in Counts I and II above.

169.    As a direct and proximate result of the conduct of the AR Capital Defendants and Defendant Schorsch as herein alleged, the Company has sustained and will in the future sustain damages.

## COUNT IV

### Derivative Claim, on Behalf of HIT, for Breach of
### Contract – Charter Against the Directors

170.   Plaintiff incorporates, adopts by reference and realleges each and every allegation set forth above as though set forth fully herein.

171.   HIT and the Directors are parties to the Charter.

172.   As alleged more fully above, the Directors breached the Charter respect to their conduct in connection with the Cash Asset Management Fee Claims, the Property Management Arrangement Claims and the Release Claims.

173.   The Company has performed all of its obligations under the Charter.

174.   As a direct result of the breaches of the Charter, the Company has sustained damages.

## COUNT V

### Derivative Claim, on Behalf of HIT, for Unjust Enrichment
### against the AR Capital Defendants, Property Manager Defendants, Schorsch and Kahane

175.   Plaintiff incorporates, adopts by reference and realleges each and every allegation set forth above as though set forth fully herein.

176.   Count V is pled in the alternative to Counts I-III.

177.   Defendant AR Capital is the ultimate owner of the Advisor and Property Managers, and Defendants Schorsch, Kahane, Budko, Weil, and Block are the owners of AR Capital.

178.   As alleged more fully above, the AR Capital Defendants, Schorsch, and Kahane, received improper benefits when Defendants caused the Company to: (i) pay unconditional asset management fees to the Advisor in cash violation of the Charter; and (ii) convert the Advisor's

Class B Units in the Operating Partnership into shares of common stock in the Company despite

that the Economic Hurdle had not been met.  Further, the AR Capital Defendants, Property

Manager Defendants, Schorsch and Kahane received improper benefits when Defendants caused

the Company to: (i) pay property management fees to the Property Managers at rates grossly

uncompetitive and unfair for the Company; and (ii) pay compensation to the Advisor and

Property Managers in consideration for the termination, amendment, and assignment of property

management agreements that were grossly uncompetitive and unfair for the Company.

179.    The AR Capital Defendants, Property Manager Defendants, Schorsch, and

Kahane have unjustly benefitted from the wrongful conduct set forth above at the Company's

expense.

180.    It would be unjust to allow the AR Capital Defendants, Property Manager

Defendants, Schorsch, and Kahane to retain the benefits that they received at the Company's

expense.

181.    The Company has no adequate remedy at law.

182.    As a direct and proximate result of the unjust enrichment as herein alleged, the

Company has sustained damages.

### COUNT VI

### Derivative Claim, on Behalf of HIT, for Declaratory
### Judgment against all Defendants

183.    Plaintiff incorporates, adopts by reference and realleges each and every allegation

set forth above as though set forth fully herein.

184.    As alleged more fully above, the Fiduciary Defendants caused the Company to

enter into the Release Agreement which is unenforceable as a matter of law, and is therefore null

and void.  The Fiduciary Defendants acted in bad faith when they caused the Company to enter

into it, it is unsupported by adequate consideration, and it was entered into in violation of Charter

provisions limiting the Company's exculpation of bad faith acts and negligence by Company

Directors and officers.

185.    An actual, present and justiciable controversy exists between the Plaintiff and

Company (on the one hand) and Defendants (on the other hand) as to the enforceability of the

Release Agreement.

186.    Plaintiff seeks declaratory judgment from the Court that the Release Agreement is

unenforceable as a matter of law and is therefore null and void.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of the Company, prays for relief as follows as

appropriate for the particular cause of action:

A.    Issuing an order that Defendants have committed a gross abuse of trust and have

breached their fiduciary duties owed to the Company, and or aided and abetted the breaches of

fiduciary duties, when they caused the Company to: (i) enter into an amendment to the Advisory

Agreement purportedly requiring the Company to pay unconditional asset management fees to

the Advisor in violation of the Charter and that was otherwise grossly unfair for the Company;

(ii) pay unconditional asset management fees to the Advisor in cash in violation of the Charter;

(iii) enter into property management agreements with terms grossly uncompetitive and unfair for

the Company; (iv) pay base property management fees to the Property Managers at the grossly

uncompetitive and unfair rate of 4% of gross revenue; (v) pay compensation to the Advisor and

Property Managers in connection with the restructuring of the grossly uncompetitive property

management arrangements; and (vi) converting the Advisor's Class B Units in the Operating

Partnership to shares of common stock in the Company despite that the Economic Hurdle had not been met;

B.      Issuing an order that Defendants Wenzel, Burns, and Perla breached fiduciary duties owed to the Company when they: (i) approved the November 2015 amendment to the Advisory Agreement amendment without ensuring that the asset management fees payable pursuant to the amendment were within the limits prescribed by the Charter in dereliction of their fiduciary obligation pursuant to the Charter, and when unconditional asset management fees payable by the Company were in fact were impermissible under the Charter; and (ii) failed to adequately supervise the relationship of the Company and Advisor in dereliction of their fiduciary obligation pursuant to the Charter;

C.      Issuing an order declaring that the Release Agreement is enforceable as a matter of law and is therefore null and void;

D.      An award to the Company and/or the Company's stockholders[7] of the amount of compensatory and any other damages the Company sustained as a result of Defendants' wrongful conduct as alleged herein, including pre- and post-judgment interest thereon;

E.      Issuing an order requiring Defendants AR Capital, the Advisor, the Property Managers, Schorsch, Kahane, Budko, Weil, and Block to disgorge to the Company all of the benefits that they received resulting from the Company's payment of improper asset management fees, property management fees, and compensation in connection with the restructuring of the property management arrangements;

---

[7] Under Maryland law "any damages so recovered [in a derivative action] will be available for the payment of debts of the [Company], and, if any surplus remains, for distribution to the [S]tockholders in proportion to the number of shares held by each." *Waller v. Waller*, 187 Md. 185, 189-90 (1946).

F.      Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMAND**

Plaintiff demands a trial by jury on all claims in this Complaint so triable.


DATED:  February 26, 2018


By:      /s/ Leslie A. Blau
         Leslie A. Blau
         Paul D. Malmfeldt (to seek admission *pro hac vice*)
         **BLAU & MALMFELDT**
         566 West Adams Street, Suite 600
         Chicago, Illinois 60661
         Tel: (312) 443-1600
         Fax: (312) 443-1665

         Nicholas E. Chimicles (to seek admission *pro hac vice*)
         Kimberly Donaldson Smith (to seek admission *pro hac vice*)
         **CHIMICLES & TIKELLIS LLP**
         One Haverford Centre
         361 West Lancaster Avenue
         Haverford, PA 19041
         Telephone: (610) 642-8500
         Fax: (610) 649-3633

         ***Attorneys for Plaintiff***

## VERIFICATION

I, Tom Milliken, hereby verify that I have reviewed the foregoing Verified Shareholder Derivative Complaint and that the allegations as to myself and my own actions are true and correct and the other allegations upon information and belief are true and correct.

Dated: 2/24/18

Tom Milliken

HB6741144.