```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X
TOM MILLIKEN (derivatively on behalf of        :
HOSPITALITY INVESTORS TRUST, INC.),            :
                                               :
                              Plaintiff,       :
                                               :
             -against-                         :
                                               :
                                               :
AMERICAN REALTY CAPITAL HOSPITALITY            :
ADVISORS, LLC, AMERICAN REALTY CAPITAL         :
HOSPITALITY PROPERTIES, LLC, AMERICAN          :
REALTY CAPITAL HOSPITALITY GRACE               :
PORTFOLIO, LLC, AR CAPITAL, LLC, AR GLOBAL     :
INVESTMENTS, LLC, NICHOLAS A. SCHORSCH,        :
WILLIAM M. KAHANE, PETER M. BUDKO,             :
EDWARD M. WEIL, BRIAN S. BLOCK, JONATHAN       :
P. MEHLMAN, EDWARD T. HOGANSON, STANLEY        :
R. PERLA, ABBY M. WENZEL, and ROBERT H.        :
BURNS,                                         :
                                               :
                              Defendants.      :
------------------------------------------------------------------------ X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/7/2018

18-CV-1757 (VEC)

MEMORANDUM
OPINION AND ORDER

VALERIE CAPRONI, United States District Judge:

      Plaintiff Tom Milliken brings this derivative action on behalf of Nominal Defendant Hospitality Investors Trust, Inc. ("HIT" or the "Company") against HIT's former officers and directors, along with its former external advisor, property managers, and other corporate affiliates. Plaintiff sues primarily for breach of fiduciary duty, waste of corporate assets, breach of contract, federal securities violations, and unjust enrichment. HIT moves to stay all proceedings while a Special Litigation Committee ("SLC" or the "Committee") of the Company's board of directors (the "Board") investigates Plaintiff's allegations. *See* Notice of Mot., Dkt. 45. For the following reasons, HIT's motion is GRANTED. This case is STAYED pending the SLC's investigation. The SLC must continue to submit monthly updates on the

status of its investigation, pursuant to the instructions in the order at Dkt. 43. Plaintiff may move to lift the stay if he can show that the SLC's investigation is not proceeding with reasonable expeditiousness, but Plaintiff may not file any such motion earlier than **December 3, 2018**.

## BACKGROUND[1]

### I. HIT and the AR Capital Entities

HIT is a real estate investment trust ("REIT") that acquires and manages hospitality and lodging properties. Am. Compl., Dkt. 65, ¶ 1. HIT was formed in July 2013 by a wholly-owned subsidiary of Defendant AR Capital, LLC. *Id.* ¶¶ 2, 48. AR Capital, LLC and its successor, AR Global Investments, LLC (together, "AR Capital"), have sponsored numerous other REITs and direct investments worth billions. *Id.* ¶ 5.

For most of its existence, HIT had no employees of its own; rather, the Company's day-to-day affairs were managed by several other AR Capital-affiliated entities. *Id.* ¶ 57. In particular, Defendant American Realty Capital Hospitality Advisors, LLC (the "Advisor") provided asset management services to HIT, and Defendants American Realty Capital Hospitality Properties, LLC and American Realty Capital Hospitality Grace Portfolio, LLC (together, the "Property Mangers") managed the properties that HIT controlled. *Id.* ¶¶ 3, 23, 41, 53, 57, 144–146. Both the Advisor and the Property Managers received fees from the Company in exchange for their services. *Id.* ¶¶ 4, 53, 60, 65–67, 95–96, 134, 143–146, 150. The Advisor and the Property Managers were affiliates of AR Capital. *Id.* ¶ 3.

### II. HIT's Efforts to Raise Capital

In January 2014, in order to raise capital for its property acquisitions, the Company began a process to conduct an initial public offering ("IPO"). *See id.* ¶¶ 52, 69. Within several months,

---

[1] The Court will accept all allegations in the Amended Complaint as true for purposes of this motion.

