**REPORT OF THE**

**SPECIAL LITIGATION COMMITTEE**

**OF THE**

**BOARD OF DIRECTORS**

**OF**

**HOSPITALITY INVESTORS TRUST, INC.**

**October 11, 2019**

<u>TABLE OF CONTENTS</u>

I.      EXECUTIVE SUMMARY ................................................................................. 11

        A.      The Milliken Demands and Milliken Action ......................................12

        B.      The Wollman Demand ..........................................................................14

        C.      The Special Litigation Committee's Investigation .............................15

II.     SUMMARY OF SHAREHOLDER ALLEGATIONS .................................. 18

        A.      The Shareholder Allegations................................................................18

III.    THE SPECIAL LITIGATION COMMITTEE ............................................ 30

        A.      Appointment and Authority of the Special Litigation Committee.........30

        B.      Members of the Special Litigation Committee ....................................31

        C.      Independence of the Members of the Special Litigation Committee ..................32

        D.      Retention of Counsel to the Special Litigation Committee ................36

IV.     THE INVESTIGATION ................................................................................. 37

        A.      Duration of Investigation ....................................................................37

        B.      Committee Meetings and Status Updates ............................................38

        C.      Document Review.................................................................................39

        D.      Interviews and Meetings .....................................................................42

        E.      Unsuccessful Efforts to Obtain Certain Interviews or Information ....................43

V.      INVESTIGATION SUMMARY .................................................................. 44

        A.      AR Capital and Key Persons................................................................44

        B.      Hospitality Investors Trust, Inc...........................................................45

        C.      The Advisor .........................................................................................46

        D.      The Property Managers........................................................................49

        E.      The Property Management Agreements ...............................................50

        F.      Acquisition of Properties and REIT Performance ..............................56

        G.      HIT's Debt Obligation.........................................................................60

        H.      The Amendment to the Advisory Agreement in November 2015 ....................62

        I.      The RCS Investigation and Subsequent Shuttering of its Business and the
                Company's IPO....................................................................................64

        J.      The Need for Strategic Alternatives To Meet The Company's Funding
                Obligations...........................................................................................67

        K.      Hentschel & Co. Strategic Alternatives Process..................................72

2

L.     The April 2016 Proxy Statement ............................................................75

M.    Duff & Phelps Net Asset Valuation ......................................................75

N.    Retention of Jefferies, LLC ..................................................................76

O.    The Company's Going Concern Issue ...................................................77

P.    The Company's Evaluation of Investment Proposals ............................78

Q.    The Brookfield Transaction and Internalization of Management ..........81

R.    The Securities Purchase, Voting, and Standstill Agreement ................84

VI.    GOVERNING LEGAL PRINCIPLES ............................................................ 85

A.    Elements of Demand Shareholders' Claims ..........................................85

B.    Limitations on Liability ........................................................................90

VII.    ANALYSIS OF SHAREHOLDER ALLEGATIONS ...................................... 92

A.    The Allegation That The Independent Directors Lacked Independence To Make Decisions In The Best Interest Of The Company .........................92

B.    The Allegation That The Property Management Arrangements With Affiliates Were Designed To Generate Fees For AR Capital At The Expense Of The Company ....................................................................100

C.    The Allegation That The Amendment to the Advisory Agreement Was Designed To Generate Fees For AR Capital At The Expense Of The Company .............................................................................................109

D.    The Allegation That The Company's Strategy To Acquire Properties Was Designed To Generate Fees For AR Capital At The Expense Of The Company .............................................................................................121

E.    The Allegation That Company's Transaction with Brookfield and Corresponding Securities Purchase, Voting, and Standstill Agreement Violated The Charter And Benefited Brookfield To The Detriment Of Shareholders .........................................................................................123

F.    The Allegation That The Framework Agreement Caused Impermissible Payments To The Advisor And Property Managers ............................129

G.    The Allegation That The April 2016 Proxy Statement Violated Section 14(a) Of The Securities Exchange Act .............................................131

H.    The Allegation That The Mutual Release Is Void And Unenforceable ..............132

I.    Jonathan P. Mehlman Settlement ........................................................135

J.    Shareholder Claims Involving Officers and Independent Directors ....136

VIII.    CONCLUSIONS .......................................................................................... 142

IX.    NEXT STEPS .............................................................................................. 147

LIST OF EXHIBITS

Exhibit A:      Milliken and Wollman Demand Letters

Exhibit B:      Action by Unanimous Written Consent of the Board of Directors Appointing Special Litigation Committee, dated as of May 1, 2018

Exhibit C:      Articles of Amendment and Restatement for American Realty Capital Hospitality Trust, Inc., dated as of December 6, 2013 (Company Charter)

Exhibit D:      Advisory Agreement by and among American Realty Capital Hospitality Trust, Inc., American Realty Capital Hospitality Operating Partnership, L.P., and American Realty Capital Hospitality Advisors, LLC, dated as of January 7, 2014

Exhibit E:      First Amendment to the Advisory Agreement, dated as of November 11, 2015

Exhibit F:      Form of Management Agreement by and between American Realty Capital Hospitality TRS Subsidiary and American Realty Capital Hospitality Properties, LLC

Exhibit G:      Form S-11 Registration Statement of American Realty Capital Hospitality Trust, Inc., dated as of August 16, 2013

Exhibit H:      Minutes of Meeting of the Board of Directors of American Realty Capital Hospitality Trust, Inc. and Related Presentations to the Board of Directors, dated May 16, 2014, May 20, 2014, May 27, 2015, May 29, 2015, and June 12, 2015

Exhibit I:      Hentschel & Co. Presentations to the Special Committee

Exhibit J:      Jefferies, LLC Presentations to the Board of Directors

Exhibit K:      Framework Agreement, dated as of January 12, 2017

Exhibit L:      Mutual Waiver and Release, dated as of March 31, 2017

Exhibit M:      Securities Purchase, Voting, and Standstill Agreement, dated as of March 31, 2017

Exhibit N:      Hentschel & Co. Fairness Opinion, Jefferies Fairness Opinion, & Venable Non-Contravention Opinion

Exhibit O:      Status Letters from the Committee to the Court

Exhibit P:      Declarations of Edward A. Glickman and Stephen P. Joyce

4

<u>Exhibit Q:</u>     Proposed Settlement Agreement between Hospitality Investors Trust, Inc. and Jonathan P. Mehlman

TIMELINE OF KEY EVENTS[1]

Company Formation                                                          July 2013

- The Company was formed in July 2013 as "American Realty Capital Hospitality Trust, Inc." by its sponsor American Realty Capital IX, LLC.  During March 2017, the Company changed its name to Hospitality Investors Trust, Inc. in connection with the internalization of its management functions.

The Public Offering                                                        January 7, 2014

- The Company commenced its public offering on January 7, 2014.

Form Property Management Agreement                                         December 6, 2013

- The Board of Directors, comprised of Nicholas Schorsch, Abby Wenzel and Sue Perotty, approved, on December 6, 2013, the form of a property management agreement which provided for a payment of 4% of gross revenue to the Company's Property Manager.

American Realty Capital Properties, Inc. Accounting Scandal                October 2014

- In October 2014, an accounting scandal involving an ARC-sponsored REIT, American Realty Capital Properties, Inc. ("ARCP") became public.  The ARCP accounting scandal involved knowingly misrepresenting a key metric that was used to evaluate ARCP's financial performance and led to securities fraud charges against Brian Block and Nicholas Schorsch's resignation as Chairman of the Company's Board.

Grace Transaction                                                         February 27, 2015

- On February 27, 2015, the Company closed on its acquisition of 116 hotels owned by W2007 Grace I, LLC and WNT Holdings, LLC (the "Grace Transaction").

Summit, Wheelock, and Noble Transactions                                  May and June 2015

- On May 27, May, 29, and June 12, 2015, the Board of Directors approved the acquisition of the Summit, Wheelock, and Noble portfolios.  The Company's eventual liquidity crisis caused the Company to forfeit more than $40,000,000 of the money deposited in connection with these transactions.

---

[1] The information contained in this Report is based on the Committee's investigation, which included the review of documents and interviews of various persons.  The Committee received some but not all of the information that it sought. This summary is based on the Committee's knowledge to date.

| Apollo Transaction Fails | November 8, 2015 |
|---|---|

- On November 8, 2015, AR Global and an affiliate of Apollo Global Management, LLC terminated an agreement in which Apollo would have purchased a 60% stake in AR Capital's assets.

| The Amendment to the Advisory Agreement | November 8, 2015 |
|---|---|

- On November 8, 2015, an attorney employed by RCS, the Company's Dealer Manager and an affiliate of AR Capital, sent emails to the Company's Independent Directors seeking approval of an Amendment to the Advisory Agreement between the Company and American Realty Capital Hospitality Advisors, LLC that would provide for the payment of a cash asset management fee.  The Independent Directors approved the Amendment to the Advisory Agreement as proposed by the Advisor on November 8, 2015.  Subsequently, the Independent Directors approved a clarification to the Amendment to the Advisory Agreement that added an MFFO (modified funds from operation) coverage threshold that had to be met in order for the asset management fee to be paid for a given period.  Following the amendment of the Advisory Agreement, the Company paid the Advisor approximately $26,000,000 in cash asset management fees through 2017.

| Massachusetts Secretary of State Securities Division Complaint | November 12, 2015 |
|---|---|

- The Mass. SOS alleged that RCS violated the Massachusetts Uniform Securities Act and the regulations thereunder in connection with the solicitation of proxies for an entity controlled by AR Capital.  RCS was seeking the proxies in connection with a potential transaction between AR Capital and an affiliate of Apollo Global Management, LLC.

| Suspension of Public Offering | November 15, 2015 |
|---|---|

- On November 15, 2015, the Board unanimously voted to suspend the Company's public offering effective December 31, 2015, and, on November 18, 2015, RCS suspended sales of the Company's securities.  On December 8, 2015, the Company terminated RCS as the Dealer Manager for the public offering, effective December 31, 2015.

| Hentschel & Co. Strategic Alternatives | December 8, 2015 |
|---|---|

- On December 8, 2015, the Independent Directors selected Hentschel & Co. as their financial advisor for the purpose of identifying strategic alternatives to the Company's liquidity crisis.

| Jefferies, LLC Engagement | July 8, 2016 |
|---|---|

- On July 8, 2016, the Board of Directors formally retained Jefferies, LLC as a financial advisor to evaluate strategic alternatives and review third party investor proposals.

<u>Framework Agreement</u>            <u>January 12, 2017</u>

- On January 12, 2017, the Framework Agreement which conveyed roughly $37M to the Property Managers and the Advisor was finalized.  The Framework Agreement provided the path to the termination of the Advisory Agreement and the restructuring of the Company's property management arrangements.

<u>Securities Purchase, Voting, and Standstill Agreement</u>    <u>March 31, 2017</u>

- On March 31, 2017, the Company closed its transaction with Brookfield Strategic Real Estate Partners II Hospitality REIT II, LLC.  The Brookfield transaction was the result of the Company's strategic alternatives process and resulted in up to a $400-million dollar investment in the Company and severance of ties with AR Capital.

## KEY PERSONS AND ENTITIES

| | |
|---|---|
| • AR Capital, LLC and its successor, AR Global Investments, LLC | The parent of the Company's sponsor and majority owner of the Company's former Advisor and former Property Managers. |
| • American Realty Capital Hospitality Advisors, LLC | The Company's former Advisor. |
| • American Realty Capital Hospitality Properties, LLC; and<br>• American Realty Capital Hospitality Grace Portfolio, LLC | The Company's former Property Managers. |
| • Nicholas Schorsch | The Chairman of the Company's Board of Directors from inception until December 2014.  He is a majority owner of AR Capital. |
| • William Kahane | The Company's Chief Executive Officer from inception through December 2014 and Chairman of the Board from December 2014 through March 2017.  He is a part-owner of AR Capital. |
| • Peter Budko;<br>• Edward Weil; and<br>• Brian Block | Block served as the Company's initial Chief Financial Officer. Weil and Budko were not officers or directors of the Company.  All three individuals are part-owners of AR Capital. |
| • Jonathan P. Mehlman | The Company's Chief Investment Officer, Chief Executive Officer and a Director. |
| • Ed Hoganson | The Company's former Chief Financial Officer from December 2014 until his resignation effective May 28, 2019. |
| • Stanley Perla;<br>• Abby Wenzel; and<br>• Robert Burns | Abby Wenzel was appointed as an independent director in September 2013 and currently serves in that role. Stan Perla was appointed as an independent director in |

|  | January 2014 and currently serves in that role, while Robert Burns resigned in March 2017. |
|--|--|

I.   **EXECUTIVE SUMMARY**

On July 14, 2017, Tom Milliken, a shareholder of Hospitality Investors Trust, Inc.,[2] a Maryland corporation (the "Company" or "HIT"), sent a letter demanding that the Company investigate certain matters which are set forth below.  Mr. Milliken sent a second demand letter to the Company's Board of Directors on December 12, 2017 (collectively, the "Milliken Demands"). Counsel for the Company engaged in discussions with counsel for Mr. Milliken and produced documents related to the allegations made in the Milliken Demands.  On February 26, 2018, Mr. Milliken filed a shareholder derivative action styled as *Milliken v. American Realty Capital Hospitality Advisors, LLC*, No. 18-CV-1757 in the United States District Court for the Southern District of New York[3] (the "Milliken Action").  The Complaint included allegations contained in the Milliken Demands.  The Milliken Action named as defendants AR Capital, LLC and its successor, AR Global Investments, LLC, the parent company of the sponsor of the Company (collectively "AR Capital"); American Realty Capital Hospitality Advisors, LLC, the former advisor to the Company; American Realty Capital Hospitality Properties, LLC and American Realty Capital Hospitality Grace Portfolio, LLC, the former property managers of the Company (the "Property Managers" or "Property Manager Defendants."); Nicholas Schorsch, the former Chairman of the Board of the Company and majority owner of AR Capital; William Kahane, the former CEO, Chairman of the Board, and part-owner of AR Capital; Peter Budko, Edward Weil, and Brian Block, other owners of AR Capital; Jonathan P. Mehlman, the current CEO of the

---

[2] The Company was formerly known as American Realty Capital Hospitality Trust, Inc.
[3] On July 23, 2018, Tom Milliken, derivatively on behalf of the Company, amended the Complaint. (A copy of the Milliken Demands and Wollman Demand are attached hereto as Exhibit A; the Complaint and Amended Complaint are filed with the Court as Docket Entries 1 and 65).

Company; Ed Hoganson,[4] the former CFO of the Company, and Stanley Perla, Abby Wenzel and Robert Burns the Company's designated independent directors during the relevant period.

On March 15, 2018, a second shareholder, Dr. Stuart Wollman (collectively with Mr. Milliken the "Plaintiff/Demand Shareholders"), sent a demand letter to the Company (the "Wollman Demand") with demands similar to those set forth in the Milliken Demands and Milliken Action (collectively the "Shareholder Allegations").[5]

On May 1, 2018, the Board established a Special Litigation Committee (the "Committee")[6] to investigate the Shareholder Allegations; to evaluate whether it was in the best interest of the Company for certain claims to be  pursued and/or to terminate some or all of the Shareholder Allegations; and to act with the full authority of the Board with regard to the allegations set forth in the Shareholder Allegations.

On May 25, 2018, the Plaintiff in the Milliken Action filed an Amended Complaint summarized below.

A.    **The Milliken Demands and Milliken Action**

The Amended Complaint asserts seven[7] causes of action, which are predicated upon three transactions: (i) Cash Asset Management Fee Claims, (ii) Property Management Arrangement Claims, and (iii) Release Claims discussed below.

The seven Counts are:

---

[4] As set forth in the Company's recent Form 8-K filing dated May 3, 2019, Hoganson left the Company earlier this year.
[5] This definition incorporates the allegations set forth in Plaintiff Milliken's Amended Complaint filed on July 23, 2018.
[6] The Committee was originally identified as the Demand Review Committee pursuant to a resolution of the Board dated March 21, 2018.
[7] Count VII is for declaratory judgment and does not seek damages.

1.　*Count I - Breach of Fiduciary Duty against the American Realty Capital Hospitality Advisors, LLC ("the Company's Former Advisor"), Nicholas Schorsch ("Schorsch"), William Kahane ("Kahane"), Jonathan P. Mehlman ("Mehlman"), Edward Hoganson ("Hoganson"), Abby Wenzel ("Wenzel"), Stanley Perla ("Perla"), and Robert Burns ("Burns"), (collectively identified in the Amended Complaint as the "Fiduciary Defendants") with respect to the Cash Asset Management Fee Claims, the Property Management Arrangement Claims and the Release Claims;*

2.　*Count II – Waste of Corporate Assets against the Directors and the Advisor with respect to the Cash Asset Management Fee Claims, the Property Management Arrangement Claims and the Release Claims;*

3.　*Count III – Aiding and Abetting Breach of Fiduciary Duty and Waste of Corporate Assets against AR Capital, LLC and its successor entity AR Global, LLC (collectively defined in the Amended Complaint as "AR Capital"), and owners of AR Capital, Peter Budko ("Budko"), Edward Weil ("Weil") and Brian Block ("Block") (collectively identified in the Amended Complaint as the "AR Capital Defendants") and Schorsch with respect to the Cash Asset Management Fee Claims, the Property Management Arrangement Claims and the Release Claims;*

4.　*Count IV – Breach of Contract by allegedly violating the Charter against Schorsch, Kahane, Wenzel, Perla and Burns with respect to the Cash Asset Management Fee Claims, the Property Management Arrangement Claims and the Release Claims;*

5.　*Count V – Violation of Section 14(a) of the Securities Exchange Act of 1934 for alleged false and misleading statements in the April 2016 Proxy Statement against Kahane, Mehlman, Hoganson, Perla and Burns;*

6.　*Count VI – Unjust enrichment against the AR Capital Defendants, American Realty Capital Hospitality Advisors, LLC American Realty Capital Hospitality Properties, LLC and American Realty Capital Hospitality Grace Portfolio, LLC (the "Property Manager Defendants"); Schorsch and Kahane, who received the alleged improperly paid cash management fees and with respect to conversion of Class B units in the Operating Partnership to common stock owned by American Realty Capital Hospitality Advisors, LLC (the "Advisor"); and*

7.　*Count VII – Declaratory Judgment that the Release Agreement is unenforceable as a matter of law and is therefore null and void.*

The causes of action relate to three factual matters:

13

1.      The Cash Asset Management Fee Claims, defined in the Amended
        Complaint as the "claims relating to the Company's payment of cash asset
        management fees, and claims relating to the April 2016 Proxy Statement."
        (Amended Compl. ¶ 13.)

2.      The Property Management Arrangement Claims, defined in the Amended
        Complaint as "the Company's claims arising from its entry into property
        management agreements with the Property Managers through which it paid
        property management fees at grossly uncompetitive rates, and its payments
        of compensation to the Advisor and Property Managers to restructure these
        uncompetitive arrangements . . . ." (Amended Compl. ¶ 16.)

3.      The Release Claims, defined in the Amended Complaint as claims arising
        from the Defendants causing the Company to enter into a Mutual Waiver
        and Release dated March 31, 2017 "through which [the Company]
        purportedly released the Advisor, Property Managers, AR Capital, AR
        Capital's members, Company officers and certain Company Directors from
        all claims, losses, and proceedings." (Amended Compl. ¶ 17.)

## B.      The Wollman Demand

On March 15, 2018, Dr. Wollman sent a demand letter to the Company's Board of

Directors.  Dr. Wollman's demand letter raises issues similar to those asserted in the Milliken

Action.  A focus of the Demand Letter is the Company's acquisition of properties, namely the

acquisition of 116 hotels owned by W2007 Grace I, LLC and WNT Holdings, LLC (referred to

herein as the "Grace Transaction" or "Grace Portfolio"), which closed on February 27, 2015 and

subsequent efforts by the Company to acquire additional hotels from Summit Hotel OP, LP, the

operating partnership of Summit Hotel Properties, Inc., affiliates of Wheelock Real Estate Fund,

L.P. and affiliates of Noble Investment Group, LLC (collectively referred to herein as the "SWN

Transactions").  The Wollman Demand addressed earnest money forfeited by the Company when

it was unable to close on all of the properties contemplated by the SWN Transactions.  The

Wollman Demand also discussed the financing transaction pursuant to which the Brookfield

Strategic Real Estate Partners II Hospitality REIT II LLC ("Brookfield") transaction was closed

14

in early 2017, including the "Framework Agreement" that the Company and AR Capital-related entities entered into in connection with the internalization of management of the Company in 2017.

### C.      The Special Litigation Committee's Investigation

On March 21, 2018, the Board unanimously adopted a resolution to create a Demand Review Committee, comprised of two independent directors who were not affiliated with the Company during the time period at issue, to review the Shareholder Demands and the Milliken Action.  On May 1, 2018, the Board of Directors adopted a resolution regarding the formation of a Special Litigation Committee, which was vested with the authority to investigate the Shareholder Allegations[8] and evaluate whether the Company should allow the claims asserted in the Shareholder Allegations to proceed, arrive at such decisions, prepare any reports as deemed appropriate by the Special Litigation Committee, and take such other actions in connection with the Shareholder Allegations as the Special Litigation Committee in its sole discretion deemed appropriate and in the best interests of the Company and its stockholders, in accordance with the Maryland General Corporation Law.  The Special Litigation Committee is vested with the full authority of the Board to assess and take action as it deems appropriate related to the current litigation (a copy of the Company's resolution establishing the Special Litigation Committee is attached hereto as Exhibit B).

The Committee retained independent legal counsel, Scott N. Sherman and Thomas A. Ferrigno[9] from Nelson Mullins Riley & Scarborough LLP to assist the Committee with its investigation.  Beginning in April 2018, the Committee engaged in an extensive undertaking that

---

[8] Defined in the board resolution as the "Matters for Review and Investigation."
[9] As of June 13, 2019, Mr. Ferrigno resigned from Nelson Mullins and joined Murphy & McGonigle, P.C. but continues to represent the Committee.

included the collection and review of Company documents and electronic communications, collecting over 1 million pages of written materials.  Furthermore, the Committee interviewed ten individuals over the course of nineteen days including Company personnel and relevant third parties.  In doing so, the Committee investigated the claims raised in both the Milliken Action (which incorporated the Milliken Demand letters) and the Wollman Demand.  During the course of its investigation, the Committee reviewed and analyzed (i) the Company's efforts to acquire hospitality properties; (ii) the property management arrangements with entities affiliated with AR Capital; (iii) the Advisory Agreement between the Company and the Advisor and the Amendment to the Advisory Agreement; (iv) the facts and circumstances surrounding the liquidity crisis that the Company confronted after the Company was forced to terminate its public offering in late 2015, which ultimately led to the Company's transaction with Brookfield (the "Brookfield Transaction"); (v) the Framework Agreement that the Company entered into with AR Capital-related entities at the time of the Brookfield Transaction in January 2017; (vi) the Securities Purchase, Voting, and Standstill Agreement between the Company and Brookfield; and (vii) the Mutual Waiver and Release entered into in connection with the Brookfield Transaction, which was finalized in March 2017.  The Committee also reviewed related allegations including claims related to the independence of the "Independent Directors of the Company — Perla, Wenzel and Burns — during the relevant timeframe and the claim associated with the 2016 Proxy Statement (Count V of the Amended Complaint).

    In summary, after considering the claims raised in the Shareholder Allegations, the Committee has determined that it is in the best interest of the Company that certain but not all of the claims asserted in the Amended Complaint should proceed.  The Committee believes it is appropriate to allow claims against Nicholas Schorsch, William Kahane, the Company's former

Advisor and former Property Managers, and AR Capital, the parent of the former sponsor of the Company, along with individuals associated with the parent to proceed in the Milliken Action. These claims include: (1) breach of fiduciary duty and corporate waste regarding the property management agreements entered into with affiliates of AR Capital; (2) breach of fiduciary duty and corporate waste regarding the Amendment to the Advisory Agreement; and (3) breach of fiduciary duty, corporate waste, aiding and abetting, and unjust enrichment regarding the Framework Agreement.  As discussed in Sections VII. B-C. below, in light of the refusal of AR Capital and its affiliated entities and individuals to cooperate, the Committee is unable to render a final determination on certain claims associated with the Property Management Agreements and Amendment to the Advisory Agreement in light of the Mutual Waiver and Release that may affect pursuit of the claims unless the Release can be voided in whole or in part.  The Committee believes it prudent to reserve the right to pursue such claims as the Milliken Action progresses.

The Company's current Chief Executive Officer, Jonathan P. Mehlman, received, through interests in the AR Capital-affiliated entities, a portion of the funds paid by the Company in connection with the transactions discussed above.  Following the Committee's investigation, the Company and Mehlman reached an agreement in principle which contemplates the repayment to the Company of a portion of the fees he received in resolution of the claims against him, subject to the Court's approval of a definitive settlement agreement (attached hereto as Exhibit Q) and dismissal with prejudice as to the claims against him.  The Committee has also determined that the claims against the remaining directors and officers named as defendants in the Milliken Action should not proceed.

## II.     SUMMARY OF SHAREHOLDER ALLEGATIONS

The Shareholder Allegations are summarized further below.

### A.     <u>The Shareholder Allegations</u>

#### 1.     *The Allegation That The Independent Directors Lacked Independence To Make Decisions In The Best Interest Of The Company*

The Plaintiff/Demand Shareholders allege that the Company's designated independent directors, Abby Wenzel, Bob Burns, and Stanley Perla (the "Independent Directors"), [10] were not capable of making decisions with only the Company's best interest in mind and therefore, were not "independent" directors.  Because this allegation relates to the Board's decision-making with respect to each of the challenged transactions, it is therefore addressed first.

The Plaintiff/Demand Shareholders allege that as a result of the Independent Directors' affiliations with numerous AR Capital-sponsored non-traded REITs in addition to the Company and their receipt of significant compensation from these entities, the Independent Directors were not capable of making decisions with only the Company's best interest in mind.  "The Independent Directors" continued nomination for director positions at AR Capital-sponsored entities, which garnered them massive compensation, rewarded their willingness to give their approval to self-interested proposals made by HIT's management that they knew were not in HIT's best interest." (Amended Compl. ¶ 119.) Specifically, the Plaintiff/Demand Shareholders allege:

- That the Independent Directors lacked independence to make decisions in the Company's best interest when approving the property management arrangements (Amended Compl. ¶ 49);

---

[10] In using the term "Independent Director" or "Independent Directors," the Committee does not intend to infer a determination that the directors Abby Wenzel, Bob Burns, and Stanley Perla were or were not independent.  That term is used simply to designate the individuals based on their identified roles by the Company.  The assessment of independence is discussed separately in this Report.

- That the Independent Directors approved the proposal to amend the Advisory Agreement[11] to pay advisory fees in cash rather than subordinated Class B Units of the Company's Operating Partnership without consulting professional advisors, without adequate support for the proposal, and without obtaining any benefit for the Company.  (Amended Compl. ¶ 12);

- That the Independent Directors lacked independence to approve the "Framework Agreement" which the Company executed as part of the Brookfield Transaction in 2017 whereby the Company restructured property management arrangements and permitted conversion of the Advisor's Class B Units to unrestricted shares of the Company's common stock and resulted in roughly $37 Million in compensation to the Property Managers and Advisor.  (Amended Compl. ¶ 156); and

- That "[t]he Independent Directors, who lacked independence to make decisions in the Company's best interest as alleged *supra*, likewise acted in bad faith when they caused the Company to enter the Release Agreement which they knew was not in the Company's best interest." (Amended Compl. ¶ 162.)

     2.     *The Allegation That The Property Management Arrangements With Affiliates Were Designed To Generate Fees For AR Capital At The Expense Of The Company*

The Plaintiff/Demand Shareholders allege that the Company paid grossly uncompetitive rates for property management services to AR Capital affiliates when it should have paid the

---

[11] A copy of the Advisory Agreement by and among American Realty Capital Hospitality Trust, Inc., American Realty Capital Hospitality Operating Partnership, L.P., and American Realty Capital Hospitality Advisors, LLC, Dated as of January 7, 2014 is attached hereto as Exhibit D. A copy of the First Amendment to the Advisory Agreement, Dated as of November 11, 2015 is attached hereto as Exhibit E.

market rate available from third party property management companies.  The Plaintiff/Demand Shareholders allege that the Company's arrangements for property management services with AR Capital affiliates (the "Property Management Arrangements") give rise to five causes of action: (i) breach of fiduciary duty; (ii) waste of corporate assets; (iii) aiding and abetting; (iv) unjust enrichment, and (v) breach of contract.

The Plaintiff/Demand Shareholders allege that "the competitive base rate of management fees for limited service hotel are between 2% and 3% of gross revenue.  Property managers may also receive an incentive fee, typically in the range of 10% to 20% of operating profit above a certain performance threshold." (Amended Compl. ¶ 142.)

However, the Company's property management arrangements required "HIT to pay a base management fee of 4% of gross revenue plus an incentive fee of 15% of operating profits above 8.5% of HIT's investment.  The primary property management agreements generally had a duration of 20 years and could not be freely terminated by HIT.  The Property Manager then contracted with a sub-manager; the Property Manager paid the sub-manager a base management fee of between 2% and 3.25% of gross revenue." *Id.* ¶ 143.