however, AR Capital and its affiliates became engulfed in a number of financial scandals. First, in October 2014, one of AR Capital's affiliates, American Realty Capital Properties, Inc. ("ARCP"), announced that it had misstated its prior financial results and that it was commencing an internal investigation into possible accounting fraud. *Id.* ¶¶ 6, 73. Several officers and directors of ARCP subsequently resigned, and some were criminally charged with securities fraud. *Id.* ¶¶ 6, 77. Additionally, in June 2015, a state regulator accused Realty Capital Securities, LLC ("RCS") (HIT's broker-dealer and another AR Capital affiliate) of proxy fraud. *Id.* ¶¶ 5, 86–90. The state regulator filed an administrative complaint to suspend RCS's business license. *Id.* ¶ 90.

The scandals surrounding AR Capital made it extremely difficult for HIT to raise capital and to continue with the IPO process. In late 2014, dozens of broker-dealer firms suspended sales of AR Capital products, including sales of HIT shares. *Id.* ¶ 78. As a result, in November 2015, the Company suspended the IPO process indefinitely. *Id.* ¶¶ 92, 132. The lack of capital caused HIT to become highly leveraged and, at one point, forced the Company to terminate an ongoing property acquisition. *Id.* ¶¶ 70, 97–99.

Notwithstanding HIT's liquidity problems, in November 2015, the Company began paying the Advisor unconditional asset management fees in the form of cash and common stock. *Id.* ¶¶ 95–96, 131. Prior to this time, HIT had paid the Advisor only in the form of subordinated profit interests. *Id.* ¶¶ 65–66, 125.

### III. The Brookfield Transaction

Looking for alternative ways to raise capital, in January 2017, HIT entered into an agreement with Brookfield Strategic Real Estate Partners II, LLC and Brookfield Strategic Real Estate Partners II Hospitality REIT II, LLC (together, "Brookfield"), pursuant to which Brookfield purchased preferred shares of HIT for more than $100 million. *Id.* ¶¶ 102–103.

3

According to Plaintiff, the investment gave Brookfield significant control over the Company. *Id.* ¶¶ 104–106.

In connection with the Brookfield transaction, HIT overhauled its organizational structure. In January 2017, the Company terminated its agreement with the Advisor and hired the Advisor's employees directly, thus moving the Advisor's asset management services in-house. *Id.* ¶¶ 109–110, 151. The Company also reduced and restructured the fees it paid to the Property Managers in connection with their services. *Id.* ¶¶ 151–152. HIT paid approximately $37 million to the Advisor and the Property Managers in connection with this restructuring. *Id.* ¶¶ 151, 153.

## IV. Plaintiff's First Demand Letter

On July 14, 2017, Plaintiff submitted a demand letter to the Board, alleging that numerous officers and directors of HIT, the Advisor, and the Property Managers had breached their fiduciary duties to the Company, committed corporate waste, and violated the Company's charter. *Id.* Ex. A (the "First Demand Letter"). The First Demand Letter also alleged that AR Capital and Brookfield were liable as aiders and abettors. First Demand Ltr. at 1–2.[2] The letter alleged three primary instances of misconduct: first, paying the Advisor unconditional fees in the form of cash and common stock when HIT was facing a liquidity crisis, *see id.* at 2–5; second, paying $37 million to the Advisor and the Property Managers as compensation for the Company's January 2017 restructuring, *see id.* at 5–7; and third, giving Brookfield substantial control over the Company as part of its investment in January 2017, *see id.* at 7–9.[3]

---

[2]  Brookfield is not a party to this action, although it was named in the First Demand Letter.

[3]  The First Demand Letter also alleged that the Advisor, AR Capital, and numerous officers and directors of the Company had failed to ensure that the Company maintained adequate controls over financial reporting. *See* First Demand Ltr. at 10.

4

Within a month of receiving the First Demand Letter, HIT delivered a presentation to Plaintiff providing context for the challenged transactions. Def.'s Mem. of Law, Dkt. 46, at 6; Pl.'s Mem. of Law, Dkt. 51, at 4.[4] Throughout September and October 2017, the parties spoke a few times, and HIT produced some documents to Plaintiff. Def.'s Mem. of Law at 6–7; Pl.'s Mem. of Law at 4–5. On December 8, 2017, Plaintiff delivered a presentation to HIT regarding his theory of the case. Def.'s Mem. of Law at 7; Pl.'s Mem. of Law at 5. The Board did not formally respond to the First Demand Letter at this time.