The Plaintiff/Demand Shareholders allege that the majority of the Company's unaffiliated sub-managers received a management fee of 2% while Crestline, an AR Capital affiliated sub-manager, received 3.25%. *Id.* ¶ 145.  The Plaintiff/Demand Shareholders allege that the day-to-day management of the hotel properties was the responsibility of the sub-manager while the Property Managers were responsible for the supervision of the sub-managers.  "In fact, the Property Managers' responsibilities fell directly within the scope of the Advisor's responsibilities for which the Advisor received separate compensation in the form of asset management fees.  AR Capital and its members intended that HIT's agreements with the Property Managers would

provide an additional level of fees to enrich the Property Managers and thereby AR Capital and its members, which they did." *Id.* ¶ 146.

The Plaintiff/Demand Shareholders also allege that the Property Management Arrangements were designed to extract exorbitant termination fees from the Company because the Charter contemplated that the Company would have a duration less than 20 years. *Id.* ¶ 147. Finally, "[u]pon information and belief, the Independent Directors acted on an uninformed basis when they approved the Company's property management arrangements . . . Had the Independent Directors complied with the Charter's provisions prohibiting them from approving transactions with affiliates of the Advisor on terms and conditions less favorable to HIT than those available from unaffiliated third parties, and exercised their fiduciary obligations in good faith, they would not have approved the uncompetitive arrangements."

> 3.   *The Allegation That The Amendment to the Advisory Agreement Was Designed To Generate Fees For AR Capital At The Expense Of The Company*

The Plaintiff/Demand Shareholders allege that the approval of the Amendment to the Advisory Agreement which provided for a change in the form of compensation to be paid to the Advisor gives rise to five causes of action: (i) breach of fiduciary duty; (ii) waste of corporate assets; (iii) aiding and abetting; (iv) breach of contract and (v) unjust enrichment.

The Amendment to the Advisory Agreement required the Company to pay the Advisor an asset management fee in cash or stock rather than paying the Advisor subordinated Class B-Units in the Company's Operating Partnership subject to certain economic hurdles: "for all periods after September 30, 2015 the Company is required to pay, without condition, asset management fees to the Advisor at the rate of 0.75% of the cost of the assets owned by the Company until the Company publishes the Company's NAV and thereafter at the rate of the lower of 0.75% of cost of the assets

owned by the Company or the fair market value of the Company's assets.   In addition, the amendment provides that the Company may pay these asset management fees either in cash or in shares of the Company's common stock.   Further, it states that the Company will not issue subordinated participation interests in the Operating Partnership to the Advisor for periods after September 30, 2015." (Amended Compl. ¶ 131.)

The Plaintiff/Demand Shareholders allege that, "[j]ust after midnight on Sunday, November 8, 2015, the Advisor (through RCS) sent to the Company's Conflicts Committee comprised of Perla, Wenzel and Burns – the three designated "Independent Directors" – by email a draft written consent to an Amendment to the Advisory Agreement ("Consent Agreement")." *Id.* ¶ 122.

The Plaintiff/Demand Shareholders allege that the Independent Directors approved the proposed Amendment to the Advisory Agreement by email on November 8, 2015 at these times: Defendant Burns at 2:02 a.m., Defendant Wenzel at 8:13 a.m., and Defendant Perla at 12:15 p.m. *Id.* ¶ 128.

On November 12, 2015, the Securities Division of the Massachusetts Secretary of State filed an administrative complaint against RCS, the Dealer Manager for the Company's public offering, alleging proxy solicitation fraud. *Id.* ¶ 132.  Following the filing of the Complaint, several broker-dealers suspended their participation in the Company's public offering and sales of the Company's shares.

The Plaintiff/Demand Shareholders allege that "only seven days after the Advisor secured the Independent Directors' approval of the Amendment to the Advisory Agreement by describing that the Company would have plenty of cash available to pay cash asset management fees to the

Advisor, the Advisor delivered the bad news to the Independent Directors that the Company actually faced a liquidity crisis on account of the impending shutdown of the IPO, lacking the cash necessary to meet its obligations." *Id.* ¶ 133.

On November 15, 2015, in a telephonic board meeting Kahane advised the board of AR Capital's recommendation that the Company suspend its public offering citing "(i) the likely adverse effects of the valuation measures prescribed by regulation of the Financial Industry Regulatory Authority ("FINRA") upon the alternative investment industry; and (ii) the current business difficulties encountered by RCS." *Id.*

4.   *The Allegation That The Company's Strategy To Acquire Properties Was Designed To Generate Fees For AR Capital At The Expense Of The Company*

The Plaintiff/Demand Shareholders allege that the Company's acquisition of properties was aimed at securing substantial acquisition fees and financing fees for the Advisor notwithstanding that the acquisitions were not in the best interests of the Company. The Plaintiff/Demand Shareholders allegations are not tied directly to a Count in the Amended Complaint but the Committee has investigated the claims in light of the reference to this issue in the Amended Complaint and the inclusion of this issue in Dr. Wollman's Demand letter.

The Plaintiff/Demand Shareholders claims relate to the acquisition of the Grace Portfolio and the SWN Transactions (comprised of the acquisition of the Summit, Noble, and Wheelock Portfolios). The Plaintiff/Demand Shareholders allege that the "total purchase price of the Grace Portfolio was approximately $1.8 billion exclusive of closing costs. Through December 31, 2015, the Company had raised only approximately $375.1 million in the IPO. The purchase was funded with approximately $230 million of cash, raised through the IPO, and approximately $1.131 billion

of debt, including a $102.8 million mezzanine loan with an outside maturity date of May 1, 2019. The balance was funded through the issuance of $447.1 million of preferred equity interests to the sellers which the Company must redeem in full by February 27, 2019.  Pursuant to the agreement with the preferred equity investor, the Company was required to use 35% of future proceeds from the IPO to redeem the preferred equity investor.  The Grace Portfolio acquisition therefore saddled the Company with extremely onerous financial obligations and put tremendous pressure on the Company to raise capital through the IPO in order to satisfy its debt obligations and obligations to the preferred equity investor." (Amended Compl. ¶ 69.) The acquisition would result in the Company's portfolio leverage substantially exceeding the limitation contained in the Company's Charter and required approval by Company directors.  *Id.* ¶ 70.

Regarding the SWN Transactions, the Plaintiff/Demand Shareholders allege that in May and June 2015, "HIT entered into agreements to acquire a total of 44 additional hotels from three separate sellers for a total purchase price of $739.8 million.  On October 10, 2015, HIT completed the acquisition of 10 of the hotels for a total price of $150.1 million and on November 2, 2015, completed the acquisition of two hotels for a total price of $46.8 million.  HIT was unable to complete the acquisition of all of the remaining hotels and was thereby forced to forfeit a $41.1 million earnest money deposit." *Id.* ¶ 71.

The Plaintiff/Demand Shareholders allege that through December 31, 2015, the acquisition fees and financing fees paid to the Advisor totaled approximately $52.5 million or 6.6% of the net proceeds from the IPO.  *Id.* ¶ 72.

5. *The Allegation That The Framework Agreement Caused Impermissible Payments To The Advisor And Property Managers*

The Plaintiff/Demand Shareholders allege that the Company paid various categories of fees to the Advisor and the Property Managers as consideration for restructuring the Property Management Agreements in connection with the Framework Agreement in breach of the Charter and in breach of fiduciary duties.[12] The Plaintiff/Demand Shareholders allege that the Company's payment of fees in connection with the Framework Agreement gives rise to five causes of action: (i) breach of fiduciary duty; (ii) waste of corporate assets; (iii) aiding and abetting; (iv) unjust enrichment, and (v) breach of contract.

According to the Amended Complaint, the Fiduciary Defendants[13] caused the "Company to enter into the 'Framework Agreement' on January 12, 2017, through which the Advisor's management functions would be internalized, many of the Advisor's employees hired directly by the Company, the Advisory Agreement terminated, and the Company's property management arrangements restructured." (Amended Compl. ¶ 151.) The Property Management Agreements were restructured to remove the Property Manager Defendants from the Company's property management arrangements. The Plaintiff/Demand Shareholders allege that the restructured Property Management Agreements were consistent with market rates and represent rates that could have been obtained from the outset. "In the case of each of 71 properties that were previously sub-managed by Crestline, the sub-management agreement was eliminated, the Property Manager assigned the primary management agreement to Crestline, and the base management fee was reduced from 4% to 3% of gross revenue. In the case of 70 properties managed by a third-party property

---

[12] A copy of the Framework Agreement, Dated as of January 12, 2017 is attached hereto as Exhibit K.

25

manager, the primary property management agreement with the Property Manager was eliminated and the sub-manager continued to manage the property pursuant to its existing agreement through which the Company paid a base management fee of 2%. The elimination of the Property Managers from the management structure therefore had the effect of reducing the Company's base management fee from 4% to 3%, in the case of properties managed by Crestline, and from 4% to 2% in the case of properties managed by a third-party manager." (Amended Compl. ¶ 152.)

As consideration for the restructuring/termination of the Property Management Agreements, the Company paid compensation to the Property Manager Defendants and Advisor, which included:

(i) a $10 million cash payment to the Property Manager Defendants;

(ii) 12 monthly cash payments of $333,333 (i.e., approximately $4 million in total) to the Property Manager Defendants;

(iii) the issuance of 279,329 shares of common stock in the Company to the Property Manager Defendants worth $6 million based upon a $21.48 estimated per-share value of the stock at that time;

(iv) a waiver of the Advisor's obligation to repay the Company $5,821,988 in organization and offering expenses that the Company previously reimbursed to the Advisor; and

(v) the removal of all restrictions on the Advisor's 524,956 Class B Units in the Operating Partnership and the conversion of these Units to 524,956 shares of the Company's common stock.

The total value of the compensation, based upon a $21.48 estimated value of the Company's stock, was approximately $37 million. (Amended Compl. ¶ 153.)

The Plaintiff/Demand Shareholders allege that the Company should not have been required to restructure the "grossly uncompetitive and unfair arrangements." *Id.* ¶ 154. The Plaintiff/Demand Shareholders allege that the Class B-Units in the Operating Partnership should not have been converted to common stock because the economic restrictions under the previous

Advisory Agreement had not been met.  *Id.* ¶ 153.  Finally, the Plaintiff/Demand Shareholders allege the Independent Directors did not comply with their duties, including those duties under the Charter, in approving the Framework Agreement.  Id. ¶ 156-158.

      6.    *The Allegation That The Securities Purchase, Voting, and Standstill Agreement Violated The Charter And Benefited Brookfield To The Detriment Of Shareholders*

The Plaintiff/Demand Shareholders allege that the Securities Purchase, Voting, and Standstill Agreement ("SPA") violated the Charter by affording Brookfield certain rights superior to those of the shareholders.[14] "On March 31, 2017, the initial closing pursuant to the SPA occurred.  HIT sold to Brookfield: (i) the Redeemable Preferred Share in HIT for a nominal purchase price; and (ii) 9,152,542.37 Class C Units in HIT's Operating Partnership for a purchase price of $14.75 per unit ($135 million in the aggregate)." (Amended Compl. ¶ 103.)

According to the Amended Complaint, the Brookfield Transaction gave Brookfield the right to elect two Directors and the right to approve the nomination of two additional Independent Directors for election by the Company's shareholders. (Amended Compl. ¶ 103-105.) According to the Amended Complaint, pursuant to the Brookfield Transaction, each committee of the Board must contain one director approved by the holder of the Redeemable Preferred Share and the majority of the outstanding Class C Units, and at least one of the Redeemable Preferred Directors must consent before the Company can take certain actions including pay dividends and acquiring property. *Id.* Finally, according to the Amended Complaint, the Redeemable Preferred Directors must also approve the Company's business plan and nomination and appointment of the Board's chairperson.  *Id.*

---

[14] A copy of the Securities Purchase, Voting, and Standstill Agreement, Dated as of March 31, 2017 is attached hereto as Exhibit M.

"The SPA provides that the Class C Units rank senior to HIT's units of limited partnership interest in the Operating Partnership ("OP Units") in priority to both ordinary distributions and to distributions of assets in the event of liquidation, dissolution or the winding-up of the Operating Partnership.   In addition, the SPA outlines the redemption rights of Brookfield which are detrimental to the interests of HIT and its stockholders for a multitude of reasons including that floors have been established for Brookfield's recovery of investment principal upon redemption regardless of HIT's performance and that Brookfield has the right to redeem at any time after March 2022." *Id.* ¶ 106.

The Plaintiff/Demand Shareholders also allege that Brookfield is entitled to preferential distributions.  "With respect to ordinary distributions, Brookfield is entitled to receive, with respect to each Class C Unit, fixed, quarterly cumulative cash distributions at a rate of 7.5% per annum. HIT's failure to pay these cash distributions when due will cause the per annum rate to increase to 10% until all accrued and unpaid distributions required to be paid in cash are reduced to zero. Brookfield is also entitled to receive, with respect to each Class C Unit, a fixed, quarterly, cumulative distribution payable in Class C Units at a rate of 5% per annum ("PIK Distribution")." *Id.* ¶ 107.

The Plaintiff/Demand Shareholders allege that the Company has not paid distributions to its shareholders since January 2017.  *Id.* ¶ 108.

The Plaintiff/Demand Shareholders allege that the SPA violated the Charter.

> 7.     *The Allegation That The April 2016 Proxy Statement Violated Section 14(a) Of The Securities Exchange Act*

The Plaintiff/Demand Shareholders allege that Defendants Kahane, Mehlman, Hoganson, Wenzel, Perla, and Burns caused the Company to issue the April 2016 Proxy Statement.  This

proxy statement, according to the Amended Complaint, contains the false representation that the Independent Directors or Conflicts Committee had determined that the Company's transactions and relationships with the Advisor during the year ended December 31, 2015 were in accordance with Company policies. (Amended Compl. ¶ 198.) The Plaintiff/Demand Shareholders claim that "neither, the Independent Directors nor Conflicts Committee had made any determination as to whether the cash asset management fees that the Company was purportedly required to pay to the Advisor pursuant to the Advisory Agreement amendment, of which the Independent Directors had given their approval in November 2015, were within the limits prescribed by the Charter, and these fees were in fact outside the Charter's prescribed limits." *Id.*

Similarly, the Plaintiff/Demand Shareholders allege that the Independent Directors failed to determine whether the Company's payment of cash asset management fees was otherwise in the Company's best interest. *Id.* Finally, they allege that this representation was "material to Company stockholders voting on the reelection of Company Directors solicited by this proxy statement which allowed the Company Directors to commit further breaches of fiduciary duty."

### 8. The Allegation That The Mutual Release Is Void And Unenforceable

The Plaintiff/Demand Shareholders allege that in connection with the internalization of the Advisor's management services, the Fiduciary Defendants caused the Company and Operating Partnership to enter into a "Mutual Waiver and Release" (the "Mutual Release") through which the Company and the Advisor, Property Managers, AR Capital, the Advisor's employees and officers (who included Company officers and certain Company Directors), and AR Capital's members, among other parties, "purportedly released" one another.[15] (Amended Compl. ¶ 159.) In

---

[15] A copy of the Mutual Waiver and Release, Dated as of March 31, 2017 is attached hereto as Exhibit L.

order to void the Mutual Release, the Plaintiff/Demand Shareholders suggest that the Mutual Release is void for lack of consideration because the Company released millions of dollars of claims while receiving little to nothing in return.  *Id.* at 160.  Similarly, they allege that it is void for unconscionability because the "AR Release Parties caused the Company to enter into the agreement in an attempt to evade liability for their own wrongdoing and unjust enrichment." *Id.* at 161.  In the alternative, the Plaintiff/Demand Shareholders assert that the "Fiduciary Defendants, among whom were numerous AR Release Parties, acted in bad faith when they caused the Company to enter into the Release Agreement in an attempt to evade liability." *Id.* at 162.

## III.   THE SPECIAL LITIGATION COMMITTEE

### A.   <u>Appointment and Authority of the Special Litigation Committee</u>

On March 21, 2018, at a meeting of the Board of Directors, the Board unanimously adopted a resolution to create a Demand Review Committee, comprised of independent and disinterested directors, to review the Plaintiff/ Demand Shareholders' allegations.  On May 1, 2018, the Board of Directors adopted a resolution to change the name of the Demand Review Committee to the Special Litigation Committee and to empower the Special Litigation Committee ("the Committee") to investigate the claims and allegations in the Shareholder Allegations and evaluate whether the Company should allow any of the claims asserted in the Shareholder Allegations to proceed, arrive at such decisions, prepare any reports as deemed appropriate by the Committee, and take such other actions in connection with the Shareholder Allegations as the Committee in its sole discretion deems appropriate and in the best interests of the Company and its stockholders in accordance with the Maryland General Corporation Law.

The Committee consists of two independent directors — Edward A. Glickman and Stephen P. Joyce — each of whom was elected to the Board of Directors in March 2017, after all of the events set forth in the Shareholder Allegations took place.

In April 2018, the Committee retained Nelson Mullins Riley & Scarborough, LLP ("Nelson Mullins") to assist in the investigation.

### B. Members of the Special Litigation Committee

The background and professional experience of the members of the Committee is as follows:

*1. Edward A. Glickman*

Mr. Glickman has served as the Executive Chairman of AIP Asset Management US since 2013. Mr. Glickman has served as an Investment Professional, with a focus on real estate investments, at Miller Investment Management, LP since 2015. Mr. Glickman served as the Executive Director of the Center for Real Estate Finance Research and Clinical Professor of Finance at New York University Stern School of Business from 2012 until 2015. He also held an adjunct appointment at Drexel University's LeBow College of Business. Mr. Glickman was President, Chief Operating Officer, and Trustee of the Pennsylvania Real Estate Investment Trust ("PREIT") (NYSE: PEI), a real estate investment trust focused on shopping malls, from 2004 until 2012 and was Executive Vice President and Chief Financial Officer of PREIT from 1997 to 2004. Mr. Glickman joined PREIT after it acquired The Rubin Organization, a closely held real estate company, where he had served as Chief Financial Officer. Mr. Glickman served as Executive Vice President and Chief Financial Officer of Presidential Realty Corporation (OTCQB: PDNLP), a real estate investment trust focused on apartment units, from 1989 to 1993.

On March 31, 2017, Mr. Glickman was elected to the Board of Directors as an independent director. Mr. Glickman understands that Company Management, along with the Company Board in discussion with Brookfield identified him for the position collaboratively.

2.    *Stephen P. Joyce*

Since September 2017, Mr. Joyce has served as Chief Executive Officer of Dine Brands Global, Inc. (formerly known as DineEquity, Inc.) (NYSE: DIN), one of the largest full-service restaurant companies in the world and as a member of its Board of Directors since February 2012. From 2008 until 2017, he served as president and Chief Executive Officer, and a member of the board of directors, of Choice Hotels International, Inc. (NYSE: CHH), a publicly-traded lodging franchisor.  From 1982 to 2008, Mr. Joyce was with Marriott International, Inc., where he served as executive vice president, global development/owner and franchise services, in addition to holding other leadership positions.

On March 31, 2017, Mr. Joyce was elected to the Board of Directors as an independent director. Mr. Joyce understands that Company Management, along with the Company Board in discussion with Brookfield identified him for the position collaboratively.

C.    **Independence of the Members of the Special Litigation Committee**

As the Company is a Maryland corporation, the determination regarding the independence of the directors of the Company with respect to the allegations raised in the Shareholder Allegations is based on Maryland law.  *See Burks v. Basket*, 441 U.S. 471, 486 (1979); *see also Rosengarten v. Buckley*, 613 F. Supp. 1493, 1495 (D. Md. 1985).

Under Maryland law, a Court shall defer to the business judgment of the Committee so long as the Court determines that the "[Committee] was independent, acted in good faith based on facts, and followed reasonable procedures." *Boland v. Boland*, 423 Md. 296, 311, 31 A.3d 529,

538 (2011) (Rejecting Petitioners' suggestion that the court apply its own business judgment and adhering to the business judgment rule applied in *Auerbach v. Bennett*, 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979)).

To make these determinations, the court may rely on the substance of a special litigation committee's report. *See Conroy v. Amos*, 2018 WL 4208855, at *10 (M.D. Ga. Aug. 31, 2018) (holding that a special litigation committee was independent and citing the special litigation committee's reports and corresponding affidavits setting forth the special litigation committee members' "qualifications and backgrounds and explain[ing] the SLC's determination, on the advice of independent counsel, that there are no factors calling the SLC members' independence into question."); *See St. Clair Shore Gen. Employees Ret. Sys. v. Eibeler*, 2007 WL 3071837, at *3 (S.D.N.Y. Oct. 17, 2007).

A director's independence concerns his or her ability to make a decision "based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Orman v. Cullman*, 794 A.2d 5, 24 (Del. Ch. 2002)[16].  In general, to establish a lack of independence, a director must be shown to be "'beholden' to [the controlling person] or so under their influence that their discretion would be sterilized." *Id.; See Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984).  Stated simply, courts have set a high bar to determine that a director lacks independence.

In determining if a Special Litigation Committee member is independent, Maryland courts will first consider whether there are any "significant business relationships or affiliations between the SLC members and the defendant directors."  *Boland*, 423 Md. at 354 (citing to *Auerbach,* 47

---

[16] Maryland courts find the independence inquiry of Delaware courts persuasive. *See Boland*, 423 Md. at 35 (2011) ("For example, the Delaware courts, whose 'independence' inquiry we find persuasive in crafting our standards . . .").

N.Y.2d at 631 (examining whether SLC members had "any prior affiliation with the corporation"). The inquiry then shifts to familial and personal relationships.  *See Id.; see also Conroy*, 338 F. Supp. 3d at 1319 (quoting *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1051–52 (Del.  2004)) (determining that directors that move in the same business and social circles were independent); *see Clifford v. Ghadrdan*, 2014 WL 11829337, at *5 (N.D.  Ga. Mar. 5, 2014).

Even in the face of extensive relationships, special litigation committee members are generally determined to be independent.  For example, "in *Kaplan v. Wyatt*, 484 A.2d 501 (Del.Ch.1984), a committee member who was a major shareholder and director of companies which had business relationships with the corporation totaling many millions of dollars was found to be independent.  In *Genzer v. Cunningham*, 498 F.Supp. 682 (E.D.Mich.1980), one of the committee members was a paid consultant to the company and found to be independent.  In *In re General Tire & Rubber Co. Sec. Litigation*, 726 F.2d 1075, 1084 (6th Cir.1984), the circuit court affirmed the district court finding that the committee was independent even though one member was a partner in the law firm retained by the company and the other had conducted an investigation of the company's corporate practices in Chile." *Rosengarten*, 613 F. Supp. at 1500–01.

In summary, the independence inquiry does not require the directors to show, beyond all doubt, that no conceivable theory of influence exists between the Defendants and the Committee. *Boland*, 423 Md. at 356.  Instead, the Committee members should attest to a lack of significant relationships with the Defendants.  *Id.*  Attached to this Report, the Committee members have attested as such.  *See* Declarations of Ed Glickman and Steve Joyce, attached hereto as Exhibit P. A summary of the information contained in the declarations is as follows:

As set forth above, the Committee consists of two independent directors — Edward A. Glickman and Stephen P. Joyce — each of whom was elected to the Board of Directors in March 2017, after the events referenced in the Shareholder Allegations occurred.  None of the Committee members has a direct financial interest in the outcome of the Committee's decision whether to proceed with litigation against any of the named Defendants or seek dismissal of any claim. Neither of the Committee members has been named as a defendant or otherwise implicated in any of the claims alleged in the Shareholder Demand Letters or the Milliken Action, as amended, nor were they members of the Board of Directors during the alleged wrongdoing.  Glickman Decl. ¶ 8; Joyce Decl. ¶ 8.

No members of the Committee, no members of their immediate families, and no entity in which any of them has a material financial interest has an interest in the determination of whether the Company should proceed with litigation against any named Defendants.  Glickman Decl. ¶¶ 8-9; Joyce Decl. ¶¶ 8-9.  Other than current service on the Board of Directors of the Company, no members of the Committee, no members of their immediate families, and no entity in which any of them has a material financial interest has a material financial or contractual relationship with any of the Defendants, the Company, or any of AR Capital's affiliates.  Glickman Decl. ¶¶ 9, 11; Joyce Decl. ¶¶ 9, 10.

Prior to Mr. Glickman and Mr. Joyce becoming members of the Company's Board of Directors, the members of the Committee had limited professional relationships with any officers or directors of the Company.  Glickman Decl. ¶ 9, 10; Joyce Decl. ¶ 9.  While Mr. Glickman was with Pennsylvania Real Estate Investment Trust ("PREIT") (NYSE: PEI), where Mr. Glickman held multiple positions, the REIT utilized the investment banking firm where Mehlman worked. Mehlman provided investment banking services to Penn REIT while Mr. Glickman was associated

with that REIT as its Chief Financial Officer.  Glickman Decl. ¶ 10.  Thereafter, Mr. Glickman occasionally communicated with Mehlman.  *Id.*  Also, at one point, while Mr. Glickman was serving as the Executive Director of the Center for Real Estate Finance Research and Clinical Professor of Finance at New York University, Schorsch was invited to speak to real estate students and the two met.  *Id.*

To the best of their knowledge, neither Mr. Glickman nor Mr. Joyce nor their immediate families have even met let alone had any business relationship with any of the other named Defendants.  Glickman Decl. ¶ 9, 11; Joyce Decl. ¶ 9, 10.  Furthermore, to the best of the Committee's knowledge, none of the named Defendants, or AR Capital's affiliates, provides contributions to charitable, political, or other organizations in which any member of the Committee is active.  Glickman Decl. ¶ 11; Joyce Decl. ¶ 10.

### D.  Retention of Counsel to the Special Litigation Committee

In April 2018, the Committee retained Nelson Mullins as counsel to the Committee.  Scott N. Sherman and Thomas A. Ferrigno were the two lead Nelson Mullins attorneys who advised the Committee with respect to the investigation. A number of other attorneys, paralegals and staff assisted with this engagement.

Nelson Mullins has almost 800 lawyers and has been in existence over 100 years.  Mr. Sherman is a partner in the firm's Atlanta office and practices complex business and securities litigation.  He represents public companies, directors, and officers in securities class actions and derivative lawsuits and represents special litigation committees as well as companies and individuals involved in U.S. Securities and Exchange Commission (SEC) and Financial Industry Regulatory Authority (FINRA) informal and formal enforcement proceedings.  His previous experience includes a number of matters involving public non-traded REITs.  At the time of

engagement by the Committee, Mr. Ferrigno was a partner in Nelson Mullins' Washington D.C. office.  Recently, Mr. Ferrigno changed firms as set forth above but continues to represent the Committee.  His experience includes the representation of public companies, broker-dealers, investment advisers, and individuals in investigations and litigation conducted by the Securities and Exchange Commission, the Department of Justice, FINRA, and other governmental and quasi-governmental authorities.  Mr. Ferrigno[17] is a former Chief Counsel of the SEC's Division of Enforcement.

Neither Nelson Mullins nor Mr. Ferrigno's current law firm Murphy & McGonigle  have previously represented the Company or any of the named Defendants.[18]  Nelson Mullins and Murphy & McGonigle are independent of the named Defendants and the Company.

## IV.   THE INVESTIGATION

### A.   <u>Duration of Investigation</u>

The Committee began investigating the facts and analyzing the issues surrounding the Shareholder Allegations soon after its formation and has continued its work through the date of this Report.  Upon request of the Court, the Committee provided monthly updates regarding its work, starting with a July 2, 2018 letter.[19] During the course of its investigation, the Committee met regularly amongst themselves and with its counsel, worked with the Company and certain third parties to obtain relevant documents and communications to review, spent substantial time

---

[17] As of June 13, 2019, Mr. Ferrigno resigned from Nelson Mullins and joined Murphy & McGonigle, P.C. and continues to represent the Committee.

[18] An attorney at Murphy & McGonigle was formerly associated with RCS as a litigation attorney.  That attorney confirmed that he never provided legal advice to the Company.  Furthermore, in an abundance of caution, Murphy & McGonigle has created an ethical wall to separate that attorney from work performed by Mr. Ferrigno regarding the Company.

[19] A copy of the Committee's letters to the Court are attached hereto as Exhibit O.

with counsel assessing those materials and thereafter conducted a host of interviews as set forth more fully herein.

**B.**     **Committee Meetings and Status Updates**

Since its formation, the Committee held both formal and informal meetings amongst themselves and with its counsel from Nelson Mullins. Informal discussions took place regularly, with formal sessions conducted and minutes taken on the following dates:

- June 6, 2018
- June 18, 2018
- July 2, 2018
- July 9, 2018
- July 16, 2018
- July 23, 2018
- August 6, 2018
- August 14, 2018
- September 4, 2018
- September 12, 2018
- September 17, 2018
- September 24, 2018
- October 1, 2018
- October 8, 2018
- October 15, 2018
- November 5, 2018
- January 7, 2019
- January 15, 2019
- January 22, 2019
- February 4, 2019

The Committee and counsel conducted two days of in-person meetings on February 21 and 22 and thereafter conducted additional interviews and held a number of telephonic informal meetings as it worked to finalize this Report with its counsel. The Committee continued to complete its investigation including conducting regular telephonic discussions through the months of March, April, May, and June, and in addition to its general work and completion of this Report,

assisted the Company with the completion of relevant disclosures in the Company's Form 10-K for the year ended December 31, 2018 and First Quarter 10-Q and has facilitated a settlement in principle with Defendant Mehlman as discussed further below. With regard to the SLC's process, on May 30, 2019, it presented a proposal to the Court based on the SLC's then preliminary assessment of next steps including the SLC's goal at the time of submitting this Report to the Court by June 28, 2019. On June 27, 2019 the Plaintiffs requested a court conference, which was held with all Parties to the lawsuit on Friday, June 28, 2019. The SLC participated in that hearing telephonically. The Court granted the Parties' request to extend the SLC's deadline to submit its report to July 31, 2019 in order for the Parties to engage in settlement discussions. On July 25, 2019, Plaintiff confirmed to the Court that the Parties were scheduling a mediation in August and therefore sought a further extension of the filing deadline for the SLC's report to September 16, 2019. The mediation was scheduled and took place on September 11, 2019. On September 5, 2019, the Plaintiff informed the Court of the mediation and requested the Court extend the filing deadline for the SLC report to October 11, 2019. The SLC attended the mediation to make itself available to the Parties and the mediator regarding the state of its investigation. The case did not settle at the mediation.