## V. Plaintiff's Supplementary Demand Letter and the Filing of This Action

On December 12, 2017, Plaintiff submitted a supplementary demand letter to the Board, adding the new allegation that the Company's fee payments to the Property Managers were uncompetitive and unfair. Am. Compl. Ex. B (the "Supplementary Demand Letter"). The Supplementary Demand Letter also asked the Board to "formally confirm" whether the Board had denied Plaintiff's claims and, if not, to advise Plaintiff when a decision was expected. Supp. Demand Ltr. at 1.

The parties held additional discussions throughout December 2017 and January 2018. Def.'s Mem. of Law at 7–8; Pl.'s Mem. of Law at 5–6. During this time, Plaintiff advised HIT that he either would need to enter into a tolling agreement or would file a complaint because the statute of limitations was soon to expire on certain of his claims. Def.'s Mem. of Law at 7–8; Pl.'s Mem. of Law at 5–6.[5] The parties were unable to agree on a tolling agreement; accordingly, Plaintiff filed this action on February 26, 2018, the day before a statute of

---

[4] While the facts relating to the Company's response to Plaintiff's demand letters are not alleged in the Amended Complaint, these facts are for the most part undisputed (unless otherwise indicated).

[5] Plaintiff alleges that he first made the request for a tolling agreement during the December 8, 2017 meeting, *see* Pl.'s Mem. of Law at 5–6, while HIT claims that the issue was first raised in January 2018, *see* Def.'s Mem. of Law at 8. This dispute is not material to the Court's analysis.

5

limitations on some of his claims would have expired. Compl., Dkt. 1; Def.'s Mem. of Law at 8; Pl.'s Mem. of Law at 7; Am. Compl. ¶ 169. The Board had not formally responded to either of Plaintiff's demand letters by this time. *See* Am. Compl. ¶ 168.

## VI. The Wollman Demand and the Company's Formation of a Special Litigation Committee

Two weeks after Plaintiff filed this action, the Company received a demand letter from another shareholder, Stuart Wollman (the "Wollman Demand"). Def.'s Mem. of Law at 8; Pl.'s Mem. of Law at 8. The Wollman Demand raised similar allegations as Plaintiff's two demand letters. *See* Def.'s Mem. of Law at 8–9; Pl.'s Mem. of Law at 8.

On May 1, 2018, the Board finally formed a Special Litigation Committee to investigate the claims made in Plaintiff's two demand letters, the Wollman Demand, and this lawsuit. Def.'s Mem. of Law at 9; Pl.'s Mem. of Law at 8.[6] The SLC is composed of two directors whom HIT claims are disinterested and independent (in particular, because these two directors were appointed to the Board in March 2017, after the transactions that Plaintiff challenges occurred). Def.'s Mem. of Law at 10.[7]

All parties except Defendant Robert H. Burns appeared for an initial pretrial conference on May 4, 2018.[8] On the same day, the Court entered an order temporarily staying the case pending the parties' briefing of HIT's expected motion to stay. *See* Order (May 4, 2018), Dkt. 38; Order (May 4, 2018), Dkt. 39.

---

[6] The SLC was initially formed in March 2018, but the Board did not formally define its scope and mandate until May 1, 2018. *See* Ltr. (May 17, 2018), Dkt. 43, at 1; Newville Decl. in Supp. of Nominal Def.'s Mot. to Stay, Dkt. 47, Ex. C, at 1.

[7] Plaintiff asserts that the two members of the SLC are not disinterested and independent because, among other reasons, they failed to take concrete action in response to Plaintiff's demands prior to the initiation of this lawsuit. *See* Pl.'s Mem. of Law at 8–9.

[8] Plaintiff's efforts to serve Mr. Burns are ongoing. *See* Ltr. (Aug. 1, 2018), Dkt. 67.

## DISCUSSION

**I.     HIT's Motion to Stay Is Granted**

   **A.     A Stay Is Warranted Under Federal Law**

The parties sharply dispute whether a stay is appropriate under Maryland law, which governs the Company's internal affairs. As an initial matter, however, the Court finds that a stay is warranted under federal law, specifically, this Court's inherent discretion to control its docket.