### C.    Document Review

As discussed in its monthly reports to the Court, the Committee engaged in a substantial undertaking to retrieve and review potentially relevant documents. Corporate records received and reviewed included but were not limited to the following:

- Formation documents of the Company including the Company's By-laws and Charter and the Agreement of Limited Partnership of American Realty Capital Hospitality Operating Partnership, L.P., dated January 7, 2014, as amended;

- The Company's United States Securities and Exchange Commission filings, including but not limited to the Company's Registration Statement and related prospectus, related amendments, forms DEF14A and the Company's 10-K, 10-Q, 8-K filings and proxy statements;

- Minutes of the Board of Directors, including any associated documents and presentations provided to the Board;

- Minutes of the Audit Committee, including any associated documents and presentations provided to the Board;

- Minutes of the Conflict Committee, including any associated documents and presentations provided to the Board;

- Minutes of the Special Committee, including any associated documents and presentations provided to the Board;

- Minutes of the Independent Directors, including any associated documents and presentations provided to the Board;

- Unanimous Written Consents of the Board of Directors in Lieu of Meeting;

- The American Realty Capital Hospitality Form Property Management and Leasing Agreement, dated December 6, 2013[20];

- The Property Management Agreements entered into between the Company and the Property Manager Defendants;

- The Sub-Property Management Agreements;

- The American Realty Capital Hospitality Exclusive Dealer Manager Agreement dated January 7, 2014;

- The Advisory Agreement By and Among American Realty Capital Hospitality Trust, Inc., American Realty Capital Hospitality Operating Partnership, L.P., and American Realty Capital Hospitality Advisors, LLC, dated January 7, 2014, as amended and associated amendment;

- Director and Officer Questionnaires from 2013 to and through 2017;

- Net Asset Value analyses prepared by the Company's management;

---

[20] A copy of the Form of Management Agreement by and between American Realty Capital Hospitality TRS Subsidiary and American Realty Capital Hospitality Properties, LLC is attached hereto as Exhibit F.

- Presentations prepared by Hentschel & Co., the Independent Directors' and Special Committee's Financial Advisor from late 2015 through early 2017;

- Presentations prepared by Jeffries, the Board's Financial Advisor from mid-2016 through early 2017;

- The Securities Purchase, Voting and Standstill Agreement by and among American Realty Capital Hospitality Trust, Inc., American Realty Capital Hospitality Operating Partnership, L.P., and Brookfield Strategic Real Estate Partners II Hospitality REIT II, LLC, dated January 12, 2017;

- The Framework Agreement associated with the Brookfield Transaction; and

- The Mutual Waiver and Release associated with the Brookfield Transaction.

With regard to electronically maintained documents, as set forth in the Committee's July 2, 2018 letter to the Court, in response to its request for relevant electronic communications, the Committee received over 700 gigabytes of electronic data from the Company. The Independent Directors also responded to the Committee's requests and produced responsive email communications. The Committee proceeded to work with its counsel to systematically process and review the materials. Counsel for the Committee worked through the electronic communications and assisted the Committee in the selection and organization of relevant materials to review with key personnel during in-person and telephonic interviews.

### D.     <u>Interviews and Meetings</u>

By the end of August 2018, the Committee and its Counsel began conducting interviews, each of which the Committee discussed in its monthly letters to the Court.  During these interviews, counsel to the Committee advised the interviewees of claims being investigated, that the Committee was charged with investigating the facts surrounding the claims, the reason for the interviews, and the role of the Committee's counsel, including that the Committee did not legally represent them or the Company.  Counsel to the Committee took notes, documenting the interviews and, for interviews in which some or all of the members of the Committee did not participate, provided the Committee oral summaries of the interviews.  The following is a list of the interviews conducted in connection with the investigation, noting that a number of the individuals listed below were interviewed on multiple occasions to cover additional items that the Committee deemed relevant as it proceeded through its investigation.

1.     Paul Hughes (Company General Counsel) – August 18, 2018; September 13, 2018; and March 7, 2019;

2.     Aaron Deyerle (Company Controller) – September 27, 2018;

3.     Mark Fowler (Company SVP of Asset Management) – September 27, 2018;

4.     Ed Hoganson (then-Company CFO) – October 4, 2018; October 5, 2018; October 22, 2018; and March 4, 2019;

5.     Abby Wenzel (Company Director) – October 24; and March 21, 2019;

6.     Stanley Perla (Company Director) – October 30; and March 21, 2019;

7.     Jonathan P. Mehlman (Company CEO) – November 8, 2018; November 9, 2018; and March 7, 2019;

8.      Steve Hentschel (formerly with Hentschel & Company – financial advisor to the Independent Directors and Special Committee) – December 12, 2018;

9.      Bob Burns (former Company Director) - January 28, 2019; and

10.     Mike Murrer (Jefferies – financial advisor to the Company's Board) – March 4, 2019.

### E.      Unsuccessful Efforts to Obtain Certain Interviews or Information

As part of its investigation, the Committee spoke with Audra Soloway of the Paul Weiss law firm, counsel for AR Capital-related entities and individuals.  The Committee's counsel understands that firm represents AR Capital, the Advisor, the Property Manager Defendants, Nicholas S. Schorsch, William M. Kahane, Edward M. Weil, and Peter M. Budko with Brian Block represented by the Steptoe and Johnson firm (collectively the "ARC Defendants").

The Committee requested documents and communications in the possession of the ARC Defendants and interviews from individuals and entities represented by Paul Weiss.  To date, these individuals have declined to produce the materials requested or to be interviewed by the Committee.

The Committee views these interviews as significant to its work but does not regard the inability to obtain these interviews as a road block to completing its Report and making determinations regarding the litigation as set forth herein.  As the Court will see in this Report, in light of the inability to obtain documents and information from the ARC Defendants, the Committee believes it appropriate for the Court to allow further Amendment of the Complaint.

## V.    INVESTIGATION SUMMARY

### A.    AR Capital and Key Persons

AR Global, LLC is the successor to AR Capital, LLC (collectively, "AR Capital") and is an asset manager that sponsors real estate investment trusts.  During the relevant time period, AR Capital owned and controlled AR Capital IX, LLC, the sponsor of the Company ("the Sponsor"). Based upon its investigation, the Committee understands that AR Capital was formed in 2007 by Defendants Nicholas S. Schorsch ("Schorsch") and William H. Kahane ("Kahane") and that AR Capital is majority-owned by Defendant Schorsch and his wife Shelley Schorsch.  The Committee further understands that its remaining ownership interests are held by Defendants Kahane, Peter M. Budko ("Budko"), Edward M. Weil ("Weil"), and Brian S. Block ("Block").[21]

Schorsch served as a director of the Company and as chairman of the Company's Board from the inception until December 29, 2014.  In October 2014, an accounting scandal involving an ARC-sponsored REIT, American Realty Capital Properties, Inc. ("ARCP") became public. Following the public disclosure of an accounting scandal within ARCP, Schorsch resigned as Chairman of the Board of Directors of the Company and also resigned from positions with other AR Capital-sponsored entities.    The ARCP accounting scandal involved the knowing misrepresentation of ARCP's adjusted funds from operations, a key metric that was used to evaluate ARCP's financial performance.  Block, the CFO of ARCP, was found guilty of six counts, including securities fraud, and was sentenced to jail.  ARCP's Chief Accounting Officer, Lisa McAlister, also pled guilty to securities fraud.

---

[21] In discovery the Company understands that exact ownership percentages of each individual discussed herein will likely be determined.

Kahane served as a director of the Company from August 2013 until December 29, 2014, at which time he was appointed Chairman of the Board upon the resignation of Schorsch. Kahane served as Chairman of the Board until March 2017 and also served as Chief Executive Officer ("CEO") of the Company from August 2013 until December 2014, when Jonathan Mehlman was named Chief Executive Officer.

Budko and Weil did not serve as officers or directors of the Company. Weil served as President, Treasurer, Secretary and Director of RCS Capital Corporation, the parent of the Company's Dealer Manager. Block was the Company's original CFO from its registration until he was replaced by Amy Boyle.

### B.      Hospitality Investors Trust, Inc

The Company was formed in July 2013 as "American Realty Capital Hospitality Trust, Inc." by its sponsor American Realty Capital IX, LLC. In March of 2017, the Company changed its name to Hospitality Investors Trust, Inc. in connection with the internalization of its management functions.

Until March 2017, the Company operated as an externally managed REIT, with several officers but without any employees of its own. Defendant Jonathan Mehlman ("Mehlman") served as the Company's executive vice president and Chief Investment Officer from July 2013 to December 2014. He has served as the Company's CEO and president since December 2014 and was elected as Director by the Board of Directors in connection with the Brookfield Transaction in March 2017. Defendant Hoganson served as the Company's Chief Financial Officer ("CFO"), treasurer, and secretary from December 15, 2014 until May 28, 2019, when his resignation took effect. The Company's day-to-day affairs were managed by its external advisor, which was owned by AR Capital through March 2017. During the relevant time period, the Company's Board of

Directors also included three directors identified as independent – Defendants Stanley Perla, Abby Wenzel, and Bob Burns.  Bob Burns resigned in early 2017 but Abby Wenzel and Stanley Perla remain directors of the Company.

C.      **The Advisor**

The Advisor served as the Company's external manager from the Company's inception until the Advisory Agreement was terminated in March 2017.  The Advisor was responsible for, among other things, asset management, acquisition and disposition of properties, and creating financing opportunities.

Based on the information received through this investigation the Committee understands that AR Capital owned the Advisor and the Advisor was controlled by Schorsh and Kahane.[22]  In support of this understanding, the Committee learned the following during its investigation:  The email communications reviewed by the Committee evidence that AR Capital was regularly involved in the operation of the Advisor and that AR Capital personnel prepared financial modeling, analyses, and presentations for the Board of Directors concerning *inter alia* property acquisition proposals and the Amendment to the Advisory Agreement.   Furthermore, communications from the Advisor to the Company, whether it be financial modeling and analyses, property acquisition proposals (such as the Grace Portfolio and SWN Transactions) or the Amendment to the Advisory Agreement, were sent by RCS Capital and/or AR Capital personnel.  Likewise, correspondence from legal counsel transmitted to the Board of Directors on behalf of the Advisor was conveyed by lawyers who represented AR Capital.

---

[22] During the course of his employment with the Advisor, Mehlman received an interest in the Property Manager Defendants and the Advisor, discussed in Section VII, I.

46

Mehlman and Hoganson were also employed by the Advisor.  Mehlman was identified as the Advisor's Executive Vice President and Chief Investment Officer from July 2013 until December 2014.  He later was identified as the Advisor's CEO and President from December 2014 until March 2017 at which time the Company internalized management functions and the agreement between the Company and the Advisor was terminated.  Hoganson was identified as the Advisor's Chief Financial Officer, treasurer, and secretary from December 2014 until March 2017 when the Company internalized management functions. On January 7, 2014, American Realty Capital Hospitality Trust, Inc., American Realty Capital Hospitality Operating Partnership, L.P. and American Realty Capital Hospitality Advisors, LLC entered into an Advisory Agreement (the "Advisory Agreement").  The Advisory Agreement set forth the duties and authority of the Advisor, the fiduciary nature of the relationship between the Advisor and the Company and the compensation to be paid to the Advisor.   With respect to duties and authority, the Advisory Agreement provided, among other things, that the Advisor would serve as an investment and financial advisor to the Company and provide daily management functions to the Company.[23] The Advisory Agreement also confirmed that "[t]he Advisor, as a result of its relationship with the Company and the Operating Partnership pursuant to this Agreement, has a fiduciary responsibility and duty to the Company, the Stockholders and the partners in the Operating Partnership." Advisory Agreement at Sec. 5.

---

[23]The Advisory Agreement provided that the Advisor would present potential investment opportunities and provide a continuing and suitable investment program consistent with the Company's investment objectives; serve as the Company's investment and financial advisor; provide daily management to the Company; supervise the performance of all entities and persons necessary for the Company to run properly including affiliates of the Advisor including overseeing, supervising and evaluating the Property Manager Defendants and sub-Property Managers; locate and select potential investments for the Company and subsequently negotiate the transactions to acquire investments and arrange for all necessary financing for such transactions, all subject to final Board approval.

The Advisory Agreement provided for payment to the Advisor of Acquisition Fees, Financing Coordination Fees, Real Estate Commissions, and an Annual Subordinated Performance Fee and the reimbursement of operating expenses.  Pursuant to the Advisory Agreement, the annual subordinated performance fee was only payable to the Advisor in years in which the Company met an economic hurdle predicated on a six percent (6%) positive return to shareholders (the "Economic Hurdle").  "The Company may pay the Advisor an Annual Subordinated Performance Fee calculated on the basis of the Total Return to Stockholders, payable monthly in arrears in any year in which the Company's Total Return to Stockholders exceeds six percent (6%) per annum, in an amount equal to fifteen percent (15%) of the excess Total Return to Stockholders, provided, that the Annual Subordinated Performance Fee shall not exceed ten percent (10%) of the aggregate Total Return to Stockholders for such year." (Advisory Agreement, Section 10(e)).

The Company was obligated to cause the Company's Operating Partnership to issue subordinated participation interests in the Operating Partnership to the Advisor in accordance with the terms of the Operating Partnership Agreement (the "OP Agreement").  (Advisory Agreement, Section 10(h)).  Under the terms of the OP Agreement, all Class B-Units, when issued, shall be subject to forfeiture and shall constitute "Restricted Class B-Units" until such time as, among other things, the Economic Hurdle had been met.

The provisions of the Advisory Agreement regarding compensation to be paid to the Advisor were aligned with relevant provisions of the Charter.[24] The Charter provided for the

---

[24] A copy of Articles of Amendment and Restatement for American Realty Capital Hospitality Trust, Inc., Dated as of December 6, 2013 (Company Charter) is attached hereto as Exhibit C.

payment to the Advisor of Acquisition Fees, Disposition Fees, Incentive Fees and an Annual Subordinated Performance Fee and for the reimbursement of operating expenses.[25]

### D.  **The Property Managers**

The Company contracted with two property managers to supervise, direct, and control management of the Company's hotels - the Property Manager Defendants.  At the time of the Company's inception, only American Realty Capital Hospitality Properties, LLC existed. The sole member of American Realty Capital Hospitality Properties, LLC was American Realty Capital Hospitality Special Limited Partner, LLC, an entity 100% owned by the Sponsor (which was owned solely by AR Capital). AR Capital established American Realty Capital Hospitality Grace

---

[25] SECTION 8.6      DISPOSITION FEE ON SALE OF PROPERTIES.  The Company may pay the Advisor a real estate commission upon Sale of one (1) or more Properties, in any amount equal to the lesser of (i) one-half (1/2) of the Competitive Real Estate Commission if a third party broker is also involved, or (ii) two percent (2%) of the sales price of such Property or Properties.
SECTION 8.9      ACQUISITION FEES.  The Company may pay the Advisor and its Affiliates fees for the review and evaluation of potential investments in Assets; provided, however, (i) that the total of all Acquisition Fees and Acquisition Expenses shall be reasonable, and shall not exceed an amount equal to four and one-half percent (4.5%) of the Contract Purchase Price, or, in the case of a Mortgage, four and one-half percent (4.5%) of the funds advanced and (ii) that once all the proceeds from the Initial Public Offering have been fully invested, the total of all Acquisition Fees shall not exceed an amount equal to one and one-half percent (1.5%) of the Contract Purchase Price for all the Assets acquired; provided, however, that a majority of the Directors (including a majority of the Independent Directors) not otherwise interested in the transaction may approve fees and expenses in excess of these limits if they determine the transaction to be commercially competitive, fair and reasonable to the Company.
SECTION 8.10      ANNUAL SUBORDINATED PERFORMANCE FEE.  Subject to Section 8.7, the Company may pay the Advisor an Annual Subordinated Performance Fee ("Annual Subordinated Performance Fee") calculated on the basis of the Company's Total Return to Stockholders, payable in arrears, for any year in which the Company's Total Return to Stockholders exceeds six percent (6%) per annum, in an amount equal to fifteen percent (15%) of the excess Total Return to Stockholders, provided, that, the Annual Subordinated Performance Fee shall not exceed ten percent (10%) of the aggregate Total Return to Stockholders for such year.
SECTION 8.8      ORGANIZATION AND OFFERING EXPENSES LIMITATION.  The Company shall reimburse the Advisor and its Affiliates for Organization and Offering Expenses incurred by the Advisor or its Affiliates; provided, however, that the total amount of all Organization and Offering Expenses shall be reasonable and shall in no event exceed fifteen percent (15%) of the Gross Proceeds of each Offering.
SECTION 8.11      REIMBURSEMENT FOR TOTAL OPERATING EXPENSES.  The Company may reimburse the Advisor, at the end of each fiscal quarter, for Total Operating Expenses incurred by the Advisor; provided, however, that the Company shall not reimburse the Advisor at the end of any fiscal quarter for Total Operating Expenses that, in the four consecutive fiscal quarters then ended, exceed the greater of two percent (2%) of Average Invested Assets or twenty-five percent (25%) of the Net Income (the "2%/25% Guidelines") for such year.
SECTION 8.12      REIMBURSEMENT LIMITATION.  The Company shall not reimburse the Advisor or its Affiliates for services for which the Advisor or its Affiliates are entitled to compensation in the form of a separate fee.

Portfolio, LLC on September 11, 2014 in connection with the Company's acquisition of 116 hotels, identified herein as the "Grace Transaction" and its sole member was American Realty Capital Hospitality Properties, LLC.

Mehlman served as the Property Manager's Executive Vice President and Chief Investment Officer from July 2013 until December 2014.  He then served as the Property Manager's CEO and President from December 2014 until March 2017 when the Company internalized management functions.  Hoganson served as the Property Manager's Chief Financial Officer, Treasurer, and Secretary from December 2014 until March 2017 when the Company internalized management functions.  From the Committee's investigation, the Committee understands that AR Capital and its owners controlled the Property Managers.

E.      **The Property Management Agreements**

The registration statement filed by the Company on August 19, 2013 described the property management structure for the Company's hotels that the Company acquired following the commencement of the Company's public offering.[26] The registration statement provided that the Company, through a subsidiary, would enter into property management agreements with a property manager which, in turn, would enter into sub-management agreements with other entities which would assist in the management of the properties acquired by the Company.[27] The

---

[26] A copy of the Form S-11 Registration Statement of American Realty Capital Hospitality Trust, Inc., dated as of August 16, 2013 is attached hereto as Exhibit G.

[27] The registration statement provided as follows: American Realty Capital Hospitality Properties, LLC, or our property manager, is a Delaware limited liability company which was formed on August 13, 2013. Our property manager has no prior operating history. The parent of our sponsor, AR Capital, LLC, has entered into a membership interest purchase agreement to acquire 60% of the membership interests in Crestline Hotels & Resorts, Inc., a Delaware corporation, which will be converted prior to the close of such membership interest purchase into a Delaware limited liability company to be known as Crestline Hotels & Resorts, LLC. . . . Our property manager intends to enter into a non-exclusive sub-property management agreement with our sub-property manager to help us and our advisor identify and underwrite certain acquisitions as well as operate our lodging properties. From time to time, our property manager will hire other sub-property managers to manage and operate hotel assets as necessary. We will also create

50

Company's registration statement was signed by Schorsch in his capacity as Chairman of the Board and by Kahane in his capacities as Chief Executive Officer, President and a Director of the Company.

In order to implement this property management structure, the Board of Directors, comprised of Schorsch, Wenzel and Perotty, approved, on December 6, 2013, the form of a property management agreement which provided for a payment of 4% of gross revenue for each accounting period to the Property Manager.[28] Also on December 6, 2013, Schorsch and Wenzel approved the form of a Sub-Management Agreement pursuant to which the Property Manager would pay a percentage of the gross revenues it received to sub-managers.[29] The exhibits to an amendment to the registration statement filed on December 16, 2013 included the form of a Property Management Agreement and the form of a Sub-Management Agreement.  The Company

---

taxable REIT subsidiaries to lease our hotel properties from us and such subsidiaries will enter into agreements with our sub-property manager or third-party sub-property managers.

[28] Article VI of the Property Management Agreement, COMPENSATION OF MANAGEMENT COMPANY, provided as follows:
6.01 Management Fees
A. Base Management Fees.  In consideration of the services to be performed during the Term of this Agreement by Management Company, Management Company shall be paid a periodic base management fee ("Base Management Fee") in the amount of four percent (4%) of Gross Revenues for each Accounting Period.
B. Incentive Management Fees.  In addition to the Base Management Fee and in consideration of the services to be performed during the Term of this Agreement, Management Company shall be paid for each Fiscal Year (or partial fiscal Year), subject to Section 6.02 B, an incentive fee ("Incentive Fee") equal to fifteen percent (15%) of the amount by which Operating Profit for such Fiscal Year or (partial Fiscal Year) exceeds TRS's Priority  (prorated for any partial Fiscal Year).
[29] Article V of the Sub-Management Agreement, Assignment of Payments, provided as follows:
As compensation for the services provided  pursuant to this Agreement, Advisor hereby  assigns payments as follows:
5.1 Base Management Fees.  Manager hereby agrees to a base sub-management fee (the "Sub-Management Fee") of (3.25%) of the Gross Revenues for each Accounting Period, which shall be paid out of the Manager's Base Management Fee as set forth in Section 6.01 of the Management Agreement (the "Base Management Fee").
5.2 Incentive Management Fees.  Manager herby assigns its right to receive from TRS an Incentive Fee, if any, pursuant to Section 6.01 B of the Management Agreement.
5.3 Expense Reimbursements.  Manager hereby assigns its right to receive direct payment from TRS of expense reimbursements Sub-manager incurs on behalf of TRS or in connection with the services Sub-Manager provides to TRS pursuant to this Agreement and the Management Agreement.

had previously filed an amendment to the registration statement which included as an exhibit the form of an Advisory Agreement between the Advisor and the Company, which provided that the Advisor's responsibilities included the oversight of the entities that were retained to manage the properties acquired by the Company.

The Company's current Chief Executive Officer served as Executive Vice President and Chief Investment Officer of the Advisor and the Property Manager since their formation in July 2013 through December 2014 and as Chief Executive Officer of the Company, the Advisor and the Property Manager from December 2014 through December 2016.  The Company's now former Chief Financial Officer, Ed Hoganson, also served as the Chief Financial Officer of the Advisor and the Property Manager from December 2014 through December 2016.[30]

Following the commencement of the Company's public offering on January 7, 2014, the Company entered into agreements providing for the purchase of fee and leasehold interests with respect to four properties and agreements for the purchase of joint venture interests with respect to two properties (the "Barcelo Transaction").  On March 21, 2014, the Company closed on the acquisition of six fee simple, leasehold and joint venture interests for an aggregate contract purchase price of $106.5 million, exclusive of closing costs.  The properties consisted of three wholly-owned hospitality assets, a property subject to an operating lease, and equity interests in joint ventures that owned two hotels.  On May 28, 2014, Wenzel and Perla ratified the execution

---

[30] The Company's Proxy Statement dated April 29, 2016 states as follows: "Jonathan P. Mehlman has served as chief executive officer and president of our company, the Advisor and the Property Manager since December 2014. Previously, Mehlman served as executive vice president and chief investment officer of our company, the Advisor and the Property Manager from their formation in July 2013 until December 2014.  Edward T. Hoganson has served as the chief financial officer, treasurer and secretary of the Company, the Advisor and the Property Manager since December 2014. Hoganson previously served as executive vice president of Crestline from 2007 to December 2014.

of the Property Management Agreements with respect to four properties acquired as part of the Barcelo Transaction.[31]

The directors identified by the Board as Independent also approved the payment of fees to the Property Managers.  The Minutes of the Meeting of the Board of Directors dated June 16, 2015 indicate that Wenzel and Perla, Independent Directors, approved the payment of fees to the Property Manager.  The Minutes state as follows:

*Review and Authorization of Compensation to Advisor, Dealer Manager and Property Manager*

> **RESOLVED**, based on the determination of the Independent Directors (with abstention by William M. Kahane) taking into account, without limitation, the following factors, the compensation paid by the Corporation to American Realty Capital Hospitality Advisors, LLC (the "Advisor"), Realty Capital Securities, LLC (the "Dealer Manager") and American Realty Capital Hospitality Properties, LLC (the "Property Manager") is reasonable in relation to the nature and quality of the services performed for the Corporation's 2015 fiscal year, and is therefore hereby authorized and approved by the Independent Directors: .  .  .  .The quality and extent of service and advice furnished by the Advisor, Dealer Manager and Property Manager.[32]

---

[31] The Minutes of the Meeting of the Board of Directors dated May 28, 2014 state as follows: **RESOLVED**, that after due and careful consideration the Board of Directors deemed it in the best interest of the Corporation to ratify entrance into (i) the Management Agreement, dated January 27, 2014, by and between ARC Hospitality TRS Baltimore, LLC and American Realty Capital Hospitality Properties, LLC; (ii) the Management Agreement, dated January 27, 2014, by and between ARC Hospitality TRS Providence, LLC and American Realty Capital Hospitality Properties, LLC; (iii) the Management Agreement, dated January 27, 2014, by and between ARC Hospitality TRS GA Tech, LLC and American Realty Capital Hospitality Properties, LLC; and (iv) the Management Agreement, dated January 27, 2014, by and between ARC Hospitality TRS Stratford, LLC and American Realty Capital Hospitality Properties, LLC.

[32] Similarly, the Minutes of the Board of Directors Meeting of June 8, 2016 provided as follows:

*Review and Authorization of Compensation to Advisory, Property Manager and Crestline*

> **RESOLVED**, based on the determination of the Independent Directors (with abstention by William M. Kahane) taking into account, without limitation, the following factors, the compensation paid by the Corporation to the Advisor, American Realty Capital Hospitality Properties, LLC (the "Property Manger"), the Corporation's property manager and an affiliate of the Advisor, and Crestline Hotels & Resorts, LLC ("Crestline"), an affiliate of the Advisor that has been retained by the Property Manager to manage certain hotel properties of the Corporation, is reasonable in relation to the nature and quality of the services performed for the Corporation's 2016 fiscal year, and is therefore hereby unanimously authorized by the Independent Directors and the members of the Conflicts Committee: .  .  .  .The quality and extent of service and advice furnished by the Advisor, Property Manager and Crestline.

The Company's Forms 10-Q and 10-K contained disclosures regarding payments to the Property Managers and the amounts paid during the relevant periods.  For example, the Form 10-K for the year ended December 31, 2015 stated as follows:

> The Company pays a property management fee of up to 4.0% of the monthly gross receipts from the Company's properties to the Property Manager.  The Property Manager, in turn, pays a portion of the property management fees to Crestline or a third-party sub-property manager, as applicable.  The Company also reimburses Crestline or a third-party sub-property manager, as applicable, for property level expenses, as well as fees and expenses of such sub-property manager.  The Company does not, however, reimburse Crestline or any third-party sub-property manager for general overhead costs or for the wages and salaries and other employee-related expenses of employees of such sub-property managers, other than employees or subcontractors who are engaged in the on-site operation, management, maintenance or access control of the Company's properties, and, in certain circumstances, who are engaged in off-site activities.

A similar disclosure was included in the Company's Form 10-K for the year ended December 31, 2016.[33]  Kahane, Mehlman and Hoganson signed the Forms 10-K in their capacities as the Executive Chairman of the Board of Directors, the Chief Executive Officer and Chief Financial Officer, respectively.  Further, in their certifications, Mehlman and Hoganson represented that they had reviewed the Form 10-K and that the financial statements and other financial information included in the report fairly presents in all material respects the financial condition, results of operations and cash flows of the Company as of and for the periods represented in this report.