In federal court, "the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 96 (2d Cir. 2012) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). The decision whether to issue a stay is therefore "firmly within a district court's discretion." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. Envtl. Prot. Agency*, 630 F. Supp. 2d 295, 304 (S.D.N.Y. 2009) (quoting *LaSala v. Needham & Co., Inc.*, 399 F. Supp. 2d 421, 427 (S.D.N.Y. 2005)). In deciding whether to stay proceedings, courts in the Second Circuit examine the following five factors:

> (1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest.

*Catskill Mountains*, 630 F. Supp. 2d at 304 (collecting cases); *see also LaSala*, 399 F. Supp. 2d at 427.

Here, these factors weigh strongly in favor of granting a stay. Plaintiff has not identified any specific prejudice that he would suffer from a stay. While Plaintiff has an interest in proceeding expeditiously with this action, the SLC's letters to this Court suggest that its investigation will likely be completed within a few months from the date of this opinion.

7

*See* Ltr. (Aug. 1, 2018), Dkt. 68; Ltr. (July 2, 2018), Dkt. 59; Ltr. (May 17, 2018), Dkt. 43. On the other hand, the prejudice to HIT and the other Defendants is obvious: the SLC is currently reviewing hundreds of thousands of documents, in addition to conducting interviews of relevant parties; thus, simultaneously proceeding with discovery in this action would be onerous and duplicative. As to the interests of the Court, the SLC's investigation could cause HIT to take control of this litigation on its own behalf, or it could yield information that would assist the parties' settlement negotiations or inform a motion to dismiss. Any one of these outcomes could facilitate early resolution of this case. The interests of non-parties are also served by a stay; in particular, a stay avoids the burden that duplicative discovery would impose on any non-party employees or affiliates of the Company. And a stay serves the interests of the public, as it affirms the important principle that a corporation has a right to investigate internal misconduct and decide in the first instance whether to bring a lawsuit in its own name.

For all these reasons, a stay is warranted under this Court's discretionary power to manage its docket, that is, as a matter of federal law.

### B.  A Stay Is Warranted Under Maryland Law

#### 1.  The Applicable Law

In a diversity action, a federal court applies the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). New York law looks "to the law of the state of incorporation in adjudicating a corporation's internal affairs," including questions relating to shareholder derivative actions. *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 772 F.3d 740, 743 n.2 (2d Cir. 2014); *see also, e.g.*, *Steinberg ex rel. Bank of Am. Corp. v. Mozilo*, 135 F. Supp. 3d 178, 182 (S.D.N.Y. 2015). HIT is incorporated in Maryland, *see* Am. Compl. ¶ 22, so this Court must look to Maryland law to determine the Company's duty to respond to a shareholder demand. Maryland courts, in turn, "frequently look[] to Delaware

8

courts for guidance on issues of corporate law." *Oliveira v. Sugarman*, 451 Md. 208, 221 n.4 (2017).

Under Maryland law, a shareholder is required to make a demand on the board of a corporation before initiating a derivative action in the corporation's name. *See id.* at 223. The board must investigate the claims in the demand and decide whether to pursue the claims on behalf of the company or, alternatively, to deny the demand and move to dismiss the action. *See id.* If the board denies the demand, the plaintiff may attempt to show that the denial was wrongful, that is, that it was not the product of good-faith business judgment. *See id.*[9]

Here, Plaintiff made two demands on the Board but initiated suit before the Board formally responded to the demands. Shortly after this lawsuit was filed, the Board formed an SLC to investigate the demands and, accordingly, now moves to stay the action pending its investigation. This fact pattern is rare, but not unprecedented, under Maryland and Delaware law. *See, e.g.*, *Bender v. Schwartz*, 172 Md. App. 648, 662 (2007); *Abbey v. Comput. & Commc'ns Tech. Corp.*, 457 A.2d 368, 370–71 (Del. Ch. 1983); *cf. In re InfoUSA, Inc. S'holders Litig.*, No. CIV-A-1956-CC, 2008 WL 762482, at *1–2 (Del. Ch. Mar. 17, 2008); *In re Oracle Corp. Derivative Litig.*, 808 A.2d 1206, 1210–12 (Del. Ch. 2002). Under these circumstances, courts almost always stay proceedings to afford SLCs "a reasonable time to carry out [their] function." *Abbey*, 457 A.2d at 375; *cf. In re InfoUSA, Inc.*, 2008 WL 762482, at *2; *In re Oracle Corp.*, 808 A.2d at 1210–11 & nn.15–16 (collecting cases). The presumption in favor of a stay is grounded both in "the inherent right of the board of directors to control and look to the well-

---

[9] If, however, a majority of directors are not disinterested with respect to the transaction at issue, the board forms an SLC to investigate the demand, and the SLC chooses to deny the demand, then the burden is on the corporation to show that the SLC's decision was not wrongful. *See Oliveira*, 451 Md. at 224–25 (citing *Boland v. Boland*, 423 Md. 296, 340–41 (2011)).