The Shareholder Allegations regarding the Property Management Agreements centered on

---

[33] The Form 10-K for the period ended December 31, 2016 stated as follows: Prior to the Initial Closing, the Company paid a property management fee of up to 4.0% of the monthly gross receipts from the Company's properties to the Property Manager. The Property Manager, in turn, paid a portion of the property management fees to Crestline or a third-party sub-property manager, as applicable. The Company also reimbursed Crestline or a third-party sub-property manager, as applicable, for property level expenses, as well as fees and expenses of such sub-property manager. The Company did not, however, reimburse Crestline or any third-party sub-property manager for general overhead costs or for the wages and salaries and other employee-related expenses of employees of such sub-property managers, other than employees or subcontractors who are engaged in the on-site operation, management, maintenance or access control of the Company's properties, and, in certain circumstances, who are engaged in off-site activities.

the "above market" fees paid to the affiliated Property Managers (4% of gross revenues) and contrasted such fees with the lower price or market rate that the Company may have may paid to unaffiliated property managers (2-3% of gross revenues). As part of the Committee's investigation, it assessed the fees paid to the Property Managers and the allegations made.  After completing its analysis, the Committee determined that it had a concern with the performance (or lack thereof) of services by the Property Managers and the fees that were paid by the Company. The investigation revealed that the property management structure was designed to sweep 1-2% of gross revenues from the hotels back to AR Capital whereby the Property Managers did not perform obligations set forth in the Property Management Agreements to earn those fees.  AR Capital accomplished this by setting up a property management structure in which the Property Managers were compensated to supervise the sub-mangers who actually managed the properties.  In reality, the Property Managers appeared to exist solely on paper.  In practice, the sub-managers performed the property management functions and did so for a rate of 2 or 3% of gross revenues (depending whether the sub-manager was Crestline or another manager). Interviews revealed that the 1-2% spread (4% less the 2-3% paid to sub-managers) "earned" by the Property Managers was considered a "deal term" in favor of AR Capital. The investigation revealed that the Property Managers did not provide the services they contracted to perform, did not employ the personnel necessary to perform their contractual obligations, and did not return any value to the Company. Moreover, as part of the Committee's review of the relevant agreements, the Advisory Agreement already tasked the Advisor with oversight of the managers of the property, namely the sub-managers that did the actual work, and was paid for that service.

### F.    Acquisition of Properties and REIT Performance

The Company's Charter provides that the Company may engage in any lawful activity, including qualifying and engaging in business as a real estate investment trust.  The Charter also provides that the "Board may exercise broad discretion in allowing the Advisor to administer and regulate operations of the Company, to act as agent for the Company, to execute documents on behalf of the Company and to make executive decisions that conform to general policies and principles established by the Board."[34] The Charter further provides that the Company may pay the Advisor, among other things, acquisition fees for the review and evaluation of potential investments;  disposition fees on the sale of properties; incentive fees (i.e., an interest in the gain from the sale of properties); and may reimburse the Advisor for total operating expenses incurred by the Advisor.[35] Similarly, the Advisory Agreement provided for payment to the Advisor of Acquisition Fees, Financing Coordination Fees, Real Estate Commissions, and the reimbursement of operating expenses.

Following the commencement of the Company's public offering on January 7, 2014, the Company entered into agreements regarding the Barcelo Transaction, pursuant to which the Company acquired fee and leasehold interests with respect to four properties and agreements for the purchase of joint venture interests with respect to two properties.  On March 21, 2014, the Company closed on the acquisition of six fee simple, leasehold and joint venture interests for an aggregate contract purchase price of $106.5 million, exclusive of closing costs.  The properties consisted of three wholly-owned hospitality assets, a property subject to an operating lease, and equity interests in joint ventures that owned two hotels.

---

[34] Charter § Section 8.2.
[35] Charter §§ 8.6. 8.7, 8.8, 8.9, 8.10 and 8.11.

On May 23, 2014, the Company entered into a Real Estate Sale Agreement pursuant to which it would acquire 126 properties from various sellers which were ultimately controlled by Goldman Sachs Group, Inc. (the "Grace Transaction" or the "Grace Portfolio").[36]  The aggregate purchase price for the portfolio of hotels was approximately $1.925 billion, exclusive of closing costs.  On November 11, 2014, the Company and the Sellers entered into an Amended and Restated Real Estate Sale Agreement, and pursuant to the amendment, ten hotel assets were eliminated from the portfolio of hotels and the aggregate purchase price was reduced from approximately $1.925 billion to approximately $1.808 billion.

The Company funded approximately $230.1 million of the purchase price of the Grace Portfolio with cash-on-hand raised in its ongoing initial public offering of common stock.  The Company financed approximately $903.9 million of the purchase price through the assumption of loans and the Company financed $227 million by entering into an additional loan agreement.  The terms of the transaction also included the issuance of $447.1 of preferred equity interests which were entitled to monthly distributions at a rate of 7.50% per annum for the first 18 months following closing and 8% per annum thereafter.  Further, the Company was required to redeem the preferred equity interests within a stated period and was required to set aside 35% of the funds raised in the Company's public offering in order to redeem the equity interests.  Finally, the Company was required to set aside funds for future property improvements on the Grace portfolio properties.

---

[36] A copy of the Minutes of Meeting of the Board of Directors of American Realty Capital Hospitality Trust, Inc. and Related Presentations to the Board of Directors, Dated May 16, 2014 and May 20, 2014 approving the acquisition of the Grace Portfolio is attached hereto as Exhibit H.

In its Form 8-K regarding the Grace Transaction, the Company stated that it anticipated the closing to occur during the fourth quarter of 2014. However, the closing was delayed due to the Company's inability to raise sufficient funds through its public offering. The Company's public offering was adversely impacted by disclosures concerning ARCP, another AR Capital-sponsored REIT. In October 2014, ARCP disclosed that its previously filed financial statements should no longer be relied upon due to issues related to its calculations of adjusted funds from operations.[37] During November 2014, broker-dealers which had entered into selling agreements with RCS, the AR Capital entity with which the Company had entered into a dealer agreement regarding the distribution of its securities, announced that they were suspending selling agreements with RCS. In November 2014, the Company filed a Form 8-K which disclosed that the Grace Transaction would likely close in February 2015. The Company announced the completion of the acquisition of the Grace Portfolio on February 27, 2015.

In its Form 10-K for the year ended December 31, 2014 which was filed on March 31, 2015, the Company made disclosures regarding the impact of the acquisition of the Grace Portfolio on the Company and, in particular, the impact of the acquisition of the Grace Portfolio on future acquisitions. In its Form 10-K, the Company stated, "We intend to use substantially all available offering proceeds following the acquisition of the Grace Portfolio to reduce our borrowings to our intended limit, which may limit our ability to pay distributions or acquire additional properties for some time." In its Form 10-Q for the period ended March 31, 2015, the Company disclosed its loss from operations, the use of funds raised in the offering, and its intentions regarding additional

---

[37] In March 2015, ARCP disclosed that an investigation conducted under the direction of its audit committee had found material weaknesses in ARCP's internal control over financial reporting and its disclosure controls and procedures.

58

acquisitions.  In the Form 10-Q, the Company stated: "Through March 31, 2015, we have received $416.4 million in gross proceeds from the Offering which we have used as follows: (i) $39.6 million to pay selling commissions and dealer manager fees to our Dealer Manager; (ii) $9.9 million to pay other Offering expenses, up to 2.0% of which may be reimbursed to our Advisor at the close of the Offering once we have invested all the proceeds of the Offering; (iii) $43.2 million to pay acquisition fees and financing coordination fees to our Advisor; (iv) $8.1 million to pay distributions to our stockholders; (v) $220.7 million to fund part of the purchase price of the Grace Portfolio; and (vi) $4.0 million to fund capital expenditures.

On June 2, 2015, the Company, through a wholly owned subsidiary of the Company's operating partnership, entered into two separate agreements to purchase fee simple interests in an aggregate portfolio of 26 hotels containing an aggregate of 2,793 guestrooms from affiliates of Summit Hotel OP, LP, the operating partnership of Summit Hotel Properties, Inc., for an aggregate cash purchase price of approximately $351.4 million, subject to closing prorations and other adjustments, (the "Summit Transaction").  On June 4, 2015, the Company entered into an agreement to acquire five hotels for a purchase price of $92.5 million from a fund sponsored by Wheelock Street Capital, LLC, a private equity firm (the "Wheelock Transaction").  On June 16, 2015, the Company announced that it had agreed to acquire a portfolio of 13 hotels from affiliates of the Noble Investment Group, LLC for a purchase price of $300 million, (the "Noble Transaction" and together with the Summit Transaction and the Wheelock Transaction, the "SWN Transactions").[38]  The SWN Transaction agreements provided the Company with certain rights to

---

[38] A copy of the Minutes of Meeting of the Board of Directors of American Realty Capital Hospitality Trust, Inc. and Related Presentations to the Board of Directors Dated May 27, 2015, May 29, 2015, and June 12, 2015 approving the acquisition of the SWN Transactions are attached hereto as Exhibit H.

postpone each of the closings. The Independent Directors considered the rights to postponement at the time they approved the SWN Transactions.

As discussed below, subsequent to the execution of agreements regarding the acquisition of the SWN properties, the Company suspended and then terminated its public offering as a result of the filing of an action against RCS, the Dealer Manager of the Company's public offering, by the Securities Division of the Massachusetts Secretary of State concerning another REIT of AR Capital.  Accordingly, the Company was unable to generate sufficient funds through its public offering to close on all of the properties that comprised the SWN Transactions.  Ultimately, the Company forfeited more than $40,000,000 of the money it deposited in connection with the SWN transactions.

### G.     HIT's Debt Obligation

On May 23, 2014, the Company entered into an agreement to purchase the Grace Portfolio (126 hotels) from Whitehall Real Estate Funds, an investment arm controlled by The Goldman Sachs Group.  On November 11, 2014, the agreement was amended to reduce the number of hotels to 116 for a total purchase price of $1.808 billion, with the closing to occur on February 27, 2015.

After adjustments, the net purchase price was $1.799 billion.  Approximately $220.7 million of the purchase price was satisfied with cash on hand, approximately $904.2 million (fair value on the acquisition date) through the assumption of existing mortgage and mezzanine indebtedness (comprising the "Assumed Grace Mortgage Loan" and the "Assumed Grace Mezzanine Loan", collectively, the "Assumed Grace Indebtedness") and approximately $227.0 million through additional mortgage financing (the "Original Additional Grace Mortgage Loan").

In large part, the Grace Indebtedness was secured by the Grace Portfolio.  In addition, the remaining $447.1 million of the contract purchase price was satisfied by the issuance of the

preferred equity interests (the "Grace Preferred Equity Interests") in two newly-formed Delaware limited liability companies, ARC Hospitality Portfolio I Holdco, LLC and ARC Hospitality Portfolio II Holdco, LLC, (the "Holdco entities") each of which is an indirect subsidiary of the Company and an indirect owner of the Grace Portfolio. The holders of the Grace Preferred Equity Interests are entitled to monthly distributions at a rate of 7.50% per annum for the first 18 months following closing and 8.00% per annum thereafter. On liquidation of the Holdco entities, the holders of the Grace Preferred Equity Interests are entitled to receive their original value (as reduced by redemptions) prior to any distributions being made to the Company or the Company's stockholders. Beginning in April 2015, the Company became obligated to use 35% of any IPO proceeds to redeem the Grace Preferred Equity Interests at par, up to a maximum of $350.0 million in redemptions for any 12-month period.

The Company was also required, in certain circumstances, to apply debt proceeds to redeem the Grace Preferred Equity Interests at par. As of February 27, 2018, the Company was required to have redeemed 50.0% of the Grace Preferred Equity Interests, and the Company was required to redeem 100.0% of the Grace Preferred Equity Interests remaining outstanding by no later than February 27, 2019. The holders of the Grace Preferred Equity Interests have certain consent rights over major actions by the Company relating to the Grace Portfolio. If the Company is unable to satisfy the redemption, distribution or other requirements of the Grace Preferred Equity Interests (including if there is a default under the related guarantees provided by the Company and the OP), the holders of the Grace Preferred Equity Interests have certain rights, including the ability to assume control of the operations of the Grace Portfolio through the assumption of control of the Holdco entities.

H.    **The Amendment to the Advisory Agreement in November 2015**

During the period from January 2014 through October 2015, the Advisor was compensated pursuant to the terms of the Advisory Agreement, including the receipt of acquisition fees and financing fees.  During that period, certain events occurred which had an adverse impact on the Company.  In October 2014, an AR Capital-sponsored REIT, American Realty Capital Properties, Inc. ("ARCP"), experienced various issues that adversely affected the Company and, in particular, its ability to raise funds through the Company's public offering, which was essential as the Company had experienced a loss from operations.[39] During November 2014, broker-dealers which had entered into selling agreements with Realty Capital Securities ("RCS"), the AR Capital entity with which the Company had entered into a Dealer Manager agreement regarding the distribution of its securities, announced that they were suspending selling agreements with RCS.  In March 2015, the Company filed a Form 10-K which disclosed that "Disclosures made by an entity previously sponsored by the parent of our sponsor may adversely affect our ability to raise substantial funds." Also during that period, RCS, the Dealer Manager for the Company's public offering, became involved in an investigation conducted by the Securities Division of the Massachusetts Secretary of State.[40] Despite the issues with other ARC-related entities, the Company raised funds through its public offering until November 2015, when the investigation

---

[39] In October 2014, ARCP made a filing with SEC which stated that its previously filed financial statements should no longer be relied upon due to issues related to its calculations of adjusted funds from operations ("AFFO"). In March 2015, ARCP disclosed that an investigation conducted under the direction of its audit committee had found material weaknesses in ARCP's internal control over financial reporting and its disclosure controls and procedures.

[40] During 2015, AR Capital engaged in negotiations regarding a transaction that would require approval of amendments to advisory agreements by shareholders of REITs that it had sponsored and RCS solicited shareholder proxies.

In June 2015, the Securities Division of the Massachusetts Secretary of State began an investigation regarding the solicitation of proxies by RCS and in November 2015 the Securities Division filed an administrative complaint alleging violations of securities laws by RCS in connection with its solicitation of proxies.

into RCS, the Dealer Manager, resulted in an administrative complaint being filed by the Securities

Division of the Massachusetts Secretary of State discussed in Section V. J. below.

In November 2015, the Advisor (through AR Capital ownership which controlled the

Advisor) sought an amendment of the Advisory Agreement to provide for the payment of cash

management fees on a monthly basis.  On November 8, 2015, an attorney employed by RCS sent

emails to the Company's Independent Directors seeking approval of an Amendment to the

Advisory Agreement that would provide for the payment of a cash asset management fee.  In

support of its recommendation, the Advisor cited the following:

> January 6, 2016 would mark the second anniversary of the Company's IPO,
> "implying that the Company is currently transitioning to a more mature investment
> phase;
>
> The Company has recorded one of the best equity raising performances across past
> and current programs sponsored by AR Capital;
>
> The Company has been the best-selling product across the AR Capital platform in
> 2015;
>
> Most AR Capital programs compensate the sponsor with an asset management fee
> payable in cash on a monthly basis;
>
> Based on a survey of non-listed REIT sponsors, the Advisor tends to be
> compensated at the lower end of the range; the Company is currently fully covering
> its cash distribution obligations.

The Independent Directors approved the Amendment to the Advisory Agreement as

proposed by the Advisor on November 8, 2015.  The Independent Directors did obtain a

clarification to the proposal to amend the Advisory Agreement which added an MFFO threshold

that had to be met in order for the asset management fee to be paid in cash for a given period.

The proposal to amend the Advisory Agreement was delivered to the Independent

Directors via email from Megha Shah, assistant general counsel of RCS Capital acting on behalf

of the Advisor at 12:03 a.m. on November 8, 2015. It was approved by email by Abby Wenzel at

8:13 a.m. and by Bob Burns at 2:04 a.m. However, before approving the Amendment to the Advisory Agreement, Stan Perla contacted Kahane and Hoganson to express concern over the Company's ability to close all of the SWN Transactions and to seek confirmation that Company Management was comfortable with the Amendment to the Advisory Agreement. This conversation resulted in the MFFO condition discussed above and Stan Perla gave his consent at 12:15 p.m. the next day. Kahane did not vote on the transaction but from communications reviewed by the Committee, it is clear he was heavily involved in seeking the approval of the Advisory Amendment on behalf of AR Capital and its Advisor.

As discussed in the subsection below, just four days after the Amendment to the Advisory Agreement the Company's capital raise was halted as a direct result of a regulatory complaint lodged against the Company's Dealer Manager RCS (owned and controlled by AR Capital), which shut down less than a month later - causing a liquidity crisis for the Company.  The MFFO threshold for the Advisory Amendment had no teeth as that threshold and its limitations on paying the Advisory fee in cash was not triggered even with the halting of the Company's capital raise and inability to raise capital. Thus, at the same time that the Company was in a desperate need for cash and lost roughly $40,000,000 in earnest money deposits the amendment of the Advisory Agreement ultimately required the Company to pay the Advisor approximately $26,000,000 in cash asset management fees from late 2015 through 2017.

## I.      The RCS Investigation and Subsequent Shuttering of its Business and the Company's IPO

RCS was the former Dealer Manager of the Company and the wholesale securities broker-dealer for AR Capital's proprietary products, including non-traded REITs.  RCS Capital Corp.

("RCAP") was the parent company of the REIT's Dealer Manager, formed to hold RCS and other AR Capital entities.[41]

Schorsch served as RCAP's Executive Chairman of the Board.  Kahane served as CEO and Director of RCAP.  Weil served as President, Treasurer, Secretary and Director.  Budko served as CIO and Director.  And Block served as a Director.  In other words, RCS managed the sale process of all AR Capital REIT public offerings, including for the Company.  The Company is a public non-traded REIT, meaning that the Company is required to make SEC filings similar to any public company, but its stock is not traded publicly on a stock exchange.  Instead, the Company stock is sold through broker-dealers with whom RCS entered into selling agreements.  Those downstream broker-dealers would work with their clients who met certain qualifications to invest in non-publicly traded stock like the Company's stock.  The Company was therefore wholly dependent on RCS to raise capital for it through the Company's public offering by working with the downstream broker-dealers' network of clients.

The Securities Division of the Massachusetts Secretary ("Mass. SOS") had been conducting an investigation of certain practices of RCS unrelated to the Company filed an administrative complaint against RCS.  The complaint alleged that RCS violated the Massachusetts Uniform Securities Act and the regulations thereunder by fraudulently casting shareholder proxy votes related to a separate entity controlled by AR Capital, Business Development Corporation of America.  RCS was seeking the proxy votes in connection with a potential transaction between AR Capital and an affiliate of Apollo Global Management, LLC.

---

[41] https://www.sec.gov/Archives/edgar/data/1568832/000156883214000025/rcap-2014930x10q.htm

Through its investigation, the Committee learned from the Company's current management at the time and the Independent Directors of the Company that they were not aware of the investigation prior to the public disclosure regarding the filing of the Complaint on November 12, 2015.  The Company was unable to determine the extent of the ARC-related entities and associated individuals, including Schorsch or Kahane (the then-current Chairman of the Board of the Company) or RCS's prior knowledge of the investigation and Complaint in light of the ARC Defendants' unwillingness to produce documents and communications or sit for interviews with the Committee.  However, the Company had enough information from other sources to recognize that AR Capital and its owners controlled RCS and that the administrative complaint did not happen in a vacuum but after a well-documented investigation over time.  Yet, from what the Committee learned during its investigation, AR Capital and RCS did not discuss the investigation with the Company and certainly did not reveal the serious nature of the issues that unfolded in mid-November and within weeks ended the Company's capital raise – a time when AR Capital such as through the Advisor and Kahane as Chairman of the Board, knew the Company was entering into contracts to acquire SWN properties in the middle of 2015 when AR Capital demanded a change in payment structure for Advisory fees from subordinated Class B Units to cash.

Through the Committee's investigation, it confirmed that the filing of the Complaint had a direct impact on the Company's capital raise, which directly resulted in a liquidity crisis for the Company as discussed further below.  As a result of the Mass. SOS Complaint, RCS was forced to shut down, resulting in the termination of the Company's capital raise.

**J.      The Need for Strategic Alternatives To Meet The Company's Funding Obligations**

In light of the shuttering of the Company's public offering, the Company's ability to continue to raise capital ceased.  By way of example, in September of 2015, the Company raised approximately $47 Million.  In October of 2015, the Company raised approximately $74 Million. In November of 2015, the Company raised approximately $56 Million.[42] After the Mass. SOS Complaint, in December of 2015, the Company raised only approximately $5 Million and thereafter ended all together.

Baked into the foundation of the Company's business model was the assumption of a continued capital raise to meet debt obligations, continue property improvement plans (defined as "PIPs"), and continue to manage and acquire properties.  For example, at the time the Board voted to approve the SWN Transactions in the Spring of 2015, in connection with a review of its historic and then-current monthly capital raising activity, the Company made the reasoned business decision that it would continue to be able to pay down its debt obligations, including the Goldman Debt, and consummate the SWN transactions (i.e. complete the purchase price and operate the hotels).  As discussed more fully in Section V. G. the hotels that were a part of the SWN transactions were well-performing, quality hotels that fit the business objectives of the Company as it worked to round out it acquisitions of roughly $2 Billion of hotel assets.

On November 15, 2015, the Board had a meeting where Kahane relayed the Advisor's recommendation to suspend sales in the ongoing IPO effective December 31, 2015, with the rationale focused primarily on: "(i) the proposed and pending regulatory changes suggested by the

---

[42] The Company's decline in fundraising began to show in the final week of November 2015, just one week after the Mass. SOS Complaint. In the final 6 business days of the month, the Company raised just $3.2M down from the earlier weekly averages of approximately $17.6 Million.

Department of Labor fiduciary standard as well as the valuation measures prescribed by FINRA's 15-02 directive pertaining to alternative investment industry remaining largely opaque in terms of their implications and consequences for the alternative investment industry; and (ii) current business difficulties encountered by RCS related to an administrative complaint recently filed by the Massachusetts Securities Division against RCS."

At this time, the Company had approximately $62M paid in deposits (earnest money) for the acquisition of numerous properties in connection with the SWN Transactions including:

     i.      Noble 2 – closing 12/2/15 for $59M with $13.2M due at closing;

     ii.     Wheelock – closing 12/3/15 for $92.4M with $27.5M due at closing;

     iii.    Summit a – closing 12/29/15 for $44.5M with $11.7M due at closing;

     iv.    Summit 2b – closing 1/29/16 with $11.7M due at closing;

     v.     Noble 3 – closing 2/29/16 with $23.8M due at closing;

     vi.    Summit 3 – closing 3/7/16 with $21.1M due at closing; and

     vii.   Noble 4 – closing 3/31/16 with $41.5M due at closing.

On November 18, 2015, RCS confirmed to the Board that it suspended sales of the Company's shares. On November 23, 2015 the Company filed Supplement No. 8 to the Prospectus – confirming suspension of the ARCH offering. "On November 15, 2015, our board of directors, on the advice of our advisor, authorized the suspension of our initial public offering effective December 31, 2015 . . . On November 18, 2015, the dealer manager notified us that it had elected to suspend sales activities it performs pursuant to the dealer manager agreement for our initial

public offering, effective immediately.  There can be no assurance as to when the dealer manager will resume sales activities or when we will resume the offering, if at all."[43]

In Supplement No. 8 to the Prospectus, the Company also disclosed its potential to default on debt obligations and possibility of forfeiting deposits in connection with pending acquisitions. "Our failure to obtain the funds required to complete the Pending Acquisitions could cause us to default under the related agreements and, as a result, to forfeit all or a part of the $61.9 million in aggregate deposits we have made in connection with the Pending Acquisitions related to the closings that have not yet occurred through November 2, 2015."

On November 16, 2015, in the Company's 10-Q, the Company also disclosed its new arrangement with the Advisor, whereby it stopped paying the Advisor B-Units and started paying asset management fees in stock or cash at the Advisor's election.  "Following amendments to the Company's agreement with the Advisor and the limited partnership agreement of the OP on November 11, 2015, the Company is now required to pay asset management fees, which may be in cash (subject to certain coverage limitations during the pendency of the Offering), shares of the Company's common stock or a combination of both, at the Advisor's election, on a monthly basis effective October 1, 2015, and Class B Units will no longer be issued to the Advisor with respect to periods commencing on or after September 30, 2015 . (See Note 13 - Subsequent Events)."[44]

By the time of the Board's November 24, 2015 meeting, which also included Mehlman, Hoganson, Paul Hughes (Senior VP and Counsel at AR Capital), Jesse Galloway and members of Proskauer (Company counsel), the Company substantially reduced its estimate of anticipated

---

[43] https://www.sec.gov/Archives/edgar/data/1583077/000114420415067359/v424962_424b3.htm

[44] https://www.sec.gov/Archives/edgar/data/1583077/000158307715000016/archosp-9x30x2015x10q.htm

additional capital to the $12.3M raised that week, with no additional funds expected the remainder of the calendar year (noting $70M of cash on hand and $115M in December cash needs). The Board discussed the possibility of restructuring its debt with Deutsche Bank, the effect of not closing certain pending acquisitions, and the need to identify a source of roughly $100M in capital for 2016.

At this time, it was apparent the Company would not be able to continue to raise capital as anticipated, would not be able to continue to pay down its debt obligations, would not be able to continue its property improvement plans, and would not be able to close the SWN transactions as originally planned without taking action to secure additional capital.

At the November 30, 2015 Board meeting, also attended by Mehlman, Hoganson, Mr. Hughes, Aaron Deyerle (controller of the REIT), James Tanaka (Chief Securities counsel for AR Capital), and Company counsel, the Board discussed renegotiation efforts with Deutsche Bank, joint venture possibilities with third-party companies that had expressed potential interest, a bridge loan from American Finance Trust (an AR Capital sponsored entity), and the possibility of postponing upcoming closings.

At the December 1, 2015 Board meeting, the Board approved the Noble 2 transaction in an effort to avoid default under the applicable agreements, while it simultaneously worked to obtain a long-term financial solution. The Board also discussed extending the Wheelock sale from December 3rd to the 8th for $500,000. The Board discussed a term sheet from American Finance Trust. A discussion ensued regarding a potential investment from an affiliated AR Capital Fund for a total of $630M. The Independent Directors authorized retention of Morrison & Foerster ("MoFo") as counsel to the Independent Directors.

The next day, the Independent Directors - Perla and Wenzel - had an initial meeting with MoFo.  From that meeting, the Independent Directors decided to retain a financial advisor to assist them with assessing strategic alternatives for Company's capital needs.

On December 2, 2015, a New York Times article announced that Realty Capital Securities reached a $3M settlement and was ceasing its operations altogether.  On the same day, the Board met to discuss the upcoming closing of Noble 2, a possible extension on the Wheelock transaction, and the on-going talks with Centerbridge Partners, L.P., a potential joint venture partner.  It also discussed a proposal from American Finance Trust with the basic terms of a $400M investment in exchange for common stock in several tranches (35% would go towards preferred equity interest and mandatory redemption rights).  The Committee learned from interviews that although there were some initial discussions about the American Finance Trust investment, this proposal did not make it much further beyond initial discussions.

From December 4-7, 2015, the Independent Directors interviewed financial advisors with the goal of assessing potential strategic alternatives to address the Company's liquidity crisis.  They interviewed the following candidates:

A.    Hentschel & Company;

B.    Evercore Partners;

C.    Eastdil Secured/Wells Fargo Securities;

D.    Moelis & Company; and

E.    Robert W. Baird & Company.

At the December 7th board meeting, the Board continued to discuss the potential capital infusion transaction with the ARC-affiliated entity and also discussed an extension of Wheelock to December 15.

71

At a December 8, 2015 meeting of the Independent Directors, they selected Hentschel & Co. to be their financial advisor to assess strategic alternatives. That same day the full board entered a unanimous consent to terminate the Dealer Manager Agreement with RCS as RCS was winding down operations.

### K.    Hentschel & Co. Strategic Alternatives Process

At the time, Hentschel & Co. was a corporate and M&A advisory services company and advised real estate companies for strategic transactions including mergers and acquisitions, sales and divestitures, privatizations and management buyouts, and recapitalizations and restructurings. Hentschel & Co. also worked with institutional investors. The primary contact was Mr. Steven Hentschel.

Hentschel & Co.'s scope of work for the Independent Directors included evaluating the Company's liquidity profile and compliance with debt covenants, providing financial advice in connection with evaluating potential transactions, and among other things, preparing reports to the Independent Directors to evaluate strategic alternatives for the Company.[45]

In a report given to the Independent Directors on February 8, 2016, Hentschel & Co. identified the Company's liquidity issues and challenges noting the Company's equity source (offering) was terminated, the Company had forfeited $32M in deposits as of February 2016, the Company had the obligation to redeem $292M in preferred equity interests with 50% by February 27, 2018 (the balance thereafter) and the Company had high leverage of 74.8% net debt plus preferred equity versus the purchase price of its portfolio. The strategic alternatives evaluated by

---

[45] A copy of the Hentschel & Co. Presentations to the Special Committee are attached hereto as Exhibit I.

Hentschel & Co. included i) status quo/do nothing, ii) partial asset sales, iii) full sale iv) an IPO, or v) recapitalization through a third-party investor.

Hentschel & Co. determined that remaining status quo would not work and ultimately would lead to a default on the Goldman debt, a corresponding forfeiture of most of the Company's hotel assets, and a Company shut down.  Hentschel & Co. analyzed a sale of the Company.  In assessing the Company's current debt obligations, Hentschel & Co. determined that a partial sale of assets would not bring the Company enough funds to help with their cash shortfall and determined that a full sale likely would not bring much value to the stockholders in light of the current debt obligations.  In light of the negative publicity clouding AR Capital, among other reasons, an IPO was also not viable.  Accordingly, the independent director's focus with Hentschel & Co. was to find an institutional funding source.

In early 2016, AR Capital made a proposal for a special purpose acquisition company ("SPAC") (AR Capital Acquisition Corp.) to provide funding to the Company.  On March 7, 2016, the Board signed a unanimous written consent to form a Special Committee for the Independent Directors to assess the SPAC.  The Special Committee members were Perla and Wenzel.  The Special Committee first reviewed the SPAC proposal, as well as a third-party proposal from Baupost Group/AWH Partners.  Ultimately, the Independent Directors determined the AR Capital SPAC was not a viable option.