being of the corporation in the first instance," *In re Oracle Corp.*, 808 A.2d at 1211, and in the interest in avoiding "a duplication of discovery," *Abbey*, 457 A.2d at 375.[10]

While a stay is in effect, courts ordinarily defer resolution of a plaintiff's arguments that a board lacks independence from the challenged transactions or is otherwise not conducting the investigation in good faith. *See, e.g.*, *In re InfoUSA, Inc.*, 2008 WL 762482, at *2; *Biondi v. Scrushy*, 820 A.2d 1148, 1164 (Del. Ch. 2003), *aff'd sub nom. In re HealthSouth Corp. S'holders Litig.*, 847 A.2d 1121 (Del. 2004). Deferring these questions until after the SLC issues its response to the demand serves "judicial economy . . . because the court may then consider questions of committee independence at the same time it examines the reasonableness of the bases for the committee's conclusion." *Biondi*, 820 A.2d at 1164. The courts have carved out a narrow exception to this rule: if "the undisputed facts in the stay motion record" show that the committee so clearly lacks independence and disinterestedness that "the committee's later decision to terminate the litigation could not command respect" from the court, then a stay may properly be denied. *Id.* at 1165. Notwithstanding this exception, courts "almost invariably" grant stays pending SLC investigations. *Id.* at 1164.

### 2. The SLC Is Entitled to a Reasonable Amount of Time to Conduct Its Investigation

Here, Plaintiff challenges at least four different transactions. The challenged transactions are complex and wide-ranging, including asset management fees that were paid for a number of years and compensation for a complete restructuring of the Company. Additionally, Plaintiff challenges whether the Board acted in good faith when it decided to enter into these transactions,

---

[10] In *Abbey*, for example, a shareholder made a demand on a corporation's board and filed suit a few weeks later, before the board formally responded to the demand. *See* 457 A.2d at 370. The board subsequently formed an SLC and moved to dismiss or, in the alternative, to stay the action pending the SLC's investigation. *See id.* at 371. The Delaware Court of Chancery denied the motion to dismiss but granted the motion to stay, reasoning that the power of a corporate board to form an independent committee to investigate misconduct would not be "meaningful" if the committee did not have a "reasonable time" to conduct its investigation. *Id.* at 375.

10

requiring the SLC to review documents on which the Board relied and to conduct investigative interviews. An investigation of this scope could take several months to complete. Because the SLC's investigation has been ongoing for only three months, the Committee is entitled to more time to complete it.

Plaintiff argues that the Board delayed forming an SLC until nearly eight months after he submitted the First Demand Letter. *See* Pl.'s Mem. of Law at 11. Until the SLC was formed, Plaintiff argues, the Board did not seriously investigate his allegations. *See id.* Thus, in Plaintiff's view, the Board has already had more than a reasonable amount of time to investigate his claims and is not entitled to a stay. *See id.* The Court agrees that the Board should have moved with greater alacrity in forming an SLC and investigating the challenged transactions. Between July 2017 and March 2018, it is not clear that the Board conducted any investigative interviews, and it appears that the Board produced only a few hundred documents to Plaintiff during this time (compared with the population of 166,000 possibly relevant documents that the SLC later identified, *see* Ltr. (July 2, 2018) at 2). Additionally, because Plaintiff's allegations implicate numerous members of the Board, the Board should have more promptly formed an SLC to ensure that its investigation would be fully independent and disinterested.