The Special Committee continued to work with Hentschel & Co. throughout the Spring of 2016 to assess potential third-party funding proposals.  The proposals largely required internalization of management and a renegotiation of the property management agreements.  While Hentschel & Co. worked with the Independent Directors to find a funding source, Hentschel & Co. suggested to the Independent Directors that as a way to preserve cash on-hand, they should

73

consider stopping dividend payments and that they should try to defer asset management fee payments to the Advisor.  In furtherance of those suggestion, on March 24, 2016, the Board, through unanimous written consent, voted to discontinue cash dividends in light of the liquidity issues and amend the Advisory Agreement to provide partial payment (up to $500,000) to the Advisor in shares of Company common stock for the base fee instead of cash, subject to certain financial conditions which were never met.  Indeed, the Company paid approximately $26 Million in cash asset management fees.

On March 31, 2016, Hentschel & Co. and Perla, on behalf of the Special Committee, revised the Hentschel & Co. engagement letter to expand the scope of work to include actively seeking capital from a strategic investor.  By March of 2016, Hentschel along with the Special Committee contacted over 50 parties to inquire about making an offer to invest.  Through April of 2016, Hentschel & Co. continued to assess strategic alternatives and present them to the Special Committee.

On April 19, 2016, Hentschel & Co. provided a presentation to the Special Committee on its progress:

- o   56 potential investors contacted with 25 signed non-disclosure agreements;
- o   Two investment proposals (Baupost Group/AWH Partners and Lindsay Goldberg) and three proposals solely to change the advisor; and
- o   Hentschel & Co.  was informed that Brookfield stated it intended to present a proposal that week.

On April 29, 2016 the initial proposal from Brookfield (dated April 21, 2016) was presented by a MoFo attorney (counsel to the Special Committee) to the Board, setting forth the Special Committee's opinion that the offer is attractive and the Company should proceed with

vetting the offer.  The Brookfield proposal included the termination of the Advisory Agreement, and internalization of management functions.

### L.     The April 2016 Proxy Statement

On April 29, 2016, the Company filed its Proxy Statement for the year ended December 31, 2015.  The Proxy Statement reads:

> Prior to establishing the conflicts committee, the independent directors reviewed the material transactions between the Sponsor, the Advisor and their respective affiliates, on the one hand, and us, on the other hand.  Either the independent directors or the conflicts committee has determined that all our transactions and relationships with our Sponsor, Advisor and their respective affiliates during the year ended December 31, 2015 were fair and were approved in accordance with the applicable Company policies.

### M.     Duff & Phelps Net Asset Valuation

During the same time-frame that the Company was working through its analysis for strategic alternatives, it also began its work to determine the stock price net asset value ("NAV").  FINRA Rule 2340(c)(1) requires that issuers of REIT securities must publish their net asset value at least annually so that the value of customer assets will accurately be reflected on account statements.  Accordingly, the Company went through a process to select and retain an independent third-party valuation company.   On February 17, 2016, Duff & Phelps was engaged to calculate the Company's Net Asset Value ("NAV").  Duff & Phelps is a third-party advisor that performs valuation and corporate finance work for both publicly traded and privately-held companies.

The Company's management provided to Duff & Phelps materials and information requested by Duff & Phelps to conduct its analysis, including balance sheets for the assets, property improvement plans, other anticipated spends, and anticipated expenses, among other things.  The Company's management responded to requests for financial data and stayed apprised of Duff & Phelps' efforts and conclusions.

Duff & Phelps provided the Company with a range of values for the NAV: $20.37 per share on the low end to $24.94 per share on the high end and a midpoint of $22.60 per share. Duff & Phelps presented its conclusions to the Board on June 8, 2016 and explained that its valuation, methodology, and report was conducted in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute and the Uniform Standards of Professional Appraisal Practice. Duff & Phelps' methodology included working with the Company, performing valuation analysis on each property, and reviewing the Corporation's balance sheet and other financial information.

The Board reviewed a share dilution analysis presented by Mehlman and ultimately published a NAV per share of common stock of $21.48 (the midpoint between the low end value and the midpoint).

### N.   Retention of Jefferies, LLC

Through the investigation, the Committee learned that around May 2016, the Company decided to retain a financial advisor to advise the full Board on the strategic alternatives the Company should consider and the funding offers made thus far through the work Hentschel & Co. had undertaken. Recognizing that the Special Committee comprising of Independent Directors had been originally formed solely to vet the AR Capital SPAC proposal from early in 2016, the company terminated that committee. Hentschel & Co. provided information on its process and the outstanding offers to the Board. As discussed above, these proposals largely centered on internalization of management and corresponding termination of the agreements with the Advisor and Property Managers. The Committee learned through its work that AR Capital and its owners were focused on finding a solution that did not involve terminating the lucrative contracts with the Advisor and Property Managers.

In May and June, the Board proceeded to interview a number of investment banks to advise the Board.  Those banks included the following:

- Wells Fargo Securities, LLC;

- Deutsche Bank AG;

- Robert W. Baird & Co. Incorporated;

- Jefferies LLC; and

- Royal Bank of Canada.

Ultimately the Board retained Jefferies to be its financial advisor.  Jefferies entered into an engagement letter with the Company on July 8, 2016.  Thereafter Jefferies moved forward with assessing the strategic alternatives.  From an interview of a Jefferies' representative that worked with the Company in 2016, the Committee learned that, like Hentschel before it, Jefferies assessed potential options including a partial and/or full sale, a potential IPO, staying status quo or entering into a financing arrangement with a third party investor and determined that only a financing arrangement was a viable option.[46] Jefferies assessed that Hentschel had conducted an extensive process to seek third-party investment and was determined to work through the offers that remained on the table to decide the most viable options and work to close the financing transaction.

### O.    The Company's Going Concern Issue

Beginning in December of 2015, after the Company closed the door on its IPO, its auditor KPMG, expressed concern that the Company could continue to operate as a going concern.  In a letter to the Audit Committee, KPMG indicated that it had "substantial doubt" that the Company

---

[46] A copy of the Jefferies, LLC Presentations to the Board of Directors are attached hereto as Exhibit J.

could continue to operate as a going concern in light of (i) the suspension of the IPO and (ii) the termination of the agreement with the former Dealer Manager.

On March 24, 2016, the Company entered into the Second Amendment to the Advisory Agreement which, for a period commencing on June 1, 2016 and ending on June 1, 2017, subject to certain conditions, allowed the Company to pay up to $500,000 per month of asset management fees payable to the Advisor under the Advisory Agreement in shares of common stock.  These conditions were never met and no asset management fees were paid in shares of common stock during the term of the Advisory Agreement, which terminated at the closing of the Brookfield Transaction.  However, KPMG viewed this "stock lever" as important in its opinion that the Company could continue as a going concern for the year 2016.

Nevertheless, the Company needed a longer-term solution.  Mehlman, in a July 20, 2016 email stated, "But by year-end, I don't see any path unless we receive a significant capital infusion."

**P.   The Company's Evaluation of Investment Proposals**

On June 29, 2016, Brookfield presents its revised offer to the Board of Directors of the Company as follows:

June 29, 2016 Brookfield Terms:

**Type of security and proceeds**: Up to $400M of convertible preferred stock
- o  $100M issued at closing
- o  Up to $300M available for follow-on issuances
- o  Minimum issuance of $160M in aggregate

**Interest rate (dividend):** 7.5% current, missed payments accrue at 12.5%

**Conversion price**: $13.00

**Use of proceeds**: All components discussed previously, however intention is for Whitehall preferred to be kept in place and repaid at the contractual maturities

**Sale of company**: Brookfield has right to cause a company sale 5 years after initial issuance

**Board**: Expansion to five members, Brookfield has right to designate two directors

**Internalization / mgmt. contracts**:
- o Termination of existing mgmt. contract btw AR Capital and ARCH
- o Potential REIT buy-out of property mgmt. contract

**Crestline**: Brookfield is interested in acquiring 60% ownership stake subject to further diligence.

On September 8, 2016, Brookfield sends its third proposal to ARCH as follows raising the

per-share price from $13/share to $15/share:

Brookfield Terms:

**Type of security and proceeds**: Up to $400M of convertible preferred stock
- o $100M issued at closing
- o Up to $300M available for follow-on issuances
- o Minimum issuance of $230M in aggregate

**Interest rate (dividend):** 7.5%, missed payments accrue at 10%

**Payment in kind (PIK) dividend:** 5% per annum

**Conversion price**: $15.00

**Use of proceeds**: All components discussed previously, however intention is for Whitehall preferred to be kept in place and repaid at the contractual maturities

**Sale of company**: Brookfield has right to cause a company sale 5 years after initial issuance

**Board**: Expansion to five members, Brookfield has right to designate two directors

**Internalization / mgmt. contracts**: Termination of existing mgmt. contract between AR Capital and ARCH including Advisory Agreement and Property Management Agreements

**Crestline**: Brookfield is interested in acquiring 60% ownership stake subject to further diligence

The Company and Jefferies assessed the Brookfield offer compared to the other outstanding offers.  By the fall of 2016, those other offers were from AWH Partners/Baupost Capital, Almanac Realty Investors/Shaner Hotel Holdings, Brookfield Property Group, Benefit Street, and Lindsay Goldberg.  From discussions with Jefferies and from the Committee's own review, as discussed in more detail in Section VII. E. below, Brookfield's offer was the most attractive.  The Company choose to focus on completing a deal with Brookfield, noting that, at the time, two looming equally Company-killing issues were coming up in early 2017: (1) the debt obligation to Goldman Sachs to redeem $292M in preferred equity interests, with 50% by February 27, 2018 (the balance thereafter), required for the Company to stay out of default and risk Goldman taking most of the hotel assets from the Company; and (2) the KMPG going concern issue that if not resolved through a cash infusion, would also result in the Company ceasing to operate.

Over the months of September and October, the Company through the Independent Directors in consultation with Brookfield and AR Capital negotiated through terms including the exchange of letters, with a key focus being on the issue Brookfield required as part of the deal – separation from AR Capital including termination of the Advisory Agreement and the property management agreements with the Property Manager Defendants.  AR Capital and the Independent Directors also exchanged letters in late October and early November — but these letters were of a different nature.  AR Capital and the Independent Directors were butting heads, with the Independent Directors setting forth AR Capital stonewalling efforts that appeared designed to negatively impact the Company's only viable path forward – a capital infusion and corresponding separation of the Company from AR Capital and AR Capital's lucrative fee structure for itself.  In other words, the Committee understood from management and the Independent Directors that AR Capital was being challenging to work with and to complete the transaction with because it was

not in its best interest to allow the Company to proceed with internalization and cease the payment stream it had been receiving and with the Property Management agreements in place.

AR Capital was well aware of the looming issues discussed above that would destroy the Company's ability to continue to operate, yet demanded significant payment from the Company in order to allow the Brookfield transaction to proceed.  As of late November 2016, AR Capital demanded consideration to be paid to the Advisor and Property Manager for termination of the AR Capital property management agreements and income stream to them including i) a one-time $10M fee in cash to the Advisor; ii) an additional $4M cash payable in monthly installments over the next 12 months; iii) $6M worth of common stock; iv) the waiver of reimbursement overages that the Advisor owed to the Company (valued at $5.9M); and v) a general release of the AR Capital, its related entities and all employees of these entities in their capacity as such.  Moreover, AR Capital demanded that all of the Advisor's subordinated Class B-Units would also be converted to common stock.

### Q.    The Brookfield Transaction and Internalization of Management

To complete the Brookfield transaction, Brookfield required that the Company transition to internal management and away from AR Capital by terminating the Advisory Agreement and amending the Property Management relationships.  To make this happen, AR Capital, along with the Advisor and the Property Manager Defendants, required the Company to enter into a Framework Agreement to pay AR Capital through its affiliated entities roughly $37M in order to terminate the Advisory Agreement by March 2017 and amend the property management agreements to exclude the AR Capital-related property managers and lower the property management fees that would be paid going forward to the sub-managers that would now become the sole entities paid to manage the properties).  Hentschel & Co. issued a fairness opinion

81

concerning the value of the $37M to be paid in exchange for the restructuring of the property management agreements using a discounted cash flow analysis but did not opine on the underlying legality or fairness of the transaction in light of the factors discussed in Section VII. F. below.[47]

From the Committee's investigation, the Committee learned that at each turn, AR Capital extracted as much financially as it could from the Company, knowing full well that if the Company wanted to survive, it needed to cut ties with AR Capital.  In turn, the Company needed AR Capital to negotiate in good faith and work diligently or it would soon breach debt covenants and encounter a going concern problem that would prove fatal to the Company.  AR Capital did so knowing full well the Company's financial issues were caused by individuals from RCS, owned and controlled by AR Capital, in an apparent effort to help AR Capital close its deal with Apollo.

On January 12, 2017, the Framework Agreement was finalized which conveyed roughly $37M to the Property Manager and Advisor.  In the case of each of the properties that were previously sub-managed by Crestline, the sub-management agreement was eliminated, the Property Manager assigned the primary management agreement to Crestline, and the base management fee was reduced from 4% to 3% of gross revenue.  In the case of the properties managed by a third-party property manager, the primary property management agreement with the Property Manager was eliminated and the sub-manager continued to manage the property pursuant to its existing agreement through which the Company typically paid a base management fee of 2%.  The core terms are:

*Compensation to the Property Manager/Advisor:*

    (i)    a $10 million cash payment to the Property Managers;

---

[47] A copy of the Hentschel & Co. Fairness Opinion is attached hereto as Exhibit N.

(ii)    12 monthly cash payments of $333,333 (i.e., approximately $4 million in total) to the Property Managers;

(iii)   the issuance of 279,329 shares of common stock in the Company to the Property Managers worth $6 million based upon a $21.48 estimated per-share value of the stock at that time;

(iv)   a waiver of the Advisor's obligation to repay the Company $5,821,988 in organization and offering expenses that the Company previously reimbursed to the Advisor; and

(v)    the removal of all restrictions on the Advisor's 524,956 Class B Units in the Operating Partnership and the conversion of these Units to 524,956 shares of the Company's common stock.

*Advisory Agreement Amendment:*

- The Advisory Agreement will terminate on March 31, 2017 unless written notice is provided by the Independent Directors in which case the initial term of the Agreement will terminate on May 31, 2017, which could be further extended through July 31, 2017.

*Advisor Transactions:*

- Advisor Parties will assist the Company and its subsidiaries to 1) transition to self-management; 2) enter into the Asset Assignment Agreement; 3) enter into the Facilities Use Agreement; 4) enter into the Royalty Free IP License; 5) hire relevant personnel of the Advisor and affiliates; 6) obtain relevant consents

*Property Management Transactions:*

- In the case of each of the properties that were previously sub-managed by Crestline, the sub-management agreement was eliminated, the Property Manager assigned the primary management agreement to Crestline, and the base management fee was reduced from 4% to 3% of gross revenue.

- In the case of the properties managed by a third-party property manager, the primary property management agreement with the Property Manager was eliminated and the sub-manager continued to manage the property pursuant to its existing agreement through which the Company typically paid a base management fee of 2%.

In connection with closing the Brookfield transaction, AR Capital including the Advisor and the Property Manager Defendants also demanded a general release without which they would have let the Company default on its debt obligations and scuttled the Brookfield deal. The final

83

document was a mutual waiver and release (the "Mutual Release"). The Mutual Release specifically related to acts prior to the Framework Agreement and specifically excluded the Framework Agreement. The Mutual Release was between the Company, its operating partnership and Brookfield in their capacities as such and the AR Capital entities including the Advisor and Property Manager Defendants in their capacities as such.

### R.   The Securities Purchase, Voting, and Standstill Agreement

For the year 2017, the Company engaged PricewaterhouseCoopers ("PwC") to conduct its NAV analysis. On June 19, 2017, the Company published a NAV per share of common stock of $13.20, a significant decrease from the previously reported $21.48 the year prior.

In an exhibit to a Form 8-K filed on June 19, 2017, the Company explained that the lower value from the last year's NAV was caused by (i) the impact of the timing, scope and cost of PIP work, including the impact of taking hotel guest rooms out of service while PIP work is pending; (ii) different estimates and assumptions regarding future hotel revenues and expenses; and (iii) the effect of issuing additional shares to 279,329 with respect to the internalization of the Company's management.

A May 31, 2017, memorandum and analysis prepared by PwC for the Board confirmed that the cause of the difference between Duff & Phelps' analysis and their own was attributable to the factors the Company identified. PwC identified that its midpoint of $13.20 valued the Company's assets 10.4% lower than Duff & Phelps and that the Company's share count decreased the value by about 8.1%.

The Committee concluded from its investigation that the Company acted in good faith regarding issuance of the Company's NAV.

## VI.    GOVERNING LEGAL PRINCIPLES

### A.    Elements of Demand Shareholders' Claims

#### 1.    *Choice of Law Regarding Legal Claims*

The Plaintiff/Demand Shareholders allege breach of fiduciary duty, waste of corporate assets, aiding and abetting, breach of contract, violation of Section 14(a) of the Securities Exchange Act of 1934, and unjust enrichment.

##### a.    *Maryland Law Applies To Plaintiff's Breach Of Fiduciary Duty, Waste Of Corporate Assets, Aiding And Abetting, Breach Of Contract, And Unjust Enrichment Claims.*

Maryland law applies to the Demand Shareholders' claims under the internal affairs doctrine because the Company is a Maryland corporation.  "The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands."  *Tomran, Inc. v. Passano*, 159 Md. App. 706, 718 (2004), aff'd, 391 Md. 1, 891 A.2d 336 (2006).  Under the internal affairs doctrine, the law of the state of incorporation applies to the rights of shareholders.  *Id*. at 721.[48]

##### b.    *Federal Law Applies To The Violation of Section 14(a) Of The Securities Exchange Act of 1934.*

A claim for violation of Section 14(a) of the Securities Exchange Act is governed by federal statute.  15 U.S.C. § 78a et. seq.

#### 2.    *Elements Of Plaintiff/Demand Shareholders' Claims*

---

[48] For procedural issues such as statutes of limitation, courts will generally look to the state in which the case is being heard, here, New York.

###### a. Breach of Fiduciary Duty

Under Maryland law, officers and directors occupy a fiduciary relationship with the corporation.  A director of a corporation must perform his or her duties:

(1) In good faith;

(2) In a manner he reasonably believes to be in the best interests of the corporation; and

(3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.

Md. Code Ann., Corps. & Ass'ns § 2-405.1(c).  "Under Maryland law, it is well established that an officer/director of a corporation occupies a fiduciary relationship with the corporation and owes the corporation a duty of utmost care and loyalty." *Pitman v. Aran*, 935 F. Supp. 637, 645–46 (D. Md. 1996)(citing *Pittman v. American Metal*, 336 Md. 517, 522, 649 A.2d 356, 359 (1994); *Merchants Mortgage Co. v. Lubow*, 275 Md. 208, 215, 339 A.2d 664 (1975); *Waller v. Waller*, 187 Md. 185, 49 A.2d 449 (1946)).

Under Section 2-405.1(e), directors who fulfill these duties enjoy the immunity from liability defined in Section 5-417 of the Courts and Judicial Proceedings Article.  Maryland has codified the "business judgment rule" at Section 2-405.1(g), which provides, "An act of a director of a corporation is presumed to be in accordance with subsection (c) of this section."

The "business judgment rule's presumption that directors fulfilled their duties does not render directors impervious to a plaintiff's claims.  Rather, the business judgment rule merely places upon plaintiffs the burden of rebutting the presumption." *Hudson v. Prime Retail, Inc.*, 2004 WL 1982383, at *11 (Md. Cir. Ct. Apr. 1, 2004) (internal citations omitted).  In performing their duties, directors may rely on information from "(i) An officer or employee of the corporation whom the director reasonably believes to be reliable and competent in the matters presented; (ii)

A lawyer, certified public accountant, or other person, as to a matter which the director reasonably believes to be within the person's professional or expert competence; or (iii) A committee of the board on which the director does not serve, as to a matter within its designated authority, if the director reasonably believes the committee to merit confidence." Md. Code Ann., Corps. & Ass'ns § 2-405.1(d)(1).

The Advisor stands in a fiduciary relationship to the Company pursuant to Section 8.3 of the Charter. "Among the agent's fiduciary duties to the principal is the duty to account for profits arising out of the employment, the duty not to act as, or on account of, an adverse party without the principal's consent, the duty to not compete with the principal on his own account or for another in matters relating to the subject matter of the agency, and the duty to deal fairly with the principal in all transactions between them." *Ins. Co. of N. Am. v. Miller*, 362 Md. 361, 381, 765 A.2d 587, 598 (2001).

### b. *Waste of Corporate Assets*

Under Maryland law, "[d]irectors are also liable if they suffer the funds of the corporation or its property to be lost or wasted by gross negligence and inattention to the duties to the trust." *Par. v. Maryland & Virginia Milk Producers Ass'n*, 250 Md. 24, 76, 242 A.2d 512, 541 (1968); *See also Edge Partners, L.P. v. Dockser*, 944 F. Supp. 438, 442 (D. Md. 1996) ("Plaintiff has pled a cause of action for gross negligence and a waste of corporate assets.").

"Even if a transaction has been approved by a disinterested majority of the board or the requisite vote of disinterested stockholders, there is still an equitable safety valve in the form of the court's determination of whether the transaction constituted a gift or waste." *See Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 895 (Del. Ch. 1999).

87

"The only inquiry then is into whether the consideration paid in the transaction is so inadequate that no reasonable person could conclude the transaction was other than a gift or waste, thereby rendering the business judgment doctrine inapplicable." *See Michelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979); *Lewis v. Aronson*, C.A. No. 6919 (Del. Ch. May 1, 1985), slip op. at 13.

### c.    Aiding & Abetting

An individual may be liable for aiding and abetting if he engaged in "acts of encouragement or assistance to the person actually committing the wrongful act." *See Saadeh v. Saadeh, Inc.*, 150 Md. App. 305, 328, 819 A.2d 1158 (2003).  Under Maryland law, liability can only exist for aiding and abetting where liability exists for the underlying tort.  *See Alleco Inc. v. Harry & Jeanette Weinberg Foundation, Inc.*, 340 Md. 176, 201, 665 A.2d 1038 (1995).

Maryland courts have implicitly acknowledged that aiding and abetting may apply to a claim of breach of fiduciary duty.  *See Adobe Sys. Inc. v. Gardiner*, 300 F. Supp. 3d 718, 727 (D. Md.  2018)("While the Court finds that Adobe may not proceed with its claim for "Breach of Fiduciary Duty," the Court reads Count IV, "Aiding and Abetting Breach of Fiduciary Duties," to include Gardiner's alleged breach of a broad fiduciary duty, as well as breach of the specific fiduciary duties of loyalty and confidentiality.  Because Adobe may proceed with its claims of breach of the fiduciary duties of loyalty and confidentiality, the Court must now determine whether the remaining Defendants may be liable for aiding and abetting the breach . . .  Here, Adobe has pleaded sufficient facts to support an aiding and abetting claim against Plurality and VAR Solutions, but not OME.").

#### d.      Breach of Contract

Under Maryland law, the elements of a breach of contract claim are: (1) a contractual obligation and (2) a breach of that obligation. *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175, 776 A.2d 645, 651 (2001).  A breach is material if further performance of the contract would be "different in substance from that which was contracted for." *Ambling Mgmt. Co. v. Univ. View Partners LLC*, 2011 WL 4103098, at *8 (D. Md. Sept. 9, 2011)(quoting *Barufaldi v. Ocean City Chamber of Commerce*, 196 Md. App. 1, 23, 7 A.3d 643, 657 (2010)).

The Charter is a contract between the Corporation and its shareholders. *See McQuillen v. Nat'l Cash Register Co*., 27 F.Supp.  639, 645 (D. Md. 1939) (describing a corporate charter as a contract between the corporation and shareholders); *Warren v. Fitzgerald*, 189 Md. 476, 485, 56 A.2d 827 (1948) (corporate charter is a "contract between stockholders" and "between the corporation and the State"); *Oliveira v. Sugarman*, 451 Md. 208, 235, 152 A.3d 728, 744 (2017).

#### e.      Violation of Section 14(a) of the Securities Exchange Act of 1934

To assert a claim for a violation of Section 14(a), a plaintiff must show "that (1) the proxy statement contained a material misrepresentation or omission (2) that caused the plaintiff injury and that (3) the proxy solicitation was an essential link in the accomplishment of the transaction" that produced the injury." *Hayes v. Crown Cent. Petrol. Corp.*, 78 Fed.Appx.  857, 861 (4th Cir. 2003) (per curiam) (citing *Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 932 (3d Cir.  1992)).  The second and third elements have been termed "loss causation" and "transaction causation," respectively.  *In re AGNC Inv. Corp.,* 2018 WL 3239476, at *3 (D. Md. July 3, 2018)(quoting *Grace v. Rosenstock*, 228 F.3d 40, 47 (2d Cir.  2000)); *Wilson v. Great Am. Indus.*, 979 F.2d 924, 931 (2d Cir. 1992)).

*f.*      *Unjust Enrichment*

To succeed on a claim for unjust enrichment under Maryland law, three elements must be satisfied:

1. A benefit conferred upon the defendant by the plaintiff;
2. An appreciation or knowledge by the defendant of the benefit; and
3. The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.

*Alternatives Unlimited, Inc. v. New Baltimore City Bd. of Sch. Comm'rs*, 155 Md. App. 415, 496, 843 A.2d 252, 299–300 (2004).

**B.      Limitations on Liability**

*1.      The Company's Charter*

Section 12.2 of the Company's Charter restricts liability of its officers and directors for money damages subject to the limitations set forth under Maryland law.  A Maryland corporation may expand or limit the liability of its directors and officers to the corporation for money damages, but may not limit the liability of its directors and officers:

(1) To the extent that it is proved that the person actually received an improper benefit or profit in money, property, or services for the amount of the benefit or profit in money, property, or services actually received;

(2) To the extent that a judgment or other final adjudication adverse to the person is entered in a proceeding based on a finding in the proceeding that the person's action, or failure to act, was the result of active and deliberate dishonesty and was material to the cause of action adjudicated in the proceeding . . .

Md. Code Ann., Cts. & Jud.  Proc. § 5-418(a).

The interpretation of "improper benefit" and "active and deliberate dishonesty" is a developing area of law, and the Maryland courts are yet to set a definitive standard.  However, several decisions provide guidance to the Committee.

2.      *Active and Deliberate Dishonesty*

In a February 2014 decision, the District Court for the District of Maryland stated that "Maryland courts have not yet construed the meaning of the phrases 'improper benefit' or 'active and deliberate dishonesty.'" *Goldstein v. Berman*, 2014 WL 824050, at *3 (D. Md. Feb. 28, 2014). However, the court did confirm that mere allegations of breach of fiduciary duty are insufficient to allege that an individual acted with active and deliberate dishonesty. "Allegations of breaches of fiduciary duties alone are not sufficient. Goldstein's allegations that the Defendants took actions that 'placed the interests of K Bank ahead of the interests of K Capital and its creditors' are not sufficient to plead that the Defendants were actively or deliberately dishonest." *Goldstein*, 2014 WL 824050 at *4.

The District Court for the Southern District of New York, ruling on a motion to dismiss and applying Section 5-418(a) of the Maryland Code, also discussed the meaning of "improper benefit" and "active and deliberate dishonesty." The Court noted that "Maryland courts have held that the term 'dishonesty' 'involves lying or the intent to commit fraud,' *Attorney Grievance Comm'n v. Dore*, 73 A.3d 161, 168 (Md. 2013), and the Fourth Circuit has held that 'active and deliberate dishonesty' requires allegations of fraud. *Hayes*, 78 Fed.Appx. at 865." *Witchko v. Schorsch*, No. 15 CIV. 6043 (AKH), 2016 WL 3887289, at *8 (S.D.N.Y. June 9, 2016), appeal dismissed sub nom. *Serafin v. Kahane*, No. 16-2499, 2016 WL 9411240 (2d Cir. Nov. 15, 2016). The Court dismissed the claims against the Defendants because "Plaintiffs also cannot allege 'active and deliberate dishonesty,' as they allege negligence at most." *Id.*

3.      *Improper Benefit*

A treatise on Maryland corporation law explained the improper benefit language as follows:

Actual receipt of "an improper benefit or profit in money, property, or services" and "active and deliberate dishonesty" that is material to the cause of action resulting in a final judgment adverse to the director or officer.  """"Actual receipt" does not include constructive or imputed receipt.  The director must actually receive it.  A court should be skeptical of any effort to characterize as actual receipt by a director the receipt of a benefit by a third party.  "Improper" means to which he is not entitled.  A director may not escape this provision by directing an otherwise improper benefit to a third party.  The words "or profit" were added at the request of the Attorney General's office and do not add anything to the word "benefit." The words """"money, property, or services" mean that the benefit may not include such unquantifiable things as business goodwill or social ingratiation.

§ 6.9 LIMITATION OF LIABILITY, MDCLW § 6.9.