Nevertheless, several factors convince the Court that the Board's formation of the SLC did not come so late that a stay is unwarranted. After Plaintiff served the First Demand Letter, he and the Board actively discussed each side's view of the facts, including the possibility of defenses such as statutes of limitations and a release agreement. Additionally, Plaintiff added new allegations in the Supplementary Demand Letter as late as December 2017, arguably requiring further discussions before an SLC could be formed. The Board began the process to form the SLC less than three months after receiving Plaintiff's Supplementary Demand Letter.

Once the SLC's scope was finalized, the Committee quickly and diligently began obtaining relevant electronic communications and identifying strategies for document review. Under these circumstances, the Court cannot say that the Board was so derelict in its duties that it should lose its right to investigate possible misconduct and to determine in the first instance whether a lawsuit is in the Company's best interests. Indeed, courts have granted stays in circumstances involving considerably longer delays than the one at issue here. *See, e.g.*, *In re InfoUSA, Inc.*, 2008 WL 762482, at *1 (granting a stay pending an SLC's investigation, even though the SLC was formed nearly a year after the action was filed).

For all these reasons, the SLC is entitled to a stay for a reasonable amount of time while it conducts an investigation and decides whether to pursue this action on behalf of the Company.

### 3. The Court Will Defer Resolution of Plaintiff's Arguments Regarding the Independence and Good Faith of the Board's Investigation Until the Stay Is Lifted

Plaintiff argues that the Board's failure to investigate his claims independently and in good faith between July 2017 and March 2018 amounts to a constructive refusal of his demands. *See* Pl.'s Mem. of Law at 1–2, 9–11, 20–21. In Plaintiff's view, the Board's failure to act during that time constitutes a *de facto* refusal of his claims. *See id.* at 9–11. Plaintiff argues that the Court should not give the Board a "do-over" of its refusal decision by staying proceedings and allowing the Board belatedly to conduct an investigation. *Id.* at 8; *see also id.* 1–2, 20–21. The Court disagrees.

Plaintiff is correct that a board's failure to take action in response to a shareholder demand can, in limited circumstances, constitute a *de facto* refusal of that demand. *See Steinberg*, 135 F. Supp. 3d at 183–84 (applying Delaware law); *Rich ex rel. Fuqi Int'l v. Yu Kwai Chong*, 66 A.3d 963, 976–77 (Del. Ch. 2013); *see also, e.g.*, *Lowinger ex rel. Caterpillar, Inc. v. Oberhelman*, No. 15-CV-1109, 2017 WL 1224524, at *3 (C.D. Ill. Mar. 31, 2017) (under

12

Delaware law, "[a] board's failure to issue a formal response to the demand may constitute an implicit refusal"); *Landers v. Morgan Asset Mgmt.*, No. MDL-2009-08-2260, 2010 U.S. Dist. LEXIS 114492, at *7 (W.D. Tenn. Oct. 27, 2010) (under Maryland law, "[w]here a board of directors refuses to respond to a demand in a timely fashion, the plaintiffs may amend their complaint to state a demand-wrongly-refused action").

But whether a plaintiff may proceed with litigation in spite of a board's failure to act depends on the posture of the case and the type of relief that the board is seeking. If a board moves to *dismiss* a case after failing to act on a shareholder's demand, the plaintiff can proceed with the suit if he raises a reasonable doubt that the board's conduct was the product of good-faith business judgment. *See Steinberg*, 135 F. Supp. 3d at 183–84; *Rich*, 66 A.3d at 976–77.[11] If a board moves to *stay* a case, the standard is much higher: the plaintiff must proffer "undisputed facts" of the board's bad faith that show that the board's final report could not possibly "command respect" from the court. *Biondi*, 820 A.2d at 1165; *see also In re InfoUSA, Inc.*, 2008 WL 762482, at *2–3; *cf. Abbey*, 457 A.2d at 375.