**VII.   ANALYSIS OF SHAREHOLDER ALLEGATIONS**

A.   <u>The Allegation That The Independent Directors Lacked Independence To Make Decisions In The Best Interest Of The Company</u>

The Committee analyzed whether Perla, Burns and Wenzel were "independent" under the Company's Charter, NASDAQ Rule 5605, and common law.  In conducting this analysis, the Committee looked not only to applicable Maryland law but also to decisions from the Delaware courts, whose independence inquiry the Maryland courts find persuasive.  *See Boland*, 423 Md. at 355 ("For example, the Delaware courts, whose 'independence' inquiry we find persuasive in crafting our standards. . .").

In assessing the issue on independence, the Committee looked generally at the standards establishing the independence of a director, what the implications are if the Committee determined that as part of any claims/transactions the three directors were potentially not independent, and applying that analysis to the claims made in the Shareholder Allegations, in particular the transactions at issue where these directors voted.

*1.   Director Independence*

The Committee first addresses the issues regarding the factors to assess in determining independence and the impact on rendering a decision one way or the other.

In assessing the issue of independence and in particular the claims made in the Amended Complaint that focuses on the number of boards on which each director had sat and the fees earned by each director, as to Perla, Burns and Wenzel, the Committee and its counsel reviewed a host of information including assessing the various boards on which each director sat, the fees generated by each, the D&O questionnaires completed by each, public filings of AR Capital sponsored REITs and Funds and the testimony from these individuals.

First, the Committee assessed the Charter's definition and determined that these directors met the definitions of the Charter and thus complied with its terms as set forth below.  The Company's Charter defines an "independent" director as one who "within the preceding two years: (i) no ownership of an interest in the Sponsor, the Advisor or any of their Affiliates; (ii) no employment by the Sponsor, the Advisor or any of their Affiliates, (iii) no service as an officer or director of the Sponsor, the Advisor or any of their Affiliates, (iv) no performance of services, other than as a Director, for the Company, (v) no service as a director or trustee of more than three REITs organized by the Sponsor or advised by the Advisor and (vi) no maintenance of a material business or professional relationship with the Sponsor, the Advisor or any of their Affiliates."  The Committee's analysis as to each section was as follows:

| Charter Sections – Comply? | | Supporting Documents/Testimony |
|---|---|---|
| Point (i) | Yes | D&O questionnaire |
| Point (ii) | Yes | D&O questionnaire |
| Point (iii) | Yes | D&O questionnaire and discussions with directors |
| Point (iii) | Yes | D&O questionnaire and discussions with directors |
| Point (iv) | Yes | D&O questionnaire and discussions with directors |
| Point (v) | Yes | Assessment of corporate filings and discussions with directors |

| Point (vi)[49] | Yes | Assessment of D&O questionnaire and discussions with the directors |
|---|---|---|

Next, the Committee looked at the NASDAQ rules regarding independence.  As set forth in HIT's prospectus, "Our Common Stock is not listed on the NASDAQ Stock Market ("NASDAQ") or any other national securities exchange, but the Board of Directors has also considered the independence of each nominee in accordance with the requirements of the NASDAQ Listing Rules, including the independence requirements with respect to committees."  Although the Company's stock is not listed on the NASDAQ exchange, case law indicates that the NASDAQ rules are a "useful source" to consider when assessing an argument that a director lacks independence.  Accordingly, the Committee included in its analysis a review of the facts here in connection with NASDAQ Rule 5605, which outlines objective factors to determine a director's independence based on factors like the director's employment with the corporation, compensation from the corporation, and familial relations with executive officers and certain entities the corporation transacts with.  From that assessment, the Committee determined that the directors met the definition of independent under the NASDAQ rules.  The Committee did not, however, end its analysis there.

As set forth in the common law, a director is independent if his decision is focused on the merits of the transaction and the best interest of the company and not on any other extraneous influence.  Case law regarding independent directors focuses on the relationship between the independent director, the transaction at issue, the relationship with other directors or officers of

---

[49] This language comes from the NASAA REIT Guidelines — specifically, from the definition of "independent trustee" (i.e., independent director). The provision is discussing a director's compensation other than his/her compensation as a director from a REIT associated with any AR Capital-related sponsor, since his/her compensation as a director would come from the REIT directly (rather than the sponsor, advisor, of their affiliates).

the company, and the interest of the independent director and the entity opposite the transaction. The Committee assessed independence under the common law, including Maryland law and the law of Delaware where states including Maryland look in assessing corporate governance issues such as independence of directors.  *See Boland*, 423 Md. at 355 ("For example, the Delaware courts, whose 'independence' inquiry we find persuasive in crafting our standards. . .").; *see also In re MFW S'holders Litig.*, 67 A.3d 496, 510 (Del. Ch. 2013), aff'd sub nom.  *Kahn v. M&F Worldwide Corp., 88 A.3d 635* (Del. 2014).

Maryland courts acknowledge that a director may lack independence in two ways: "either self-interest in the transaction at issue or a loss of independence because a director with no direct interest in a transaction is controlled by a self-interested director." *Shapiro v. Greenfield*, 136 Md. App. 1, 22, 764 A.2d 270, 281 (2000)(quoting *Park River Owners Corp. v. Bangser Klein Rocca & Blum*, LLP, 269 A.D.2d 313, 703 N.Y.S.2d 465, 466 (2000)).

In *Shapiro*, the Court held that "when a director does not personally benefit from the transaction but, because of that director's relationship to a party interested in the transaction, it would reasonably be expected that the director's exercise of independent judgment would be compromised, that director will be deemed an interested director within the meaning of the statute." 764 A.2d 270.  Accordingly, "when a director's loyalty is questioned, courts must seek to ascertain whether the conflict "has deprived stockholders of a 'neutral decision-making body.' " *Id.* (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1170 (Del.Ch.1994), aff'd, 663 A.2d 1156 (Del.Supr.1995)).

A director's independence refers to his or her ability to make a decision "based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Orman*, 794 A.2d at 24.  A lack of independence can be shown when "a plaintiff

pleads facts that establish 'that the directors are 'beholden' to [the controlling person] or so under their influence that their discretion would be sterilized." *Id.*  Factors that courts typically analyze when determining whether a director lacks independence include "significant business relationship or affiliations" with other directors, "internal business influences and incentives," and "significant social or personal relationships." *Boland,* 423 Md. at 354 (2011)(citing *Auerbach,* 47 N.Y.2d at 631 (examining whether SLC members had "any prior affiliation with the corporation")).

Here, the Plaintiff/Demand Shareholders allege that because Perla, Burns and Wenzel sat on multiple AR Capital boards and received significant compensation on these boards those factors made clear that these directors lacked independence.   (Amended Compl. ¶¶ 115-121.) The Committee analyzed these individual factors but in doing so took into account the fact that Courts generally do not look at one factor but apply a contextual and cumulative analysis when reviewing a director's independence—multiple facts standing alone may not raise an independence concern, but when viewed together, they may.  *California Pub. Employees' Ret. Sys. v. Coulter*, 2002 WL 31888343, at *9 (Del. Ch. Dec. 18, 2002) (discussing the fact that cumulatively factors may give rise to a question of independence but referencing prior cases that discuss the fact that "personal friendships, without more; outside business relationships, without more; and approving of or acquiescing in the challenged transactions, without more, are each insufficient to raise a reasonable doubt of a director's ability to exercise independent business judgment.").

To assess the Plaintiff/Shareholder allegation, the Committee reviewed the law regarding compensation paid to directors generally.   Courts have routinely rejected a director's high compensation as evidence of tainting of his or her independence.  "At first blush, this might seem unjustifiable.  After all, average annual director compensation is now $136,000; presumably few would willingly give up such a lucrative position and the perquisites that accompany it.

Nevertheless, in *Beam v. Stewart*, the Delaware Supreme Court rejected a bright-line rule that conclusively excused the demand requirement on these grounds, and instead required plaintiffs to show that any compensation would be enough to "entice" the outside director to ignore her fiduciary duty.  Delaware courts have pointedly refused to find such enticement in many cases (including, for example, when the director is a person of modest means)." Usha Rodrigues, *The Fetishization of Independence*, 33 J. Corp. L. 447, 470–71 (2008).

Next, the Committee assessed cases where courts considered whether a director's service on multiple boards for corporations with common ownership and the director's cumulative compensation from that service, may affect his or her independence.  In assessing the law on this point, the Committee looked to Maryland law and analogous law on point regarding directors that sit on multiple boards of various fund companies governed by the Investment Company Act of 1940.

In a 1997 Southern District of New York decision, applying Maryland law, the court held that although multiple directorships were not necessarily determinative of a director's independence, the allegation that the director was acting in the interest of the advisor, coupled with the receipt of substantial remuneration did call into question the director's independence.  *Strougo on Behalf of Brazil Fund, Inc. v. Scudder, Stevens & Clark, Inc.*, 964 F.  Supp. 783, 795 (S.D.N.Y. 1997).  In response to this decision, the Maryland legislature enacted a statute in accord with the majority of jurisdictions.  "Delaware and Massachusetts have enacted statutes expressly declaring that any investment company trustee who is not to be considered an "interested" trustee under the ICA is deemed "to be independent and disinterested for all purposes." Del. Code Ann. Tit. 12, § 3801(h) (1998); Mass.  Gen.  Laws Ann.  Ch.  182, § 2B (1998) (same).  These statutes are

substantively identical to the Maryland statute, Md. Code Ann., Corp. & Ass'ns § 2–405.3(b) (1998).

The majority of jurisdictions have held that a director of an investment company who serves on the board of multiple companies controlled by the same advisor within the same fund does not lack independence merely because of this association. "While well-compensated membership on multiple boards within a fund complex is one factor in the control crucible, most courts have concluded that it is not sufficient evidence by itself to rebut the statutory presumption. *See id.* at 258–59 (rejecting a control claim where the complaint alleged service by "independent directors" on twenty-one boards with compensation ranging from $140,000 to $160,000); *Krantz v. Prudential Invs. Fund Management LLC*, 77 F.Supp.2d 559, 563 (D.N.J.1999) (rejecting a claim that overlapping service on between 15 and 38 boards with an average compensation of $90,000 constituted control); *Langner v. Brown*, 913 F.Supp. 260, 266 (S.D.N.Y.1996) (holding that "[j]ust as the mere receipt of director fees does not constitute a disqualifying interest as a matter of law, so too are cross-directorships insufficient to create interests"); *Olesh v. Dreyfus Corp.*, No. CV–94–1664, 1995 WL 500491, at *21 (E.D.N.Y. Aug. 8, 1995) (holding that directors who sat on over fifteen boards and received over $50,000 in compensation were not interested.)

### 2.    *The Business Judgment Rule and Entire Fairness Standard*

Under the business judgment rule, there is a presumption of "disinterestedness, independence, and reasonable decision-making to all business decisions made by a corporate board of directors." *Oliveira*, 451 Md. at 221. Maryland courts have codified the business judgment rule. Md. Code Ann., Corps. & Ass'ns 2-405.1(g)("An act of a director of a corporation is presumed to be in accordance with subsection (c) of this section."). Under the business judgment rule, courts will not supplant their own business judgment for that of a corporation's officers and directors.

98

Where a shareholder alleges facts to overcome the presumption of the business judgment rule, the challenged transaction is not automatically void, but instead, the court should apply the "entire fairness" standard.  *See Oliveira v. Sugarman*, 451 Md. at 152 n.5(citing *Bender v. Schwartz*, 172 Md. App.  648, 670, 917 A.2d 142 (2007) ("When a shareholder successfully makes such a showing, courts generally apply the two-pronged "entire fairness standard" to evaluate the challenged business decision.").

The entire fairness test comprises of both an assessment of fair dealing (when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained) and fair price (the economic and financial considerations of the business decision).  *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

### 3.    The Independence of Perla, Burns and Wenzel

The Committee analyzed the Plaintiff/Demand Shareholders allegation that the Independent Directors lacked independence to make decisions in the best interest of the Company because each served on various boards within the AR Capital REIT space and the compensation paid to these directors from AR Capital-sponsored REITs.  The Committee assessed the compensation paid to board members of unaffiliated REITs with comparable assets and reviewed the relevant case outlined in subsection one above.  Based on this analysis, the Committee determined that these facts (i.e. number of boards and compensation) did not, in the Committee's mind, in and of themselves establish that these directors were not independent.

Nevertheless, as set forth in the case law above, the analysis of independence is not an assessment of two high level factors but a contextual analysis of the relationship between the independent director, the transaction at issue, the relationship with other directors or officers of

the company, and the interest of the independent director and the entity opposite the transaction. Accordingly, the Committee determined the prudent course was to individually assess each transaction at issue as set forth in the sections below.

**B.**     **The Allegation That The Property Management Arrangements With Affiliates Were Designed To Generate Fees For AR Capital At The Expense Of The Company**

The Amended Complaint in the Milliken Action alleges that the Property Management Arrangements give rise to several causes of action, including breach of fiduciary duty; waste; aiding and abetting; and unjust enrichment.[50]

### 1.    *Breach of Fiduciary Duty*

The Amended Complaint alleges breaches of fiduciary duties by Schorsch, Kahane and the Advisor as well as the Company's officers and its Independent Directors.  The Committee addresses the liability of the Company's officers and Independent Directors below in Sections I and J.

#### a.    *Schorsch and Kahane*

Schorsch and Kahane served as directors of the Company during parts of the relevant period.  Schorsch served as a director of the Company from its inception through December 2014. Kahane served as a director from August 2013 through March 2017.  Kahane also served as the Chief Executive Officer of the Company from its inception until late 2014.  Kahane served as the CEO of the Advisor from August 2013 through November 2014 and as CEO of one of the Property

---

[50] The discussion related to the Independent Directors is set forth in Section VII J below.

Managers from August 2013 through November 2014.[51] Schorsch and Kahane were also owners of AR Capital and indirect owners of the Property Managers.

Based upon its investigation, the Committee has concluded that Schorsch and Kahane devised a property management structure which harmed the Company and which benefited them personally.  For example, the Company's TRS subsidiaries entered into Management Agreements with American Realty Capital Hospitality Properties, LLC regarding properties acquired during early 2014 following commencement of the Company's public offering.  At that time, Schorsch and Kahane served as members of the board of directors and Kahane served as an officer of the Company and both held an indirect ownership interest in American Realty Capital Hospitality Properties, LLC.  After completing its investigation, the Committee believes that claims regarding breach of fiduciary duties by these individuals should be pursued because they devised the structure that involved payments to the Property Managers for services that they did not perform.  Based upon its investigation, the Committee has concluded that the Company paid fees to the Property Managers notwithstanding that the Property Managers did not employ the personnel necessary for the Property Managers to perform their contractual obligations and, thus, the Company paid fees but did not receive services from the Property Managers.  Moreover, the Advisor was obligated, pursuant to the Advisory Agreement, to oversee, supervise, and evaluate the management of the Company's properties.  As Schorsch and Kahane had an interest in the transactions through their indirect ownership of the Property Managers and the Advisor, the Committee believes that these individuals failed to comply with Section 2-405.1 of the Maryland Code, Standard of Care Required of Directors and the standard of care imposed upon officers of

---

[51] The Property Managers were owned by AR Capital, LLC, which was owned by Schorsch, Kahane, Budko, Weil and Block.  The Property Managers did not have other officers or employees.

corporations imposed by Maryland law,[52] when the Company's TRS subsidiaries entered into Management Agreements with the Property Managers.[53] The Committee has further concluded that Schorsch and Kahane did not act in "good faith" as they were interested in the transaction as a result of their interest in the Property Manager through their ownership of AR Capital and also failed to comply with the best interest standard applicable to directors of Maryland corporations as they approved the payment of a fee to the Property Managers to perform a service that the Advisor was obligated to perform and which the Property Managers were incapable of performing as neither Property Manager employed the necessary personnel.[54]Accordingly, Schorsch and Kahane should not be able to avail themselves of the presumption of the business judgment rule codified at 2-405.1(g).[55] [56] Similarly, Schorsch and Kahane should not be able to avail themselves

---

[52] Officers of a Maryland corporation owe duties of loyalty, good faith and candid disclosure.  An officer of the corporation must place the interests of the corporation ahead of his own, refrain from competing with the corporation and disclose to other more senior officers or the board all material information. An officer of a corporation must also exercise reasonable care in the performance of his/her responsibilities. *Hale Trucks of Maryland, LLC v. Volvo Trucks North America, Inc.* 224 F. Supp. 2d 1010 (D. Md. 2002).

[53] Section 2-405.1 of the Maryland Code provides that a director of a corporation shall act: in good faith; in a manner the director reasonably believes to be in the best interests of the corporation; and with the care that an ordinary person in a like position would use under similar circumstances. The requirement that a director have a reasonable belief that an action is in the best interest of the corporation means that there must be some rational basis for the director's action, that the director must have knowledge of that basis and that the director's performance must be based upon that knowledge. The requirement that a director exercise the care that an ordinarily prudent person in a like position would use under similar circumstances focuses upon the process by which a decision is made rather than on the wisdom of the decision or the results of the decision.

[54] Minutes of Meeting of Board of Directors dated May 28, 2014.

[55] Section 2-405.1(g) provides that "An act of a director of a corporation is presumed to be in accordance with subsection (c) of this section."  This provision codifies the business judgment rule and creates a presumption that directors acted in accordance with the standards of Section 2-405.1(c).

[56] Good faith, in the context of a director of a corporation, is the absence of a desire to obtain a personal benefit or a benefit for some person other than the corporation. Maryland's good faith formulation is similar to the common law duties of loyalty or fair dealing which are applicable in other states.

of the limitation on liability provided by Sections 2-405.2[57] and 5-418[58] and the Charter[59] because they received an improper benefit through their interest in AR Capital, and the Property Managers.

### b.   The Advisor

The Advisor is alleged to have breached its fiduciary duty to the Company in connection with the Property Management Arrangements.

Based upon its investigation, the Committee believes that a claim for breach of fiduciary duty against the Advisor has merit because the Advisor was instrumental in causing the Company to pay the Property Managers a fee for services which it was obligated to perform pursuant to the Advisory Agreement between the Company and the Advisor.   As discussed above, from the Committee's investigation, the facts reveal that the Advisor was controlled by AR Capital and its owners.   AR Capital and its owners, which included officers and directors of HIT, namely Schorsch and Kahane, were aware that the Property Managers did not have the ability to actually perform the property management services set forth in the Property Management Agreements as it did not have the requisite personnel.   Accordingly, the execution of the Property Management Agreements was not in the best interests of the Company.

---

[57] Section 2-405.2 of the Maryland Code provides that "the charter of the corporation may include any provision expanding or limiting the liability of its directors and officers to the corporation or its stockholders as described under § 5-418 of the Courts and Judicial Proceedings Article."

[58] Section 5-418(a) provides, among other things, that "the charter, as defined under § 1-101 of the Corporations and Associations Article, of a Maryland corporation may include any provision expanding or limiting the liability of its directors and officers to the corporation or its stockholders for money damages, but may not include any provision that restricts or limits the liability of its directors or officers to the corporation or its stockholders: (1) To the extent that it is proved that the person actually received an improper benefit or profit in money, property, or services actually received; (2) To the extent that a judgment or other final adjudication adverse to the person is entered in a proceeding based upon a finding in the proceeding that the person's action, or failure to act, was the result of active and deliberate dishonesty and was material to the cause of action adjudicated in the proceeding."

[59] The Company's Charter includes a section that imposes a limitation on the liability of directors. Section 12.2(a), Limitation of Director and Officer Liability; Indemnification, provides as follows: "Subject to the limitations set forth under Maryland law or in paragraph (c) or (d) below, no director or officer of the Company shall be liable to the Company or its Stockholders for money damages."

Notwithstanding this belief, in light of the Mutual Release (discussed below in Section H) that may affect the ability to pursue this claim against the Advisor, unless the Release can be voided in whole or in part, the Committee believes it is in the best interest of the Company to reserve rights to assess pursuing such claims in the Milliken Action as that matter progresses.

The Committee analyzed Mehlman and Hoganson's roles as officers of the Advisor and the Property Managers and their roles in the Property Management Arrangements.  As discussed above, the Committee believes that the claims related to the fees paid to the Property Managers have merit. However, the Committee determined that these claims should not proceed against Hoganson in light of his limited role in and involvement with the Property Management Arrangements. The Committee agreed to a settlement in principle of all claims, subject to Court approval, with Mehlman as discussed in detail in Section VII.J. below.

2.      *Waste of Corporate Assets Against Directors and the Advisor*

The Amended Complaint alleges that the Directors and the Advisor committed waste in connection with the Property Management Agreements.

a.      *The Directors*

As discussed above, the Committee has concluded that Schorsch and Kahane devised the property management structure for the Company and also approved the form of the Manager Agreement and Sub-Manager Agreement in December 2013, as did the Independent Directors. Schorsch and Kahane, as well as Independent Directors, ratified the Company's Manager Agreements with the Property Managers.[60] Independent Directors also approved the payment of compensation to the Property Managers.  The Company did not receive a benefit from the

---

[60] See, e.g. Minutes of Meeting of Board of Directors dated May 28, 2014.

Management Agreement as the Advisor was contractually obligated to oversee the property managers, the Property Managers did not have any employees that were capable of performing the services required by the Property Management Agreements and the Property Managers did not perform the services set forth in the Property Management Agreement.[61] In essence, the payment of fees to the Property Managers constituted a gift of the Company's assets to the Property Managers and their owners: AR Capital, Schorsch, Kahane, Budko, Weil and Block.

Based upon its investigation, the Committee has concluded that Company Directors approved the use of the Manager Agreement and the Sub-Manager Agreement and approved the payment of fees to the Property Managers, but, for reasons set forth below in Section VII. J., the Committee has determined not to pursue claims against the Independent Directors relating to the Property Management Arrangements.

b.    The Advisor

The Advisor, as manager of the day-to-day affairs of the Company, caused the Company to enter into the Property Management Arrangements which obligated the Company to pay the Property Mangers for services which the Advisor was obligated to provide pursuant to the Advisory Agreement.

By causing the Company to waste assets by paying its affiliates for services that it was obligated to provide, the Advisor breached its fiduciary duties to the Company as set forth in the Charter and the Advisory Agreement.  Moreover, the Advisor knew that the Property Managers did not have the ability to perform its obligations in accordance with the Property Management

---

[61] The test for whether a corporation or a director has committed waste is whether what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth what the corporation has paid. *Werbowsky v. Collomb*, 362 Md. 581, 610, 766 A.2d 123, 139 (2001).

Agreements. As the Property Management Arrangements conferred an improper benefit on Schorsch, Kahane and the AR Capital Defendants and did not benefit the Company, the Advisor did not act in good faith, failed to act in the best interest of the Company and failed to act with the requisite care.

As explained in this Section, the Committee believes that the claims against the Advisor for waste of corporate assets with respect to the Property Management Arrangements have merit. Notwithstanding this belief, in light of the Mutual Release (discussed below in Section H) that may affect the ability to pursue certain claims unless the Release can be voided in whole or in part, the Committee believes it is in the best interest of the Company to reserve rights to assess pursuing such claims in the Milliken Action as that matter progresses. As part of its investigation, the Committee took action in the best interest of the Company to settle in principle with Mehlman, subject to the Court's approval, as set forth in Section VII. I. below.

### 3. Aiding and Abetting Against AR Capital and Schorsch

With respect to aiding and abetting, the Amended Complaint alleges, among other things, that AR Capital and Schorsch had knowledge of the wrongful conduct alleged in the claims of breach of fiduciary duty and waste and colluded in, aided and abetted, and/or actively participated in such breaches for the purpose of advancing their own interests. In particular, the Amended Complaint alleges that AR Capital and Schorsch aided and abetted the Fiduciary Defendants in breaching fiduciary duties with respect to, among other things, the Property Management Agreements and aided and abetted Directors and the Advisor in wasting the Company's assets through, among other things, the Property Management Arrangements.[62]

---

[62] Maryland courts recognize liability for aiding and abetting the tortious conduct of another person. *Alleco, Inc.*, 665 A.2d at 1049. In *Shenker v. Laureate Education, Inc.* 983 A.2d 408, 411 Md. 317 (2009), the Maryland Court of

As discussed above, the Committee has concluded that Schorsch and Kahane, through AR Capital, devised the property management structure (i.e. the use of a property manager and a sub-manager) and organized, owned and controlled the Advisor and the Property Managers. The Committee also concluded that the Advisor was obligated to oversee, supervise and evaluate the management of the Company's properties. The Advisor, which AR Capital and Schorsch controlled, presented the property management structure to directors for approval and caused the Company to enter into the Property Management Arrangements which were subsequently ratified by the directors; however, the Property Managers did not employ the personnel necessary to perform the services contemplated by the Property Management Agreements. Most importantly, AR Capital, through its ownership of the Advisor, received compensation for services that the Advisor was obligated to provide, yet caused the Company to become contractually obligated to pay the Property Managers for the same services. Further, AR Capital, through its ownership of the Property Managers, received payment for services which the Property Managers did not provide to the Company.

As explained in this Section, the Committee believes that the claims against AR Capital and Schorsch for aiding and abetting have merit. Notwithstanding this belief in light of the Mutual Release (discussed below in Section H) that may affect the ability to pursue certain claims unless the Release can be voided in whole or in part, the Committee believes it is in the best interest of the Company to reserve rights to assess pursuing such claims in the Milliken Action as that matter progresses.

---

Appeals affirmed the dismissal of an aiding and abetting claim because the plaintiff did not allege sufficiently that the defendant, "encouraged, incited, aided or abetted the act of the direct perpetrators of the alleged tort of breach of fiduciary duty."

4.      *Unjust Enrichment*

The Amended Complaint alleges that the AR Capital Defendants, the Property Manager Defendants, Schorsch and Kahane received improper benefits when the Company was caused to pay property management fees to the Property Managers at grossly uncompetitive rates.[63]

As discussed above, the committee has concluded that Schorsch and Kahane devised a structure that provided for the payment of 4% of the gross revenues of the Company's properties to a property manager that would, in turn, contract with a sub-manager which would manage the Company's properties and would receive 2% or 3% of the gross revenues of the properties.  The Property Managers were majority-owned by AR Capital, which was owned by Schorsch, Kahane, Budko, Weil and Block.  The officers of the Property Managers included a Chief Executive Officer and a Chief Financial Officer, but the Property Managers did not have employees who were capable of overseeing the performance of the sub-managers and the Property Managers did not oversee the sub-managers.   Moreover, the Advisor was contractually obligated to oversee the performance of the sub-managers.

Because the Property Managers did not provide oversight of the Sub-Managers, there was no reason to pay a fee of 4% of gross revenues to the Property Managers.  The fee for the actual management of the Company's properties was 3% or 2%.  Thus, the Committee has concluded that the property management structure devised by Schorsch and Kahane resulted in an improper benefit being conferred on the AR Capital Defendants, the Property Manager Defendants,

---

[63] Maryland recognizes a cause of action for unjust enrichment.  The elements of unjust enrichment are as follows: (i) a benefit conferred upon the defendant by the plaintiff; (ii) an appreciation or knowledge by the defendant of the benefit: and (iii) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value. *Everhart v. Miles*, 422 A.2d 28, 47 Md. App. 131 (1980).

Schorsch and Kahane, of which such Defendants were aware and the retention of the benefit by such Defendants would be inequitable.

As explained in this Section, the Committee believes, based upon its investigation, that the claims against the AR Capital Defendants, the Property Manager Defendants, Schorsch and Kahane for unjust enrichment have merit. Notwithstanding this belief, in light of the Mutual Release (discussed in Section H) that may affect the ability to pursue certain claims unless the Release can be voided in whole or in part, the Committee believes it in the best interest of the Company to reserve rights to assess pursuing such claims in the Milliken Action as that matter progresses.

**C.**     **The Allegation That The Amendment to the Advisory Agreement Was Designed To Generate Fees For AR Capital At The Expense Of The Company**

The Amended Complaint alleges that the amendment of the Advisory Agreement to provide for the payment of Cash Asset Management Fees gives rise to several causes of action, including breach of fiduciary duty; waste; aiding and abetting; and unjust enrichment.[64]

*1.*     *Breach of Fiduciary Duties against the Fiduciary Defendants*

The Fiduciary Defendants include the Advisor, Schorsch[65], Kahane, the Company's officers, and the Independent Directors. The Committee addresses the claims against the Company's officers and Independent Directors in Sections I and J below.

---

[64] The discussion related to the Independent Directors is set forth in Section J below.

[65] During the time period relevant to the Amendment to the Advisory Agreement, Schorsch was no longer director of the Company. Schorsch did not take any actions in his capacity as a director of the Company related to the Amendment of the Advisory Agreement.

a.      *Kahane*

Kahane served as the Chairman of the Board at the time the Amendment of the Advisory Agreement was presented to the Conflicts Committee.[66] The Committee has concluded that as a member of the Board, Kahane was aware that the Company's ability to raise funds through its public offering had been adversely affected by disclosures concerning another AR Capital-sponsored REIT.[67] Specifically, broker-dealers which had entered into selling agreements with RCS, the AR Capital entity with which the Company had entered into a Dealer Manager agreement regarding the distribution of its securities, suspended selling agreements with RCS.  Similarly, the Company's Form 10-K for the year ended December 31, 2014 disclosed that "Disclosures made by an entity previously sponsored by the parent of our sponsor may adversely affect our ability to raise substantial funds." Also during that period, RCS, the Dealer Manager for the Company's public offering, became involved in an investigation conducted by the Securities Division of the Massachusetts Secretary of State.[68]

The Committee has further concluded that in addition to being aware of the Company's financial circumstances and its reliance on the public offering, Kahane was aware of the reasons

---

[66] As noted above, Section 2-405.1 of the Maryland Code provides that a director of a corporation shall act: in good faith; in a manner the director reasonably believes to be in the best interests of the corporation; and with the care that an ordinary person  in a like position would use under similar circumstances.
Section 2-405.1(g) provides that "An act of a director of a corporation is presumed to be in accordance with subsection (c) of this section."