The difference between these two standards is well-founded. When a board moves to dismiss a case, the court must balance the interests of the corporation in possibly meritorious litigation with the deference traditionally accorded corporate boards. *See Oliveira*, 451 Md. at 221; *Werbowsky v. Collomb*, 362 Md. 581, 599 (2001). A motion for a stay does not raise the same risks that the plaintiff will be unable to proceed with the lawsuit and that the corporation will be deprived of the opportunity to pursue important litigation. Thus, it is appropriate for a

---

[11] To be precise, the plaintiff needs to raise a reasonable doubt as to the board's good faith only if the board failed to respond formally to the demand but took "some action" to investigate it. *Rich*, 66 A.3d at 977; *see also Steinberg*, 135 F. Supp. 3d at 183–84. If, on the other hand, the board took no action at all in response to the demand, the plaintiff can succeed if he shows that the board's failure to act was "wrongful," an analysis that turns on the amount of time that the board had to respond to the demand in light of the demand's complexity. *Rich*, 66 A.3d at 976; *see also Steinberg*, 135 F. Supp. 3d at 183.

court to require a higher standard to defeat a motion to stay and, on the other hand, to inquire more carefully into the board's good faith and independence on a motion to dismiss.[12]

Here, HIT has moved for a stay, not a dismissal. The undisputed facts do not show that the SLC's report would not command respect from this Court; on the contrary, the SLC is composed of two directors who joined the Board after the challenged transactions took place, making it likely that they are independent and disinterested from those transactions. *See* Def.'s Mem. of Law at 10.[13] Given that HIT has satisfied the standard for a stay, any further inquiry into the independence and good faith of the Board is not appropriate at this stage.

For all these reasons, Plaintiff's argument that the Board wrongfully refused his demand fails.

### 4. Plaintiff May Move to Lift the Stay if the SLC Does Not Proceed with Reasonable Expeditiousness

The stay in this case, like all other stays under these circumstances, is subject to a limit of reasonableness. To date, the SLC's investigation appears to be proceeding diligently and expeditiously, based on the monthly status letters that it has submitted. *See* Ltr. (Aug. 1, 2018); Ltr. (July 2, 2018); Ltr. (May 17, 2018). The SLC must continue submitting these monthly updates, pursuant to the instructions in the order at Dkt. 43. If Plaintiff has reason to believe that

---

[12] To be clear, very few Delaware or Maryland cases have dealt with the situation currently before this Court, that is, a board's motion to stay that was filed after a shareholder made a demand but before the board formally acted on it. *See, e.g.*, *Abbey*, 457 A.2d at 375. Most cases involved motions to stay when a plaintiff *failed* to make demand (because the plaintiff argued that demand was excused in his case). *See, e.g.*, *In re InfoUSA, Inc.*, 2008 WL 762482, at *2; *Biondi*, 820 A.2d at 1150. Nevertheless, in light of the policy rationales that the Court has discussed, the Court believes that the standards set forth in these cases should apply to all motions to stay, regardless of whether demand has or has not been made at the time of the motion.

[13] Plaintiff argues that these two directors lack independence because they failed to investigate his claims prior to the SLC's formation and because they signed a public filing which stated that Plaintiff's claims are "without merit." Pl.'s Mem. of Law at 8–9. This argument falls far short of showing *undisputed* facts that demonstrate that the SLC's decision could not command the respect of this Court, not least because Plaintiff omits the full context of the public filing, which stated that "[b]ased on its investigation to date, the Company believes that the claims are without merit." Newville Reply Decl. in Supp. of Nominal Def.'s Mot. to Stay, Dkt. 55, Ex. A, at 4 (emphasis added).

the SLC's investigation is not proceeding with reasonable expeditiousness, he may move to lift the stay. Given the complexity of the issues and the nature of the investigation, Plaintiff may not file any such motion earlier than **December 3, 2018**.

## CONCLUSION

For all the foregoing reasons, HIT's motion to stay (Dkt. 45) is GRANTED. This case is STAYED pending the SLC's investigation. The SLC must continue to submit monthly updates on the status of its investigation, pursuant to the instructions in the order at Dkt. 43. Plaintiff may move to lift the stay if he can show that the SLC's investigation is not proceeding with reasonable expeditiousness, but Plaintiff may not file any such motion earlier than **December 3, 2018**.

The Clerk of Court is respectfully directed to close the open motion at Dkt. 45.

**SO ORDERED.**

**Date: August 7, 2018**
**New York, New York**

**VALERIE CAPRONI**
**United States District Judge**