[67] In October 2014, American Realty Capital Properties, Inc. ("ARCP") made a filing with SEC which stated that its previously filed financial statements should no longer be relied upon due to issues related to its calculations of adjusted funds from operations ("AFFO"). In March 2015, ARCP disclosed that an investigation conducted under the direction of its audit committee had found material weaknesses in ARCP's internal control over financial reporting and its disclosure controls and procedures.

[68] During 2015, AR Capital engaged in negotiations regarding a transaction that would require approval of amendments to advisory agreements by shareholders of REITs that it had sponsored and RCS solicited shareholder proxies.  In June 2015, the Securities Division of the Massachusetts Secretary of State began an investigation regarding the solicitation of proxies by RCS and in November 2015 the Securities Division filed an administrative complaint alleging violations of securities laws by RCS in connection with its solicitation of proxies.

that the Advisor presented for the Amendment to the Advisory Agreement.  The Committee further believes that compelling or even adequate reasons for the Amendment to the Advisory Agreement were not presented.  The Committee has further concluded that the Company did not receive anything of value for amending the Advisory Agreement to provide for the payment of cash asset management fees rather than subordinated interests in the operating partnership, which was apparent to Kahane.   Further, the Committee is unaware of any indication that Kahane informed the members of the Conflicts Committee that the Massachusetts Secretary of State was investigating the solicitation of proxies by RCS prior to the time that the members of the Conflicts Committee consented to the Amendment to the Advisory Agreement.  In addition, as an owner of AR Capital and an indirect owner of the Advisor, Kahane benefited financially from the payment of cash asset management fees by the Company.

The Committee anticipates that Kahane will argue Section 2-419 of the Maryland Code "Interested director; disclosure and vote" shields him from liability. Under Section 2–419, a transaction between a corporation and any other corporation may be ratified by the board of directors if the director's interest is disclosed to the board of directors and a majority of disinterested directors approves the transaction. Md.Code. Corps. & Assn's § 2–419(b). Discussed further in Section VII.A. above, the Committee has concerns regarding the Independent Directors actions in approving the Amendment to the Advisory Agreement. Nevertheless, even assuming the Amendment to the Advisory Agreement was approved by independent directors, the Committee believes the "safe harbor" defense is not available to Kahane.

An interested director may not devise a wrongful transaction and then abstain from voting on that transaction specifically to absolve himself or herself from liability. Instead, where an

interested director formulates a wrongful transaction but does not vote, his or her "nonvote" cannot be accorded exculpatory significance.

Here, in the days prior to the Amendment to the Advisory Agreement, communications reviewed by the Committee evidence that Kahane took a direct role in formulating and presenting the proposal to amend the Advisory Agreement to the Board.  The proposal presented was solely to benefit the Advisor.  Just days later, the Board learned that RCS (controlled by AR Capital in part by its owner Kahane), which provided substantial revenue to AR Capital, was being sued by the Massachusetts Securities Division whereby RCS shut down soon thereafter.  RCS shutting down decimated the Company's ability to raise capital and left it in a liquidity crisis.  The Committee has serious concern about the lack of full disclosure to the Board of all relevant facts leading up to the request by AR Capital to amend the Advisory Agreement that would ultimately shift $26,000,000 over the coming months from the Company to the Advisor (AR Capital), returning no benefit to the Company. Even after Stan Perla expressed  concern over the Company's ability to meet its financial obligations in light of the proposal, from its investigation the Committee is concerned that AR Capital, including Kahane who was a director of the Company at the time, failed to disclose information to the Independent Directors and prevented them from making a fully informed decision.

The Committee's investigation did not disclose, in the Committee's view, any indication that Kahane acted with a reasonable belief that his actions were in the best interests of the Company or in good faith.[69] Although Kahane abstained from voting on the transaction, he is not absolved

---

[69] Section 2-405.1 of the Maryland Code provides that a director of a corporation shall act: in good faith; in a manner the director reasonably believes to be in the best interests of the corporation; and with the care that an ordinary person in a like position would use under similar circumstances. The requirement that a director have a reasonable belief that an action is in the best interest of the corporation means that there must be some rational basis for the director's action,

from liability because of his active involvement in the Amendment to the Advisory Agreement and his failure to communicate all relevant information to the Board.

Kahane should not be able to avail himself of the presumption of the business judgment rule codified at 2-405.1(g).[70] Specifically, he did not act in good faith as he  personally benefited from an amendment of the Advisory Agreement that provided for a payment of a cash management fee to the Advisor.[71] Similarly, Kahane should not be able to avail himself of the limitation on liability provided by Sections 2-405.2[72] and 5-418[73] and the Charter[74] because he received an improper benefit through his interest in the Advisor.

> ### b.    The Advisor

The Advisor was aware that the Company's ability to raise funds through its public offering had been adversely affected by disclosures concerning American Realty Capital Properties,

---

[70] that the director must have knowledge of that basis and that the director's performance must be based upon that knowledge. The requirement that a director exercise the care that an ordinarily prudent person in a like position would use under similar circumstances focuses upon the process by which a decision is made rather than on the wisdom of the decision or the results of the decision.

[70] Section 2-405.1(g) provides that "An act of a director of a corporation is presumed to be in accordance with subsection (c) of this section."  This provision codifies the business judgment rule and creates a presumption that directors acted in accordance with the standards of Section 2-405.1(c).

[71] Good faith, in the context of a director of a corporation, is the absence of a desire to obtain a personal benefit or a benefit for some person other than the corporation. Maryland's good faith formulation is similar to the common law duties of loyalty or fair dealing which are applicable in other states.

[72] Section 2-405.2 of the Maryland Code provides that "the charter of the corporation may include any provision expanding or limiting the liability of its directors and officers to the corporation or its stockholders as described under § 5-418 of the Courts and Judicial Proceedings Article."

[73] Section 5-418(a) provides, among other things, that "the charter, as defined under § 1-101 of the Corporations and Associations Article, of a Maryland corporation may include any provision expanding or limiting the liability of its directors and officers to the corporation or its stockholders for money damages, but may not include any provision that restricts or limits the liability of its directors or officers to the corporation or its stockholders: (1) To the extent that it is proved that the person actually received an improper benefit or profit in money, property, or services actually received; (2) To the extent that a judgment or other final adjudication adverse to the person is entered in a proceeding based upon a finding in the proceeding that the person's action, or failure to act, was the result of active and deliberate dishonesty and was material to the cause of action adjudicated in the proceeding."

[74] The Company's Charter includes a section that imposes a limitation on the liability of directors. Section 12.2(a), Limitation of Director and Officer Liability; Indemnification, provides as follows: "Subject to the limitations set forth under Maryland law or in paragraph (c) or (d) below, no Director or officer of the Company shall be liable to the Company or its Stockholders for money damages."

another AR Capital-sponsored REIT.  As discussed above, broker-dealers which had entered into selling agreements with RCS, the AR Capital entity with which the Company had entered into a Dealer Manager agreement regarding the distribution of its securities, suspended sales of the Company's securities.  Similarly, the Company's Form 10-K for the year ended December 31, 2014 disclosed that "Disclosures made by an entity previously sponsored by the parent of our sponsor may adversely affect our ability to raise substantial funds." Also during that period, RCS, the Dealer Manager for the Company's public offering, became involved in an investigation conducted by the Securities Division of the Massachusetts Secretary of State.

In addition to being aware of the Company's financial circumstances and its reliance on the public offering, the Advisor did not present compelling or even adequate reasons for the Amendment to the Advisory Agreement.  Moreover, the Advisor's proposal regarding an amendment to the Advisory Agreement did not include anything of value for the Company in exchange for the Company's agreeing to pay cash management fees rather than subordinated interests in the operating partnership.

As the Advisory Agreement specifically provided that the Advisor "has a fiduciary responsibility and duty to the Company," the Advisor owed the Company duties of loyalty and care and was required to act in good faith.  Because the Advisor presented a proposal to amend the Advisory Agreement to provide for the payment of cash management fees, it breached a fiduciary duty to the Company as it was not in the best interest of the Company to begin paying management fees in cash at a time when the Company needed cash to proceed with its acquisition of the SWN properties.

As explained in this Section, the Committee believes that the claims against the Advisor for breach of fiduciary duty with respect to the Amendment to the Advisory Agreement have merit.

Notwithstanding this belief, in light of the Mutual Release (discussed in below Section H) that may affect the  ability to pursue certain claims unless the Release can be voided in whole or in part, the Committee believes it is in the best interest of the Company to reserve rights to assess pursuing such claims in the Milliken Action as that matter progresses.

2.      *Waste of Corporate Assets*

The Amended Complaint alleges that Directors and the Advisor committed waste in connection with the Amendment to the Advisory Agreement to provide for the payment of cash management fees.

a.      *Kahane*

The Advisory Agreement provided for the payment to the Advisor of acquisition fees, financing fees, disposition fees and subordinated performance fees for various services and also provided for the reimbursement of certain expenses.  The proposal to amend the Advisory Agreement was presented to the Conflicts Committee by personnel associated with RCS, the broker-dealer that was acting as the Dealer Manager with respect to the Company's public offering. The proposal to amend the Advisory Agreement was forwarded to the members of the Conflicts Committee by email at or about 11:00 p.m. on November 8, 2015, which was a Saturday evening. The email regarding the proposal to amend the Advisory Agreement included a brief memorandum that purported to set forth reasons in support of the proposed amendment.  However, the purported reasons for the proposed amendment related primarily to the Company's public offering rather than the performance of the Advisor.  The proposed Amendment to the Advisory Agreement did not provide for any benefit to the Company in exchange for the payment of cash asset management fees.

115

The members of the Conflict Committee did not consult a financial adviser regarding the fairness of the proposed Amendment to the Advisory Agreement and did not consider the proposal to amend the Advisory Agreement at a meeting of the Conflicts Committee.  Rather, the members of the Conflicts Committee approved the Amendment to the Advisory Agreement by email soon after receiving the proposal.  Following the initial approval of the Amendment to the Advisory Agreement, a member of the Conflicts Committee engaged in communications with officers of the Company and the Advisor regarding an amendment which resulted in the addition of a MFFO coverage requirement to the amendment.  The addition of the MFFO coverage provision did not alter the fact that the Amendment to the Advisory Agreement provided a benefit to the Advisor without providing any benefit to the Company.  Moreover, an obligation to pay cash management fees was being assumed at a time when the Company required cash in order to proceed with the closings on the acquisitions of additional properties.

Based upon its investigation, the Committee has concluded that Kahane, as a director of the Company and an indirect owner of the Advisor, was aware that that there were no compelling or even adequate reasons for the Amendment to the Advisory Agreement and that the Company would not receive anything of value in agreeing to pay cash asset management fees rather than subordinated interests in the operating partnership.[75]  Further, the Committee's investigation did not yield evidence that Kahane informed the members of the Conflicts Committee that the Massachusetts Secretary of State was investigating the solicitation of proxies by RCS prior to the time that the members of the Conflicts Committee consented to the Amendment to the Advisory

---

[75] As noted above, the test for whether a corporation or a director has committed waste is whether what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth what the corporation has paid. *Werbowsky*, 362 Md. at 610.

Agreement.   In addition, as an owner of AR Capital and an indirect owner of the Advisor, Kahane improperly benefited financially from the payment of cash asset management fees by the Company.

<em>b.      The Advisor</em>

The Advisory Agreement provided for the payment to the Advisor of acquisition fees, financing fees, disposition fees and subordinated performance fees for various services and also provided for the reimbursement of certain expenses.   The proposal to amend the Advisory Agreement to provide for the payment of cash asset management fees included a brief memorandum that purported to set forth reasons in support of the proposed amendment.  However, the purported reasons for the proposed amendment related primarily to the Company's public offering rather than the performance of the Advisor.  The proposed Amendment to the Advisory Agreement did not provide for any benefit to the Company in exchange for the payment of cash management fees.

Following the initial approval of the Amendment to the Advisory Agreement, a member of the Conflicts Committee engaged in communications with officers of the Company and the Advisor regarding an amendment which resulted in the addition of a MFFO coverage requirement to the amendment.  The addition of the MFFO coverage provision did not alter the fact that the Amendment to the Advisory Agreement provided a benefit to the Advisor without providing any benefit to the Company.  Moreover, an obligation to pay cash management fees was being assumed at a time when the Company required cash in order to proceed with the closings on the acquisitions of additional properties.

Based upon its investigation, Committee has concluded that the Advisor was aware that there were not any compelling or even adequate reasons for the Amendment to the Advisory

117

Agreement and that the Company would not receive anything of value in agreeing to pay cash management fees rather than subordinated interests in the operating partnership.[76] Further, the Advisor benefited financially from the payment of cash asset management fees by the Company.

As explained in this Section, the Committee believes there is a basis for the pursuit of claims related to the Amendment to the Advisory Agreement against the Advisor. Notwithstanding this belief, in light of the Mutual Release discussed below in Section H) that may affect the ability to pursue certain claims unless the Release can be voided in whole or in part, the Committee believes it is in the best interest of the Company to reserve rights to assess pursuit of claims related to the Amendment to the Advisory Agreement in the Milliken Action as that matter progresses.

> ### 3.    *Aiding and Abetting Against AR Capital and Schorsch*

With respect to aiding and abetting, the Amended Complaint alleges, among other things, that AR Capital and Schorsch had knowledge of the wrongful conduct alleged in other counts of the Amended Complaint and colluded in, aided and abetted, and/or actively participated in such breaches for the purpose of advancing their own interests.

Based upon its investigation, the Committee has concluded that the proposal to amend the Advisory Agreement to provide for the payment of cash asset management fees was driven by the Advisor, AR Capital, Schorsch and Kahane.  For example, the proposal and the reasons therefore were formulated by personnel associated with AR Capital and RCS.  The Committee further concluded that although AR Capital and Schorsch were likely aware of information relating to the

---

[76] As noted above, the test for whether a corporation or a director has committed waste is whether what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth what the corporation has paid. *Werbowsky*, 362 Md. at 610.

Company's financial circumstances, the inquiry being conducted by the Securities Division of the Massachusetts Secretary of State they did not share such information notwithstanding that they or their subordinates prepared the materials relating to the amendment of the Advisory Agreement which were provided to the members of the Conflicts Committee.

Accordingly, the Committee has determined that AR Capital and Schorsch aided and abetted breaches of fiduciary duty and waste of corporate assets in connection with the amendment of the Advisory Agreement as they were responsible for formulating the proposal to amend the Advisory Agreement and prepared or directed the preparation of materials that were provided to the Conflicts Committee regarding the proposal to amend the Advisory Agreement.[77] As discussed above, the materials did not set forth a credible basis for the amendment and the Company did not receive anything of value in exchange for becoming obligated to pay cash asset management fees.

As explained in this Section, the Committee believes there are meritorious arguments that AR Capital and Schorsch would be liable for aiding and abetting with respect to this claim. Notwithstanding this belief, in light of the Mutual Release discussed below in Section H) that may affect the ability to pursue certain claims unless the Release can be voided in whole or in part, the Committee believes that it is in the best interest of the Company to reserve rights to pursue such claims in the Milliken Action as that matter progresses.

---

[77] Maryland courts recognize liability for aiding and abetting the tortious conduct of another person. *Alleco, Inc.*, 665 A.2d at 1049.   In *Shenker v. Laureate Education, Inc.*, 983 A.2d 408, 411 Md. 317  (2009), the Maryland Court of Appeals affirmed the dismissal of an aiding and abetting claim because the plaintiff did not allege sufficiently that the defendant, "encouraged, incited, aided or abetted the act of the direct perpetrators of the alleged tort of breach of fiduciary duty."

4.      *Unjust Enrichment*

The Amended Complaint alleges that the AR Capital Defendants, Schorsch and Kahane received improper benefits when the Advisory Agreement was amended to provide for the payment of cash asset management fees to the Advisor.

Because the Amendment to the Advisory Agreement provided a benefit to the Advisor (i.e. management fees in the form of cash or stock rather than subordinated performance interests) a benefit was conferred upon the Advisor, the AR Capital Defendants, Schorsch and Kahane, without any benefit being conferred on the Company as its rights pursuant to the Advisory Agreement did not change.   As the Advisor was owned by AR Capital, which was owned by Schorsch, Kahane, Budko, Weil and Block, it is inequitable for the AR Capital Defendants, Schorsch and Kahane to retain the improper benefit.[78]

The Committee believes that the claims in this Section most accurately describe breach of fiduciary duty, corporate waste, and aiding and abetting causes of action. Nevertheless, the claims in this Section also satisfy the elements of unjust enrichment under Maryland law.

As explained in this Section, the Committee believes there are meritorious arguments that the AR Capital Defendants, Schorsch and Kahane would be liable for unjust enrichment with respect to this claim.   Notwithstanding this belief, in light of the Mutual Release (discussed below in Section H) that may affect the  ability to pursue certain claims unless the Release can be voided

---

[78] Maryland recognizes a cause of action for unjust enrichment.  The elements of unjust enrichment are as follows: (i) a benefit conferred upon the defendant by the plaintiff; (ii) an appreciation or knowledge by the defendant of the benefit: and (iii) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value. *Everhart v. Miles*, 422 A.2d 28, 47 Md. App. 131 (1980).

in whole or in part, the Committee believes that it is in the best interest of the Company to reserve rights to pursue such claims in the Milliken Action as that matter progresses.

### D.   The Allegation That The Company's Strategy To Acquire Properties Was Designed To Generate Fees For AR Capital At The Expense Of The Company

The shareholder claims relating to the acquisition of properties involve breach of fiduciary duties by the Advisor and directors.

Pursuant to the Advisory Agreement, the Advisor identified properties and recommended the acquisition of properties by the Company and directors of the Company approved the acquisition of the properties which the Advisor recommended.  Through the Barcelo, Grace Transaction and SWN Transactions, the Company acquired 141 hospitality properties with a total of 17,193 guestrooms located in thirty-two states.  Also, pursuant to the Advisory Agreement, the Advisor received more than $60 million in acquisition and financing fees in connection with the Barcelo Transaction, the Grace Transaction and the SWN Transactions.  In addition, the Company forfeited more than $ 40 million in deposits because the Company was unable to raise sufficient funds through the public offering to close on the transactions.

In light of the Company's investment objectives as disclosed in the Company's prospectus,[79] it was necessary for the Company to identify and acquire hospitality properties.  The

---

[79] The Prospectus states as follow: Our ability to achieve our investment objectives and to pay distributions depends primarily upon the performance of our advisor with respect to the acquisition of our investments, including the ability to source loan origination opportunities for us. Competition from competing entities may reduce the number of suitable investment opportunities offered to us or increase the bargaining power of property owners seeking to sell.
. . . .
We are also subject to competition in seeking to acquire real estate-related investments. The more shares we sell in this offering, the greater our challenge will be to invest all of the net offering proceeds on attractive terms. We can give no assurance that our advisor will be successful in obtaining suitable investments on financially attractive terms or that our objectives will be achieved. If we are unable to find suitable investments promptly, we will hold the proceeds from this offering in an interest-bearing account or invest the proceeds in short-term assets. If we would continue to be unsuccessful in locating suitable investments, we may ultimately decide to liquidate. In the event we are unable to timely locate suitable investments, we may be unable or limited in our ability to pay distributions and

Barcelo Transaction, the Company's initial transaction which involved six properties, allowed the Company to enter the hospitality sector.  At the time the Company entered into the agreement, the Company had commenced its public offering and was raising funds necessary to close on the properties.  The Grace Transaction ultimately involved 116 properties and required the directors to authorize the Company to exceed the debt limitations imposed by the Charter.  Although the Company experienced some difficulty in raising funds in the public offering necessary to close on the Grace Portfolio as a result of the ARCP accounting matter, the Company was ultimately able to close the Grace Transaction.  The debt obligations imposed by the Grace Transaction were such that the Company indicated in its Form 10-K for the year ended December 31, 2014 that, "We intend to use substantially all available offering proceeds following the acquisition of the Grace Portfolio to reduce our borrowings to our intended limit, which may limit our ability to pay distributions or acquire additional properties for some time." Nevertheless, the Advisor recommended and directors approved the execution of agreements that provided for the acquisition of additional properties through the SWN Transactions.  At the time that the Company determined to enter into agreements regarding the SWN Transactions, the adverse effect of the ARCP accounting matter on the Company's public offering had begun to lessen and sales of the Company's shares in the public offering had increased.  Further, Company management presented and the directors considered the Summit, Wheelock, and Noble Transactions, separately and the materials presented to the directors in connection with the Noble Transaction included information regarding the funds that the Company needed to raise in the public offering in order to close the SWN Transactions.  At the time the SWN Transactions were approved, Company directors did not

---

we may not be able to meet our investment objectives. Prospectus of American Realty Capital Hospitality Trust, Inc., Form 424B3 at 33-34.

have reason to conclude that the funds necessary to close on the SWN Transactions would not be raised through the public offering.  While the Advisor and the Directors embarked on a course of action that differed from the course of action described in the Company's disclosure documents regarding the debt incurred in the Grace Transaction and the Company's limited ability to acquire additional properties, it does not appear that breaches of fiduciary duty occurred.  The Committee believes that had the Company's Offering continued, the SWN transactions may well have benefited the Company.

### E.   The Allegation That Company's Transaction with Brookfield and Corresponding Securities Purchase, Voting, and Standstill Agreement Violated The Charter And Benefited Brookfield To The Detriment Of Shareholders

The Plaintiff/Demand Shareholders alleged that the Company's transaction with Brookfield in early 2017 and corresponding signed SPA violated the Charter by affording the Brookfield certain rights superior to those of the shareholders and was not in the best interest of the Company to have completed.  Specifically, they allege that the SPA violated Sections 7.1 and 11.1.  Section 7.1 states in relevant part that "The Board may take any action that, in its sole judgment and discretion, is necessary and desirable to conduct the business of the Company." And Section 11.1 deals with the election of directors by the Company's stockholders.   The Plaintiff/Demand Shareholders also alleged that the $14.75 per share of common stock for Brookfield was a discount to the Company's net asset value.

As discussed above in Sections V. I-K. in November and December 2015, due to issues unrelated to the Company, Company management or the Independent Directors, the Company's public offering abruptly ended, leaving the Company with a significant funding issue.  The Company's liquidity issue resulted in the Company facing a "going concern" issue for 2017, pending closings on multiple hotel transactions with millions in earnest money at stake and facing

a large debt payment owed to Goldman in 2018 and 2019.  The Company, namely through its directors, Perla and Wenzel, and their outside financial advisor Hentschel & Co.  engaged in a robust effort to assess strategic alternatives to solve the issues above.  Through the work of Hentschel & Co.  on behalf of the identified Independent Directors and the work of Jefferies on behalf of the full Company Board, they determined that an outside investment was in the best interest of the Company and engaged in a process that lasted roughly a year to negotiate through the best potential capital source to meet the Company's needs.

By August of 2016, the Board narrowed its focus to the most attractive proposals: AWH Partners/Baupost Capital, Almanac Realty Investors/Shaner Hotel Holdings, Brookfield Property Group, Benefit Street, and Lindsay Goldberg.  In its September presentation to the Board, Jefferies presented a side-by-side comparison of these offers as set forth below:



## Current Proposals: Merits and Considerations



| | AWH Partners / Baupost Capital | Almanac Realty Investors / Shaner Hotel Holdings | Brookfield Property Group | Benefit Street Partners |
|---|---|---|---|---|
| **Merits** | ▲ Preserves Board control; (2 of 5) <br> ▲ Upfront payment limits commitment risk <br> ▲ Limited exclusivity period <br> ▲ No requirement to eliminate or amend Crestline agreement | ▲ Low preferred return <br> ▲ Longest maturity <br> ▲ Strategic partnership with Shaner Hotel Holdings | ▲ Preserves Board control; (2 of 5) <br> ▲ Attractive cash coupon <br> ▲ Limited exclusivity period <br> ▲ High strike price <br> ▲ No requirement to eliminate or amend Crestline agreement <br> ▲ Open to purchase of Crestline | ▲ High strike price <br> ▲ No requirement to eliminate the Advisor <br> ▲ No requirement to eliminate or amend the Property Management agreement <br> ▲ No requirement to eliminate or amend Crestline agreement |
| **Considerations** | ▼ Negotiations required with Advisor and Property Manager <br> ▼ Significant preferred return <br> ▼ Issuance of equity at effectively $0 strike price <br> ▼ 4 year maturity <br> ▼ No delayed funding mechanism requires higher upfront funding <br> ▼ Offer letter does not provide for sufficient funds to meet liquidity needs <br> ▼ Low future stock price due common stock grants <br> ▼ Breakup fee | ▼ Negotiations required with Advisor, Property Manager and Crestline <br> ▼ Control of board (3 of 5), including Chairman <br> ▼ Low strike price <br> ▼ No PIK option on preferred return (coupon) <br> ▼ Significant exclusivity period (90 days) <br> ▼ Includes financial covenants <br> ▼ Commitment fee | ▼ Negotiations required with Advisor and Property Manager <br> ▼ Significant preferred return <br> ▼ Amounts in excess on $330 million require covenant tests <br> ▼ Commitment fee | ▼ Board control unclear <br> ▼ Significant preferred return <br> ▼ Future fee structure and Property Manager unclear <br> ▼ Less due-diligence conducted to date compared with other bidders <br> ▼ Commitment fee |

17

**Jefferies**

## Current Proposals: Comparison of Terms



| | AWH Partners / Baupost Capital | Almanac Realty Investors / Shaner Hotel Holdings | Brookfield Property Group | Benefit Street Partners |
|---|---|---|---|---|
| Date Received | September 8, 2016 | September 9, 2016 | September 8, 2016 | September 11, 2016 |
| Issue Type | Preferred / Common Stock | Subordinated Debenture with Warrants | Convertible Preferred Shares | Preferred Equity with Warrants |
| Amount | – $350M Preferred issued at close<br>– 16.1M shares issued to AHW Partners / Baupost at close | – $370M Subordinated Debenture commitment<br>– 31.72M warrants or 45% shares outstanding | – $100M Convertible Preferred issued at close<br>– $300M of Convertible Preferred available for 2 years post-close<br>– $230M minimum secondary Convertible Preferred Issuance | – $100M Preferred Equity issued at close<br>– $250 million available through March 1, 2019<br>– 21.21M warrants |
| Conversion Price | – N/A | – $11.67 | – $15.00 | – $16.50 |
| Maturity | – 4 years | – 6 years (subordinated debenture)<br>– 10 year (warrants) | – 5 year (put feature)<br>– 7 year (call feature) | – 5 years (extension option) |
| Use of Proceeds | – Retire Goldman Preferred<br>– Remaining funds to be used for PIP requirements | – $92M to Retire Goldman Preferred<br>– $23.4M repayment of Summit seller note<br>– DB Term Loan Amortization<br>– Remaining funds PIPs, transaction costs and general corporate purposes | – Repay Summit Note and Whitehall Preferred<br>– Remaining funds PIPs<br>– General corporate purposes | – Prepay debt obligations<br>– Remaining funds PIPs<br>– General corporate purposes |
| Rank | – Senior (Preferred) or Equal to Common Stock (Shares) | – Subordinated Debt | – Senior to Common Stock | – Senior to Common Stock |
| Dividends / Coupon | – 9.0% cash coupon on Preferred<br>– 3.0% PIK interest based on Preferred | – 9.0% cash coupon | – 7.5% cash coupon<br>– 5.0% PIK | – 9.50% cash coupon<br>– 2.50% PIK |

**Jefferies**

Current Proposals: Comparison of Terms (Cont'd)

AMERICAN REALTY CAPITAL

| | AWH Partners / Baupost Capital | Almanac Realty Investors / Shaner Hotel Holdings | Brookfield Property Group | Benefit Street Partners |
|---|---|---|---|---|
| Board Seats / Governance | – Expanded board to 5 seats<br>– AWH Partners / Baupost gets 2 seats | – Expand board to 5 seats<br>– Almanac Shaner gets 3 seats<br>– Lance Shaner – Chairman | – Expanded board to 5 seats<br>– Brookfield gets 2 seats, including one on each committee | – Add three board members and discuss appropriate board size |
| Asset Management Contract | – Cancelled and internalized with no termination fee<br>– G&A cost of no greater than $15 million per year | – Cancelled and internalized with no termination fee<br>– Assumes overhead costs of $15.5 million | – Cancelled and internalized with no termination fee<br>– Brookfield will assist with negotiations | – Cancellation is not a requirement of the proposal |
| Property Management Contract | – Reduction from 4% to 3%<br>– Any reduction cost will reduce the pricing of the investment | – Eliminates property management agreement<br>– Crestline contracts will be 10 years for 50 properties and 5 years for 22 properties (terminable subject to penalty) | – Brookfield will assist in restructuring<br>– Potential offer to purchase Crestline | – Cancellation is not a requirement of the proposal |
| Commitment Fee | – Potential in the event of a delayed draw (discussed with bidder) | – 2.0% | – 1.0% | – 1.25% |
| Exclusivity | – November 30, 2016 | – 90 days | – 45 days | – None specified |
| Breakup Fee | – 2.50% | – N/A | – N/A | – N/A |

Jefferies LLC / September 2016

14

Jefferies

In assessing each aspect of the potential deals at hand, in consultation with Jefferies, the Board ultimately determined that the Brookfield offer was the most attractive to the Company and elected to pursue an investment from Brookfield that would satisfy its capital needs.  In conducting this analysis, the Board did consider other options including potential sale, IPO, etc.  as discussed in Section V. L.  above.  It also considered that an investment of this size would dilute the net asset value per share of common stock but determined, after employing a reasonable process with the help of professional advisors, that this course of action was necessary to allow the Company to continue operation including addressing the "going concern" issue addressed by the Company's independent auditor KMPG and the pending Goldman debt obligation to redeem $292M in

preferred equity interests, with 50% payable by February 27, 2018 (the balance thereafter).  If the Company defaulted, Goldman would be entitled to reclaim almost all of its hotels that were subject to the Goldman debt pursuant to the Grace Portfolio transaction.

On January 11, 2017, Jefferies issued a fairness opinion as to the financial terms of the SPA and presented its opinion to the Board.[80] On March 31, 2017, Venable LLP, an AMLAW 100 law firm with experience in complex M&A transactions and Maryland corporate law, in particular with Maryland-based REITs, issued a non-contravention opinion and determined that the SPA did not violate the Company's Charter.[81]

From its investigation the Committee determined that the process undertaken by the Company to arrive at the agreement with Brookfield and corresponding SPA was thorough and conducted in good faith.  The Committee determined it not in the best interest of the Company to pursue any claims against any defendants regarding the SPA.

F.    **The Allegation That The Framework Agreement Caused Impermissible Payments To The Advisor And Property Managers**

Separate from the SPA, the Committee rendered a different determination regarding the Framework Agreement.  As discussed above in Section V Q. similar to a vast majority of the third party potential funding sources assessed by the Company, Hentschel & Co. and Jefferies in 2016, Brookfield required separation from the Company in terms of the Advisory Agreement and Property Management relationships and transition to internal management and away from AR Capital in order to complete the Brookfield transaction.  To make this happen AR Capital, along with the Advisor and the Property Manager Defendants, required the Company to enter into a

---

[80] A copy of the Jefferies Fairness Opinion is attached hereto as Exhibit N.
[81] A copy of the Venable Non-Contravention Opinion is attached hereto as Exhibit N.

Framework Agreement to pay AR Capital through its affiliated entities roughly $37M in order to terminate the Advisory Agreement and the Property Management Agreements with Property Manager Defendants that at the time had 20 year contracts with the Property Manager Defendants keeping between 1% and 2% of all yearly property management fees (with the sub-managers receiving the remainder of the 4% in fees).

Through its investigation, the Committee learned that the Property Manager Defendants did not maintain a staff of employees capable of engaging in the services outlined in the Property Management Agreements discussed in Section VII, B above. The Committee determined that the Property Management Agreements with the AR Capital Property Manager Defendants whereby the Property Manger Defendants received between 1% and 2% of the management fees was improper. Section VII, B discusses these claims and the Committee's determination as to which Defendants should be pursued. The Committee's determination related to the Property Management Agreements directly connects with its determination on the Framework Agreement.

As the Framework Agreement makes clear, the $37 Million payment made by the Company is directly related to the payments to the AR Capital Property Manager Defendants' management fees of 1% to 2% and corresponding termination of those fees. Similarly, in determining that it is in the best interest of the Company to allow claims to proceed or settle with certain Defendants at this time related to the Property Management Agreements, the Committee has determined it is in the best interest of the Company to pursue damages of $37M in cash and stock issued under the Framework Agreement. Accordingly, the Committee intends to allow claims to proceed as to the following Defendants: the Advisor, the Property Manager Defendants, AR Capital, and Block, Weil, Budko, Schorsch and Kahane.

G.     **The Allegation That The April 2016 Proxy Statement Violated Section 14(a) Of The Securities Exchange Act**

The Plaintiff/Demand Shareholders allege that Defendants Kahane, Mehlman, Hoganson, Wenzel, Perla, and Burns caused the Company to issue the April 2016 Proxy Statement which contained the material misstatement that the Independent Directors or Conflicts Committee had determined that the Company's transactions and relationships with the Advisor during the year ended December 31, 2015 were in accordance with Company policies. They allege that this misstatement caused the shareholders to reelect the Independent Directors which, in turn, allowed them to commit future breaches of fiduciary duty.

As set forth above in Section VI. A. 2. e. to assert a claim for violation of Section 14(a), a plaintiff must not only point to a misstatement in the Company's proxy statement, but also show loss causation and transaction causation. The law is clear that alleged misstatements in proxy materials soliciting the approval of directors' reelection thus, allowing directors' continued mismanagement after reelection, is "precisely the sort of claim that courts have repeatedly found insufficient to satisfy the transaction causation requirement." *Gen. Elec. Co.*, 980 F.2d at 933. Instead, "damages are recoverable under Section 14(a) only when the votes for a specific corporate transaction requiring shareholder authorization, such as a corporate merger, are obtained by a false proxy statement, and that transaction was the direct cause of the pecuniary injury for which recovery is sought." *Id.*

Here, the Plaintiff/Demand Shareholders' allegation fails to establish that the Independent Directors' reelection caused a cognizable harm to the Company under Section 14(a) because the shareholders' votes did not authorize the transactions at issue. *See, e.g., United Canso Oil & Gas Ltd. v. Catawba Corp.*, 566 F.Supp. 232, 237 (D.Conn.1983) (rejecting notion that purported "scheme" of mismanagement lasting 26 years and requiring directors' elections to implement it, is

a "transaction" needing shareholder approval); *see also In re General Tire and Rubber Co. Securities Litig.*, 726 F.2d at 1082; *Gaines v. Haughton*, 645 F.2d at 776–77; *Murray v. Hospital Corp. of America*, 682 F.Supp. 343, 348–49 (M.D.Tenn.1988); *Issen v. GSC Enters., Inc.*, 522 F.Supp. 390, 395 (N.D.Ill.1981); *In re Tenneco Sec. Litig.*, 449 F.Supp. 528, 531 (S.D.Tex.1978*); Limmer v. GTE Corp.*, [1977–78 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,111, 1977 WL 1029 (S.D.N.Y.1977); *Levy v. Johnson*, [1976–77 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,899, 1977 WL 931 (S.D.N.Y.1977).

Accordingly, the Plaintiff/Demand Shareholders' claim fails to establish the necessary elements of loss causation and transaction causation and the Committee determined that it is in the best interest of the Company that Count V of the Milliken Action be dismissed with prejudice against all defendants.

## H.    The Allegation That The Mutual Release Is Void And Unenforceable

As discussed in Section V. Q. above, as a condition to restructuring the property management contracts and terminating the Advisory Agreement, AR Capital not only required the Company to pay $37M in compensation, but also required the Company enter into the Mutual Release.[82] In relevant part, through the Mutual Release, the Company released all claims against the "Advisor Parties,"[83] each of their respective members, partners, equity holders, Affiliates and Representatives, in each case in each of their capacities as such, and the respective predecessors, successors and assigns of the foregoing." This release includes the Advisor, the Property Manager, AR Capital, Kahane, Schorsch, Mehlman, Hoganson, Block, Budko, and Weil in their capacities as

---

[82] Brookfield required the Company restructure the property management contracts and terminate its affiliation with the Advisor as a condition to the Brookfield Transaction.
[83] Defined in the Mutual Release as the Advisor, the Property Manager Defendants and AR Capital.

representatives of the Advisor Parties.  The Mutual Release explicitly carved out any claims "under the Framework Agreement or any document or instrument delivered pursuant to or in connection with the transactions contemplated by Framework Agreement (including, without limitation, this Agreement, but expressly excluding the SPA)."  Accordingly, in relevant part the Company did not release any claims against Kahane, Schorsch, Mehlman, and Hoganson in their capacities as directors and/or officers of the Company.  The Company also did not release claims against any defendant regarding the Framework Agreement.

The claims potentially affected by the Mutual Release are the claims associated with the property management agreements in 2014 through 2016 as they relate to the Advisor Parties (the Property Management Arrangement Claims) discussed in Section II, A., 2. above, and the claims associated with the November 2015 Amendment to the Advisory Agreement, discussed in Section II, A. 3., above (the Cash Asset Management Fee Claims).

Recognizing the importance of this issue, the Committee considered the Shareholder Plaintiff's theories to set aside the Mutual Release, which include that the Mutual Release is void and unenforceable due to (1) lack of consideration and (2) under the theory of unconscionability. The Committee also considered whether other bases may exist to set aside the Mutual Release.

With regard to the Shareholder Plaintiff's first theory, lack of consideration, the Committee determined that it would be challenging to set aside the Mutual Release based upon relevant Maryland law that establishes the general proposition that in a mutual release of liability, the release of liability from each promise constitutes adequate consideration for the other.  *See e.g. Wittstadt v. Hosch*, No. CCB-16-2251, 2016 WL 7157417, at *2 (D. Md. Dec. 8, 2016).

With regard to the Plaintiff's argument concerning unconscionability, the Committee considered that argument and found it equally challenging in light of Maryland law that requires a

133

finding of both procedural and substantive unconscionability to declare a contract void on this ground.   *See Doyle v. Fin. Am., LLC*, 173 Md. App. 370, 918 A.2d 1266, 1274 (Md.Ct.Spec.App.2007).

The Committee also considered whether the Company could set aside the Mutual Release under a breach of fiduciary duty theory.   Maryland law does provide support that a release agreement may be set aside for a breach of fiduciary duty/breach of contract.   Under Maryland law, a director seeking a release agreement from the Company has a fiduciary duty to disclose to the Company the information that would allow the Company to fully evaluate the extent of the release it would give.   *Md. & Va. Milk Producers Ass'n*, 250 Md.  at 74.

The Committee considered whether the Mutual Release could be set aside under a theory of breach of fiduciary duty by the Advisor and corresponding claims of aiding and abetting and unjust enrichment as to the other AR Capital entities and individuals could be pursued.   The Committee considered the likelihood of success on the merits of this claim, contrasted with the potential efforts by the AR Capital related parties to drive up costs in this litigation with potential counterclaims.   The Committee also weighed the fact that the AR Capital related parties substantially undermined the Committee's ability to proceed with claims to set aside the Mutual Release in light of their refusal to cooperate with the Committee by producing documents and information requested or appearing for interviews.   The Committee believes some of the claims purportedly released by the Mutual Release have merit.   That said, based on the Committee's analysis to date, the Committee was unable to review any materials from AR Capital that would have informed its decision. Thus, the Committee believes it is prudent to reserve rights to void the Mutual Release but not to pursue this course of action in the Amended Complaint. The Committee also considered that the same monetary recovery is available from defendants who were otherwise

not purportedly released by the Mutual Release.  The Committee recognizes that the AR Capital Defendants may move to dismiss any action against them on the basis of the Mutual Release, in which case, the Committee recognizes the Plaintiff in this litigation will need to make a strategic assessment regarding how to respond to that potential argument and may ultimately raise this issue in the litigation.

### I.        Jonathan P. Mehlman Settlement

The Committee analyzed each cause of action against Mehlman in the context of the extensive evidence it reviewed over the course of its investigation.  Although the Committee concluded that some of the claims against Mehlman may have merit, it also considered the costs and risks of litigation outlined above and the defenses available to Mehlman.  The Committee also considered the fact that Mehlman is the current Chief Executive Officer of the Company and assessed his role with the Company, including the work he undertook to help secure the completion of the Brookfield transaction and his leadership with respect to the transaction.

During the time period that the Company was externally managed, Mehlman received a 5% interest in the Property Manager Defendants and the Advisor.  The Committee reviewed Mehlman's ownership interest in the Advisor and the Property Manager Defendants, the compensation Mehlman received through his interest, and determined it was in the best interest of the Company to seek return of certain compensation in the form of stock and cash that Mehlman received in connection with: (1) the Property Management fees received by the Property Manager Defendants; (2) the Framework Agreement; and (3) the Amendment to the Advisory Agreement. The Committee discussed a settlement with Mehlman concerning claims asserted against him.  The Committee reached a settlement with Mehlman contingent upon the Court's acceptance of the Committee's conclusion and dismissal with prejudice of claims against Mehlman, which the

135

Committee and the Company will seek from the Court.  The material terms of the settlement agreement, with the full settlement agreement attached hereto as Exhibit Q, are:

1. Mr. Mehlman will repay the Company $250,000 (Two Hundred Fifty Thousand Dollars) in cash; and

2. 16,949 (Sixteen Thousand Nine Hundred Forty-Nine) shares of common stock in HIT (calculated as the equivalent of $250,000 in stock at $14.75 per share).

### J.  Shareholder Claims Involving Officers and Independent Directors

As discussed above, the Company's Independent Directors[84] and Officers[85] participated in the Company's actions involving the Property Management Arrangements, the Amendment to the Advisory Agreement and the Framework Agreement.  The Independent Directors also approved the Company's entrance into the Mutual Release.

The shareholder claims against the Company's Independent Directors with respect to the Property Management Arrangements, the Amendment of the Advisory Agreement, and the Framework Agreement include breach of fiduciary duty, waste of corporate assets, and breach of contract.[86] The shareholder claims against the Independent Directors with respect to the Mutual Release (as an alternative theory of recovery in the event the Mutual Release cannot be voided) include breach of fiduciary duty. The claims against the Company's Officers with respect to the Property Management Arrangements, the Amendment to the Advisory Agreement, and the Framework Agreement include breach of fiduciary duty.

---

[84] The Company's Independent Directors include Abby Wenzel, Stanley Perla and Robert Burns.

[85] The Company's Officers include Jonathan P. Mehlman, the Chief Executive Officer, and Edward Hoganson, the Chief Financial Officer.

[86] Shareholder claims against the Independent Directors involving acquisition of properties and the Company's proxy statement are addressed in other sections of this Report.

Section 2-405.1 of the Maryland Code, Standard of Care Required of Directors, sets forth the standard of care imposed on directors of Maryland corporations. Section 2-405.1 of the Maryland Code provides that a director of a corporation shall act: in good faith;[87] in a manner the director reasonably believes to be in the best interests of the corporation;[88] and with the care that an ordinary person in a like position would use under similar circumstances.[89] Section 2-405.1(g) provides that "An act of a director of a corporation is presumed to be in accordance with subsection (c) of this section."[90] The standard of care for officers of Maryland corporations is similar to the standard of care of directors under Section 2-405.1 of the Maryland Code.[91]

Section 2-405.2 of the Maryland Code provides that the charter of a corporation may include a provision expanding or limiting the liability of its directors and officers to the corporation or its stockholders. Section 5-418 of the Maryland Code provides that the charter of a corporation may include a provision limiting the liability of its directors and officers to the corporation or its stockholders for money damages, unless the officer or director improperly benefited from the transaction or engaged in active dishonesty. Section 12.2(a) of the Company's Charter includes a provision that purports to limit the liability of directors and officers for money damages. As a

---

[87] Good faith, in the context of a director of a corporation, is the absence of a desire to obtain a personal benefit or a benefit for some person other than the corporation. Maryland's good faith formulation is similar to the common law duties of loyalty or fair dealing which are applicable in other states.

[88] The requirement that a director have a reasonable belief that an action is in the best interest of the corporation means that there must be some rational basis for the director's action, that the director must have knowledge of that basis and that the director's performance must be based upon that knowledge.

[89] The requirement that a director exercise the care that an ordinarily prudent person in a like position would use under similar circumstances focuses upon the process by which a decision is made rather than on the wisdom of the decision or the results of the decision.

[90] This provision codifies the business judgment rule and creates a presumption that directors acted in accordance with the standards of Section 2-405.1(c).

[91] Officers of a Maryland corporation owe duties of loyalty, good faith and candid disclosure. An officer of the corporation must place the interests of the corporation ahead of his own, refrain from competing with the corporation and disclose to other more senior officers or the board all material information. An officer of a corporation must also exercise reasonable care in the performance of his/her responsibilities. *Hale Trucks of Maryland, LLC v. Volvo Trucks North America, Inc.* 224 F. Supp. 2d 1010 (D. Md. 2002).

result, neither the Independent Directors nor Officers in their capacity as such would be liable to the Company for money damages, unless they improperly, personally benefited from the relevant action or engaged in active dishonesty.

With respect to the Property Management Arrangements, the Board, on December 6, 2013 approved the form of a Manager Agreement and a Sub-Manager Agreement.  Following the closing of the Barcelo Transaction, the Management Agreement and the Sub-Manager Agreement were used with respect to properties acquired by the Company.  On May 28, 2014, Wenzel and Perla ratified the execution of the Property Management Agreements with respect to four properties acquired as part of the Barcelo Transaction.  In subsequent years, the Independent Directors approved the payment of fees to the Property Managers.  Based upon its investigation, the Committee has determined that the Independent Directors, in approving the use of and payment to the Property Managers, did not take into account the provision of the Advisory Agreement which provided that the Advisor shall "oversee, supervise and evaluate Affiliated and non-Affiliated property managers who perform services for the Company or the Operating Partnership." Furthermore, from the Committee's investigation, it understands that the Independent Directors relied largely on the officers and other directors of the Company, including individuals associated with AR Capital (e.g., Kahane) regarding the role of the Property Manager and propriety of getting paid a fee and were not aware that the Property Manager did not employ the personnel necessary to oversee the managers of the properties acquired by the Company.  The Committee has concerns about their reliance without independent review of the situation.  The Committee believes that after assessing the actions and inactions discussed above, the Independent Directors should have likely taken additional action to ensure that the Company complied with the provision of the Company's Charter which provides that the "Company shall not engage in any other transaction

with the Sponsor, a Director, the Advisor, or any Affiliates thereof unless a majority of the Directors (including a majority of the Independent Directors) not otherwise interested in such transaction approve such transaction as fair and reasonable to the Company and on terms and conditions not less favorable to the Company than those available from unaffiliated third parties." The Committee understands that the Independent Directors relied on individuals associated with AR Capital including those that were officers and directors of the Company, the Advisor, as well other individuals associated with the Company, to help determine the Property Management arrangements were in the best interest of the Company. As set forth herein, the Committee has determined that the Property Management arrangements as they relate to payments to the Property Manager Defendants were not in the best interest of the Company. As part of its analysis, the Committee assessed Maryland law and the Company Charter, including but not limited to §2-405.1(d) of the Maryland Code that states directors of Maryland corporations can rely on information presented by officers or other professionals whom the director reasonably believes to be reliable.

The Independent Directors also approved the Amendment to the Advisory Agreement which provided for the payment of cash asset management fees to the Advisor rather than Class B units of the Operating Partnership. The Independent Directors initially approved the Amendment to the Advisory Agreement by email soon after receiving an email which attached the proposal for the Amendment to the Advisory Agreement. The Advisor delivered to the Independent Directors a brief memorandum to explain the basis for the request. The Committee understands that the Independent Directors relied on the recommendation of the Advisor for the request. The Committee understands that the Independent Directors did not otherwise seek consultation of an outside financial advisor with respect to the proposal to amend the Advisory Agreement to provide

139

for cash asset management fees.  The Committee has concern regarding the Independent Directors'
acceptance of the Amendment to the Advisory Agreement without taking separate independent
review of a substantiated basis for the request.  That said, before approving the Amendment to the
Advisory Agreement, Perla contacted Kahane and Hoganson to express concern over the
Company's ability to close all of the SWN Transactions and to seek confirmation that Company
Management was comfortable with the Amendment to the Advisory Agreement. The Independent
Directors obtained a clarification to the proposal to amend the Advisory Agreement which added
an MFFO threshold that had to be met in order for the asset management fee to be paid in cash for
a given period.  The Amendment to the Advisory Agreement resulted in a benefit to the Advisor
and its indirect owners, but did not result in benefits to Company.  Also, as a result of the
Amendment to the Advisory Agreement, the Company paid the Advisor approximately $26M and
at least some of these funds were paid to the Advisor during a period in which the Company was
experiencing difficulty in closing on certain of the SWN properties and ultimately forfeited
deposits on certain properties which resulted in losses to the Company of approximately $41M.
The approval of the Amendment to the Advisory Agreement by the Independent Directors was of
concern to the Committee in light of the fact that it brought no value to the Company.  Like the
Property Management Arrangement Claims above, the Committee notes that the Independent
Directors were not the parties who proposed the Amendment to the Advisory Agreement, which
the Committee understands was requested by AR Capital and the Advisor.

Further, the Independent Directors approved certain agreements in connection with the
internalization of the management of the Company, including the Framework Agreement, pursuant
to which the Company paid approximately $37M which related to the restructuring of the Property
Management Agreements.  The Independent Directors also approved the Company's entrance into

the Mutual Release which released the Company's claims against the AR Capital related individuals and entities for certain claims.[92]  The Committee assessed the substantial undertaking by the Company and the Independent Directors to assess options to solve the liquidity crisis that began in November 2015 whereby the Independent Directors accepted what appears to have been the best option available to them with the Brookfield transaction without which the Company would likely have shut down in the near term.

With regard to Mehlman and Hoganson, from the Committee's investigation, the Committee understands that both individuals were aware that the Advisor was obligated to oversee the managers of the properties that the Company acquired.  The Committee also understands that both individuals were aware that Property Managers were being paid a fee for oversight of the Sub-Managers but as discussed herein the Committee has concerns that the Property Manager did not undertake its obligations nor did it have the personnel necessary to do so. Furthermore, the Committee has concerns that the Advisor was already being paid fees to oversee the property managers.

During the course of the investigation, the Committee, with the assistance of counsel, reviewed documents relating to the Property Management Agreements, the Amendment to the Advisory Agreement, the Mutual Release, and the Framework Agreement and interviewed Officers, Independent Directors and other persons regarding the role of Officers and Independent Directors in the actions that resulted in the Company's entering into such agreements, including

---

[92] In relevant part, through the Mutual Release, the Company released all claims against the "Advisor Parties," each of their respective members, partners, equity holders, Affiliates and Representatives, in each case in each of their capacities as such, and the respective predecessors, successors and assigns of the foregoing." The Mutual Release specifically excluded the Framework Agreement and the corresponding agreements such as the Mutual Release, but specifically included the SPA.

whether such persons engaged in active dishonesty or personally benefited from their involvement in or actions with respect to the Property Management Arrangements, the Amendment to the Advisory Agreement, the Mutual Release, and the Framework Agreement.   Ultimately, the Committee concluded that the Independent Directors and the Chief Financial Officer Ed Hoganson did not engage in active dishonesty and did not improperly, personally benefit from the Property Management Arrangements, the Amendment to the Advisory Agreement, the Mutual Release, or the Framework Agreement.  Furthermore, in addition to the limitations of liability under Maryland law, the Committee also assessed the Charter provisions that requires the Company to hold independent directors harmless but for gross negligence.   In light of the determinations set forth in this Report, coupled with the limitation on liability provided by Maryland law and the Company's Charter and assessing what is in the best interest of the Company, the Committee determined it appropriate that the claims against the Company's Independent Directors and the Chief Financial Officer be dismissed with prejudice.   The Committee did conclude that the Company's Chief Executive Officer benefited from agreements entered into by the Company and discussions between the Committee and the Chief Executive Officer regarding those concerns and the settlement in principle are discussed above.

## VIII.   CONCLUSIONS

Throughout its investigation and in reaching these conclusions, the Committee considered the legal and factual strengths and weaknesses of the claims asserted against each defendant, and also considered numerous factors that go to the calculus of the ultimate issue of whether pursuing such claims would be in the best interests of the Company.

Among the factors considered by the Committee were:

- the cost and expense of litigation;

142

- potential disruption to the business of the Company as a result of litigating against past and present officers and directors of the Company;

- the traditionally high burden of establishing liability of corporate officers and directors in the face of protective statutory and case law;

- the Company's obligations regarding indemnification and advancement of defense costs;

- the exculpatory clause of the Company's charter barring claims against directors and officers subject to the limitations of Maryland discussed in Section VI. B.;

- the applicability of the business judgment rule (Md. Code Ann., Corps. & Ass'ns § 2-405.1(g)) barring liability of officers and directors for decisions made on behalf of the Company with care, in good faith, and with a reasonable belief that such act is in the best interest of the Company;

- the entire fairness of the transactions at issue;

- the applicability of statutes of limitation;

- the right of officers and directors to reasonably rely on the opinions of experts and other professionals and advisors if reliance is warranted;

- considerations regarding insurance coverage and the likelihood of recovering money damages;

- potential effects on the Company's current and future business relationships; and

- possible effects on the Company's other litigation risks.

The conclusions set forth below reflect the Committee's business judgment in light of all the factors set forth above considered during the course of the Committee's investigation and deliberations.

The Committee will address its conclusions in categories, beginning with the Company's management (Hoganson, Mehlman), the Company's current and former directors (Perla, Burns and Wenzel and Kahane), the Company's former Advisor and the remaining defendants associated with AR Capital.

### 1.    Company Management

#### a.    Ed Hoganson

The Committee concludes that it is not in the best interest of the Company to pursue any cause of action against Hoganson.  As the Chief Financial Officer of the Company, Hoganson did not play a significant role in many facets of the causes of action alleged against him.  The Committee analyzed each cause of action in the context of the extensive evidence it reviewed over the course of its investigation.  The Committee also reviewed the Company's limitations on liability for its directors and officers which exculpates conduct to the extent permitted under Maryland law.

Here, the Committee concluded that in light of the facts and law, the limitations on liability, the unlikely chance of success on the merits, and the balance of the factors articulated in the general conclusion section above, it is not in the Company's best interest to pursue claims as to Hoganson.

> ### b.    Jonathan Mehlman

The Committee pursued a settlement with Mehlman concerning all claims asserted against him.  The Committee reached a settlement with Mehlman contingent upon the Court's acceptance of the Committee's conclusion and dismissal with prejudice of claims against Mehlman, which the Committee and the Company will seek from the Court.  The material terms of the settlement agreement, with the full settlement agreement attached hereto as Exhibit Q, are:

1. Mr. Mehlman will repay the Company $250,000 (Two Hundred Fifty Thousand Dollars) in cash; and

2. 16,949 (Sixteen Thousand Nine Hundred Forty-Nine) shares of common stock in HIT (calculated as the equivalent of $250,000 in stock at $14.75 per share).

> ## 2.    Current and Former Directors

> ### a.    Perla, Burns and Wenzel

The Committee concludes that it is not in the best interest of the Company to pursue any cause of action against Perla, Burns and Wenzel.

The Committee analyzed each cause of action in the context of the extensive evidence it reviewed over the course of its investigation.  The Committee also reviewed the Company's limitations on liability for its directors as discussed in Section II. B. above.  In assessing these issues the Committee determined that in light of the Company's limitations on liability, the unlikely chance of success on the merits, and the balance of the factors articulated in the general conclusion section above, it is not in the Company's best interest to pursue claims as to Perla, Burns and Wenzel.

### b.      William Kahane

The Committee concludes that it is in the best interest of the Company to allow claims for breach of fiduciary duty (failure to satisfy statutory duties under Md. Code Ann., Corps. & Ass'ns § 2-405.1) and corporate waste against Kahane for the Cash Asset Management Fee Claim and Property Management Arrangement Claims to proceed.  The Committee concludes it is in the best interest of the Company to allow claims for unjust enrichment against Kahane in connection with the Framework Agreement to proceed but reserves rights regarding additional unjust enrichment claims as the litigation proceeds in light of the Mutual Release.

### c.      Nicholas Schorsch

The Committee concludes that it is in the best interest of the Company to allow claims for breach of fiduciary duty (failure to satisfy statutory duties under Md. Code Ann., Corps. & Ass'ns § 2-405.1) and corporate waste against Schorsch for the Property Management Arrangement Claims to be pursued, reserving rights to add additional claims as discussed above and as the Company sees fit as the current litigation proceeds. The Committee concludes it is in the best interest of the Company to allow claims for unjust enrichment against Schorsch in connection with the Framework Agreement to be proceed but reserves rights regarding additional unjust enrichment claims as the litigation proceeds in light of the Mutual Release.

### 3.      The Advisor

The Committee concludes that it is in the best interest of the Company to allow claims for breach of fiduciary duty, breach of contract, and unjust enrichment against the Advisor related to Framework Agreement to proceed, reserving rights regarding additional claims as discussed above and as the Company sees fit as the current litigation proceeds.

4. *The Property Manager, AR Capital, and Messrs. Block, Weil, and Budko*

The Committee concludes that it is in the best interest of the Company to allow claims for unjust enrichment and aiding and abetting against AR Capital to proceed and unjust enrichment against the Property Manager, AR Capital, and Messrs. Block, Weil and Budko related to Framework Agreement, reserving rights to add additional claims as discussed above and as the Company sees fit as the current litigation proceeds.

## IX.   NEXT STEPS

The Committee will be working with the Company to submit court filings consistent with the Committee's determinations in this Report. The Company will request:

- Certain claims and parties be dismissed with prejudice pursuant to the determinations in this Report;

- The Court approve the attached settlement agreement between the Company and Mr. Mehlman and dismiss all claims against him as alleged in the Amended Complaint with prejudice;

- Provide leave to further amend the Amended Complaint consistent with the Committee's determinations in this Report; and

- Correspond with counsel for Dr. Wollman in response to his demand letter and transmit a copy of this Report to notify him of the Committee's conclusions.

Respectfully submitted to the Company, this 11th day of October, 2019.

_____
Ed Glickman
Special Litigation Committee Member

_____
Steve Joyce
Special Litigation Committee Member

147